James S. Yu, Esq.
**SEYFARTH SHAW LLP**
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Plaintiffs
Capstone Logistics Holdings, Inc.,
Capstone Logistics, LLC, and
Pinnacle Workforce Logistics, L.L.C.

17 CV 4819

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

CAPSTONE LOGISTICS HOLDINGS, INC.,
CAPSTONE LOGISTICS, LLC, and PINNACLE
WORKFORCE LOGISTICS, L.L.C.,

                    Plaintiffs,

      - against -

PEDRO NAVARRETE, DAVID
POFFENBERGER, STEVEN WILLIS, MARIO
ROJAS, and HUMANO, LLC,

                    Defendants.

-------------------------------------------------------------x

Civil Action No. _____

**COMPLAINT**



Plaintiffs Capstone Logistics Holdings, Inc. ("Capstone Inc.") and its subsidiaries, Capstone Logistics, LLC ("Capstone LLC") and Pinnacle Workforce Logistics, L.L.C. ("Pinnacle" and collectively with Capstone Inc. and Capstone LLC, "Capstone," the "Company" or "Plaintiffs"), by and through their undersigned attorneys, Seyfarth Shaw LLP, as and for their Complaint against Defendants Pedro Navarrete ("Navarrete"), David Poffenberger ("Poffenberger"), Steven Willis ("Willis,"), Mario Rojas ("Rojas," and together with Navarrete, Poffenberger and Willis, the "Individual Defendants"), and Humano, LLC ("Humano" and collectively with the Individual Defendants, the "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is a case involving theft on a national scale of Plaintiffs' business.  Capstone, one of the largest workforce logistics providers in the United States, recently learned that at least four of its former high-level executives -- including Pinnacle's former President, Navarrete -- are now operating Humano, a competing logistics business, and are actively soliciting Capstone's customers and employees, resulting thus far in the loss of at least one significant customer and over 30 employees throughout the country.  Such conduct is in direct violation of the contractual agreements that three of the Individual Defendants – Navarrete, Poffenberger, and Willis (together, the "Equity Defendants") – had with Capstone, Inc., which acquired Pinnacle in 2015 and purchased the Individual Defendants' ownership interests in Pinnacle.

2.      As a consequence of that buy-out, the Individual Defendants were paid collectively over **$4 million**.  Furthermore, the Equity Defendants were offered and agreed to participate in an equity incentive plan when they each executed a Restricted Stock Award Agreement (the "RSA Agreement(s)") with Capstone, Inc.  In consideration thereof, their continued high level positions within the Company, and their unfettered access to Capstone's confidential information and trade secrets, the RSA Agreements include covenants not to compete and not to solicit any of Capstone's customers or employees for a period of two years after separation of employment.

3.      Despite these express contractual and legal obligations, Defendants are in the process of siphoning business away from Capstone and orchestrating a mass exodus of Capstone employees aided by their theft and use of the Company's confidential and trade secret information.  Such information includes, but is not limited to, contracts negotiated with each one of Capstone's customers, its cost-per-unit model based upon years of experience and application, pricing information, customer sites, distribution centers, proprietary technology, carrier

information, negotiated rebates, compensation information relating to each Capstone employee, the years of data Capstone has compiled or acquired about the industry, and other strategic information relating to Capstone's business practices, projections and finances.

4.      **Indeed, forensic evidence obtained this week confirms that Defendants are currently in possession of highly sensitive data, including information relating to one of Capstone's top customers, and that Defendants accessed this information as recently as June 18, 2017.**

5.      The transition of a major customer and over 30 employees to Humano -- a company that was just formed in February -- could not have been accomplished overnight.  Upon information and belief, Defendants started conspiring to irreparably harm Capstone after Navarrete was ousted from the Company in May 2016, when Capstone discovered he had given unlawful kickbacks to a customer.   In February 2017, unbeknownst to Capstone, Navarrete registered Humano, putting into action his scheme to start a competing business assisted by his closest former colleagues within the Company.

6.      Around the same time Humano was formed, defendant Poffenberger, then Senior Vice President of Operations for Capstone, abruptly gave notice of his resignation, but not before emailing to his personal email account extensive pricing information relating to each one of Capstone's customer sites.  Poffenberger then completely "wiped" his work computer before returning it to the Company.

7.      When asked about his post-termination plans, Poffenberger indicated to Capstone that he planned to either teach at a local community college or work for a non-competing third-party logistics provider.  This was obviously a lie.  What's more, a review of Poffenberger's Company emails in the days leading up to his departure revealed that he was communicating with an established customer, DPI Specialty Foods, Inc. ("DPI") -- for which he had operational

responsibility -- by phone, email and in person concerning his impending separation from Capstone and future plans. On May 26, 2017, DPI terminated its contract with Capstone and began transitioning all of its business to Humano.

8.      Just one week before DPI terminated its seven-year relationship with Capstone, defendant Willis -- who was responsible for Capstone's operational performance with DPI -- also abruptly announced his resignation. At that time, Willis informed Capstone that he was planning to manage a third party distribution center close to his home, which would allow him to spend more time with his family. This was also obviously a lie. Because Capstone had no reason to believe Willis was in fact secretly intending to work for Humano, nor did it have knowledge that Humano existed, Capstone still involved him in the DPI relationship up to June 1, 2017. Immediately after leaving Capstone, Willis joined Humano and, like Poffenberger, completely "wiped" his computer before returning it.

9.      The very same day that DPI gave its notice of termination, Rojas, Senior Director of Partnership, also resigned, effective June 9, 2017. Rojas's primary role in the Company was to manage the relationship of one of Capstone's largest customers, referred to hereinafter to protect its identity as "Customer X." Upon information and belief, Rojas was recruited by the other Defendants to usurp Capstone's valuable relationship with Customer X. Capstone has in fact received confirmation that Defendants are soliciting Customer X, which has sites throughout the country, including in New York.

10.     Although Rojas also attempted to "wipe" his computer clean before returning it, a forensic investigation of his computer indicates that Rojas is currently in possession of a USB flash drive containing at least 35 files, several of which is confidential information relating to Capstone's customers, customer sites, associates, and financials, including that of Customer X. Furthermore, on June 18, 2017 -- over a week after he already left the Company -- Rojas

4

accessed two files from that flash drive, one of which contains the pay model used by Capstone at its largest site for Customer X.

11.     The Defendants' overarching plan is clear -- to steal Plaintiffs' customers and employees on behalf of their new competing venture, despite having been paid over $4 million for their interests in Pinnacle.  To further expedite their theft of Capstone's business, Defendants have systematically recruited several other Capstone employees and associates -- including a Senior Business Analyst, a recruiter, site mangers, and warehouse associates -- armed with knowledge of their exact salaries and wages.  By aiding, abetting, and acting in concert with each other, Defendants have successfully diverted Capstone business to Humano, misappropriated Capstone's confidential and trade secret information, and poached dozens of Capstone's employees, all while pretending to devote their honesty and loyalty to the Company.

12.     With this action, Plaintiffs seek injunctive relief, compensatory and punitive damages against each Defendant arising from their contractual, statutory and/or common law violations, and other misconduct including but not limited to, breaches of their agreements with Plaintiffs, misappropriation and misuse of Plaintiffs' confidential and trade secret information, tortious interference, and unfair competition.

13.     Absent injunctive relief, Capstone faces irreparable injury, including the loss of customers, its competitive advantage, its trade secrets and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of this Court.

## THE PARTIES

14.     Plaintiff Capstone Inc. is a Delaware corporation with its principal place of business located in Peachtree Corners, Georgia.

15.     Plaintiff Capstone LLC is a Delaware limited liability company wholly owned by Capstone Inc.  Accordingly, for diversity purposes, Capstone LLC is considered a citizen of the States of Delaware and Georgia.

16.     Plaintiff Pinnacle is a Delaware limited liability company wholly owned by RWS Holdings, LLC, which is in turn wholly owned by Capstone LLC.  Accordingly, for diversity purposes, Pinnacle is also considered a citizen of the States of Delaware and Georgia.

17.     Upon information and belief, defendant Navarrete is a citizen of the State of California and resides at 15768 Via Santa Pradera, San Diego, California 92131.

18.     Upon information and belief, defendant Poffenberger is a citizen of the State of California and resides at 16868 Suttles Drive, Riverside, California 92504.

19.     Upon information and belief, defendant Steven Willis is a citizen of the State of California and resides at 4422 Nogal Avenue, Yorba Linda, California 92886.

20.     Upon information and belief, defendant Rojas is a citizen of the State of Texas and resides at 8237 Snow Goose Way, Fort Worth, Texas 76118.

21.     Defendant Humano is a California limited liability company with a principal place of business located in San Diego, California.  Upon information and belief, Navarrete is Humano's sole member.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.00 excluding interest and costs.

23.     This Court also has original subject matter jurisdiction under 28 U.S.C. § 1331, because this action involves a claim arising under the laws of the United States, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, et seq., and supplemental jurisdiction under 28

U.S.C. § 1367 because all other claims are so related that they form part of the same case or controversy.

24.     This Court has personal jurisdiction over Navarrete, Poffenberger and Willis, and venue is proper in this District by reason of their execution of the RSA Agreement, in which they each consented to the jurisdiction of the state and federal courts located within the Southern District of New York.  Capstone's ultimate parent is also headquartered in New York.

25.     This Court has personal jurisdiction over Navarrete and Poffenberger and venue is proper in this District by reason of their execution of the Pinnacle Agreements (defined below), in which Navarrete and Poffenberger each consented to the jurisdiction of the courts of any jurisdiction within the United States in which a breach of their obligations therein occurred.

26.     This Court has personal jurisdiction against Rojas insomuch as Rojas conducts business in New York, conspired to commit tortious acts in New York, and is a closely related party by reason of him knowing, acting in concert with, aiding and abetting, and/or conspiring with Navarrete, Poffenberger, and Willis to breach their RSA Agreements, each of which specifies the Southern District of New York as the exclusive forum in which any suit can proceed.

27.     This Court has personal jurisdiction against Humano insomuch as Humano is owned and wholly controlled by Navarrete, conducts business in New York, and is a closely-related party by reason of it knowing, acting in concert with, aiding and abetting, and/or conspiring with Navarrete, Poffenberger, and Willis to breach their RSA Agreements, each of which specifies the Southern District of New York as the exclusive forum in which any suit can proceed.

28.     Moreover, general and specific jurisdiction exists against Defendants based on their contacts with this jurisdiction, the fact that they each conduct business in New York,

committed tortious acts against Plaintiffs in New York, and/or caused harm to Plaintiffs in New York.

## ALLEGATIONS COMMON TO ALL COUNTS

**I.   Capstone's Business and Its Confidential and Trade Secret Information.**

29.     Capstone is one of the nation's largest non-asset-based warehouse labor providers.  With very limited exceptions, Capstone does not own or manage the buildings it operates in, nor does it own the equipment it utilizes; rather Capstone provides a workforce trained to provide various logistics and support services in its customers' warehouses and distribution centers, utilizing the customers' equipment.

30.     More specifically, among the services provided by Capstone are the following: warehouse and distribution unloading and shipping, pallet management, inbound and outbound freight hauling, plant maintenance, and warehouse labor services, among other manufacturing and distribution operations.  Capstone unloads over five million loads -- three billion cases -- per year across a network of hundreds of operating locations and distribution centers throughout the United States and Canada, including in New York.

31.     Capstone serves distribution and manufacturing operations in a variety of industries, including automotive, retail, food service, grocery retail and wholesale, home improvement, electronics and appliances among others.  Many of Capstone's customers are Fortune 500 companies, some of which are headquartered or have logistics operations in New York.

32.     Each customer contract is extensively negotiated based upon a customer's specific and particular needs, and is deemed highly confidential.  Capstone uses a proprietary software program to determine prices per load based upon the operations of each customer site, the

carrier, and any applicable rebates.   Capstone will then work with both the carrier and the customer to coordinate loading and delivery.

33.     In addition, Capstone uses a proprietary, dynamic operating and reporting system which enables it to accurately capture multiple data points for each activity performed.   This provides customers with, among other things, enhanced data analysis and information for any period of time and at any level of the operational hierarchy to help improve performance.

34.     Because customers entrust the handling of their business and their confidential information to Capstone, an essential aspect of the Company's business model is to protect its customer relationships, reputation and goodwill.   These customer relationships are critical to Capstone's success because long-term business relationships with established customers allow Capstone to maintain its strategic position in the industry.

35.     Capstone's retention of business relationships with customers results not only from its successful performance of a broad range of logistics services, but is also driven by its continuous efforts and investment of substantial money and resources to improving innovations for customers over time and the development of industry-related data, about which Capstone has developed confidential and trade secret information.

36.     The foregoing confidential, proprietary and/or trade secret information is not generally known to the public.

37.     Capstone's confidential, proprietary and/or trade secret information would give a competitor who acquired it an unfair competitive advantage by, among other things: (a) not having to expend the time and resources to develop the customer relationships or information as Capstone has done; and (b) allowing the competitor to unfairly compete against Capstone by, among other things, having access to such information, such as pricing.

38.     Capstone protects its confidential, proprietary, and/or trade secret information by, among other safeguards: (a) requiring employees to sign non-disclosure agreements; (b) storing information on password protected desktop computers, servers and off-site secure cloud storage environments; (c) limiting access to it to select employees only; (d) requiring employees to agree to comply with the Company's confidentiality policies, and acknowledging that all property on the Company's computers is the property of the Company; and (e) requiring employees to return all company information upon termination without damage.

39.     Capstone's policies with respect to its property and the treatment of company property, including its confidential and trade secret information, are expressly described in the Company's Associate Handbook, the most recent version of which is dated April 2016 (the "Handbook") and was rolled out in or around July 2016.  Relevant excerpts of the Handbook are attached hereto as **Exhibit A**.

40.     With respect to Capstone's property and electronic information stored on computer devices, the Handbook states:

- In the event of an Associate's separation of employment from Capstone, the Associate agrees to return all property/equipment in good condition without damage. (Handbook, at 16.)

- Computers, computer files, the e-mail system, and software furnished to Associates are the property of Capstone and are intended for business use.  Associates should not use an unauthorized password, access a file, or retrieve any stored communications without authorization.  (Handbook, at 17.)

- **All data on information systems at Capstone is classified as proprietary information, including the Capstone intranet system.** (Handbook, at 17 (emphasis in original.))

- **All data stored on Associates personal devices -- otherwise known as BYOD - (Bring Your Own Device) will adhere to the Internal and Electronic Communication Policy.** (Handbook, at 17 (emphasis in original.))

- Unauthorized use, destruction, modification, and/or distribution of Capstone information or information systems is strictly prohibited.  (Handbook, at 17.)

- All e-mail on the Capstone information systems, including personal e-mail, is the property of Capstone.  This includes data stored on company issued devices or Associate owned devices.  (Handbook, at 17.)

41.     The Handbook also makes clear that customer information is considered confidential.  In this regard, the Handbook states:

> Capstone Customers/Partners and other parties with whom Capstone does business entrusts Associates of Capstone Logistics with important information relating to their businesses.  It is Capstone's policy that all information considered confidential will not be disclosed to external parties or to Associates without a "need to know."  If there is a question of whether certain information is considered confidential, the Associate should first check with his /her immediate supervisor.

42.     Executives and managers within the Company, such as the Individual Defendants, are not only required to abide by the Company's policies, but also have a duty to make sure that employees and their reports are also complying with these policies, to effect a culture of confidentiality, and to maintain best practices with respect to information governance throughout the workplace.

## II.      Capstone's June 12, 2015 Acquisition of Pinnacle.

43.     In early 2015, Capstone management was approached by investment bankers seeking to gauge Capstone's interest in acquiring Pinnacle.  At the time, Pinnacle was one of Capstone's largest competitors in the non-asset-based warehouse logistics industry, operating 98 sites in 26 states in the U.S. – including New York – and 2 provinces in Canada.

44.     Notably, the marketing materials provided to Capstone repeatedly stressed the "sticky" nature of Pinnacle's customer relationships, noting an average tenure of 11 years and a 90% year-over-year customer retention rate.  This was a critical factor in Capstone's valuation of Pinnacle; because Pinnacle, like Capstone, did not own the buildings it operated in or the equipment that it utilized, its value rested primarily in its customer contracts and the goodwill associated with those relationships.

11

45.    Following a due diligence period, on May 8, 2015, Capstone entered into an agreement to acquire Pinnacle and its affiliates (the "Pinnacle Acquisition"), and the transaction closed on June 12, 2015.

46.    Each of the Individual Defendants maintained an ownership interest in Pinnacle prior to the Pinnacle Acquisition.  As a result of that transaction, Navarrete received just shy of $3 million, Poffenberger received over $1 million, and Willis and Rojas each received approximately $120,000.  These amounts do not include additional funds in escrow that were released to them and additional amounts in connection with certain tax refunds that will be paid to them.

### III.    The Individual Defendants' Employment with the Company.

47.    Each of the Individual Defendants was a Pinnacle employee at the time of the Pinnacle Acquisition, and they each continued in their same respective roles with Capstone after the acquisition.

48.    Navarrete served as the President between 2010 through May 29, 2016.  In that role, he had overall responsibility for the Company's customer-facing operations across the country (48 states and 2 Canadian provinces following the Pinnacle Acquisition).  As set forth in more detail below, Navarrete was forced to resign from Capstone after certain improprieties relating to a customer came to light.

49.    Poffenberger served as the Senior Vice President of Operations from 2009 through March 11, 2017.  In this role, Poffenberger bore ultimate responsibility for Capstone's operational performance for, and relationship with, the customers assigned to him and managed more directly by the Vice Presidents reporting to him.  At various times throughout his tenure with the Company, Poffenberger was responsible for customers headquartered in, among other

states, New York, Rhode Island, Georgia, Tennessee, New Hampshire, Illinois, California, and Arizona.

50.     Willis served as Vice President of Operations until June 2, 2017.  As Vice President of Operations, Willis was responsible for Capstone's operational performance with respect to the customers assigned to him, as well as maintaining Capstone's relationships with those customers from the site-level up to corporate management.  At various times throughout his tenure with the Company, Willis was responsible for customers headquartered in New York, Rhode Island, Florida, Idaho, and several other states.

51.     Although Rojas held a number of job titles over the years (his last title with Capstone was Senior Director of Partnership), his job duties remained constant.  Both before and after the Pinnacle Acquisition, Rojas functioned as a dedicated senior account executive for Customer X, one of Capstone's five largest customers.  In that role, Rojas was responsible for ensuring customer satisfaction, launching customer initiatives, and supplementing operations when necessary.  Customer X maintains a site in New York that is serviced by Capstone.

52.     As a function of their positions within the Company, each of the Individual Defendants had access to all of Capstone's confidential and trade secret information, including information relating to each one of Capstone's customers and their specific contracts, as well as information relating to pricing, customer sites, distribution centers, and employee salaries, among other information.

53.     Each of the Individual Defendants was also responsible for maintaining Capstone's goodwill and relationship with a number of long-standing, well-established and valuable customers.  Capstone's relationship with these customers generated millions of dollars in annual revenues.

## IV.     The Restricted Stock Award Agreements.

54.     As an additional consequence of the Pinnacle Acquisition, the Equity Defendants each agreed to participate in an equity incentive plan by executing the RSA Agreement with Capstone, Inc., effective July 6, 2015.

55.     A copy of Navarrete's signed RSA Agreement is attached hereto as **Exhibit B**.

56.     A copy of Poffenberger's signed RSA Agreement is attached hereto as **Exhibit C**.

57.     A copy of Willis's signed RSA Agreement is attached hereto as **Exhibit D**.

58.     To further protect Capstone's trade secrets, confidential and other proprietary information, and in consideration for access to such information and their participation in the equity incentive plan, the RSA Agreement contains express non-compete and non-solicitation covenants governing the protection and treatment of Capstone's confidential information.

59.     Specifically, with respect to the Equity Defendants' confidentiality obligations, Section 8(b) of the RSA Agreement provides in pertinent part:

> Participant recognizes and acknowledges that Participant has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries (the "Confidential Information"), and that such Confidential Information constitutes valuable, special and unique property of the Company.   The term Confidential Information will be interpreted to include all information of any sort (whether or embodied in a tangible or intangible form) that is (i) related to the Company's and its Subsidiaries' current or potential business (including information received by the Company or any of its Subsidiaries for third parties), and (ii) is not generally or publicly known.  Participant agrees not to disclose or use for Participant's own account any Confidential Information without the Board's prior written consent . . . . Participant acknowledges and agrees that all notes, records, reports, sketches, plans, unpublished memoranda or other documents, whether in paper or electronic form (and copies thereof), held by Participant concerning any information relating to the Company's and its Subsidiaries' business, whether confidential or not, are the property of the Company and will be promptly delivered to it upon the termination of Participant's ownership of Participant's Securities.

14

60.     Each of the Equity Defendants also agreed in Section 8(c) of the RSA Agreement

to the following non-solicitation provision:

> During the Restricted Period [defined as "the period ending on the two (2)
> year anniversary of the termination of Participant's employment by the
> Company or any of its subsidiaries], the Participant shall not, directly or
> indirectly, and will cause its employees, agents and affiliates not to, induce
> or attempt to induce any employee, sales representative, consultant or
> other agent of the Company or any of the Company Subsidiaries to
> terminate his, her or its relationship with, or breach any agreement with,
> the Company or such Company Subsidiary, provided that any general
> solicitation not specifically directed to the employees, sales
> representatives, consultants or other agents of the Company or any of the
> Company Subsidiaries shall not constitute a breach of this Section 8(b).

61.     Furthermore, each of the Equity Defendants also agreed in Section 8(d) of the

RSA Agreement the following non-compete provision:

> During the Restricted Period, the Participant shall not, directly or
> indirectly, and will cause its employees, agents and affiliates not to, either
> directly or indirectly, (i) contact or solicit any Customer for the purpose of
> providing products or services competitive with those offered by the
> Company and the Company Subsidiaries as of the date hereof, (ii) request
> or advise any Customer or any supplier or vendor to the Company or any
> Company Subsidiary to withdraw, curtail or cancel any of its business or
> relations with the Company or such Company Subsidiary, as applicable, or
> (iii) participate in the Business [defined as having the same meaning set
> forth in the Stockholders' Agreement].

62.     The term "Business" is defined in the Stockholders' Agreement as:

> [A]ny enterprise, business or venture which derives a material portion of
> its revenue from (i) trailer, yard and warehouse labor services (including
> staffing); (ii) coordinating inbound freight (including inbound scheduling);
> (iii) receiving and organizing freight (including the unloading, hauling,
> and putting away freight); (iv) coordinating outbound freight (including
> selecting, loading, and auditing freight); (v) managing ancillary services
> (including yard management, pallet management, and trailer washing
> and/or stripping); (vi) managing reverse logistics (including coordination,
> processing, scanning and disposition); (vii) freight running; (viii) trailer
> spotting; (ix) pallet building; and (x) any other business as may be
> engaged in by the Company or any of its Subsidiaries from time to time.

63.     The foregoing restrictive covenants to which the Equity Defendants agreed are

essential to the protection of Capstone's confidential and trade secret information and to

Capstone's ability to develop and maintain its customer base.  Indeed, each Equity Defendant recognized in Section 8(f) of the RSA Agreement that because he has access to the Company's confidential information, in the event of a breach or threatened breach of the foregoing restrictive covenants, "money damages would not be an adequate remedy."

64.     In section 8(g) of the RSA Agreement, each Equity Defendant also agreed that these restrictions did not prevent him from earning a livelihood and agreed that these restrictions are reasonably necessary for the proper protection of confidential information.

## V.     The Pinnacle Agreements.

65.     In addition to the RSA Agreements, in consideration for their employment with Pinnacle, the Equity Defendants each executed employment agreements while employed with Pinnacle (the "Pinnacle Agreements") that also contained certain restrictive covenants.

66.     The Pinnacle Agreements were subsequently amended effective the date of Capstone's merger with Pinnacle on June 12, 2015 (the "Pinnacle Agreement(s)").    The amendments kept in place the non-compete, non-solicitation, and non-disclosure covenants in the Equity Defendants' original employment agreements with Pinnacle, and were made as a consequence of the merger with the understanding that the Equity Defendants, having sold their interests in Pinnacle for a hefty sum while continuing their employment with the Company, would continue to abide by their restrictive covenants.

67.     A copy of Navarrete's Pinnacle Agreement is attached hereto as **Exhibit E**.

68.     A copy of Poffenberger's Pinnacle Agreement is attached hereto as **Exhibit F**.

69.     A copy of Willis's Pinnacle Agreement is attached hereto as **Exhibit G.**

70.     Navarrete's and Poffenberger's Pinnacle Agreements each contain a provision not to disclose or misuse the Company's confidential information.  Specifically, section 3(a) of their Pinnacle Agreements state identically as follows:

16

You acknowledge that the Company and its Affiliates continually develop Confidential Information, that you may develop Confidential Information for the Company and its Affiliates and that you may learn of Confidential Information during the course of employment with the Company. You agree to comply with the policies and procedures of the Company and its Affiliates for protecting Confidential Information and also agree not to disclose to any Person or use any Confidential Information obtained by you incident to the employment or other association with the Company or any of its Affiliates, other than as required for the proper performance of your duties and responsibilities to the Company and its Affiliates or as required by applicable law after notice to the Company and a reasonable opportunity for it to protect Confidential Information. You understand that this restriction shall continue to apply after your employment terminates, regardless of the reason for such termination, for so long as such Confidential Information remains confidential or, if sooner, until the expiration of three years following the date your employment with the Company terminates. The obligations of the confidentiality imposed by this Section 3(a) shall not apply to Confidential Information that becomes generally known to the public hereafter through no act of yours in breach of this Agreement and no act of any other Person in breach of an obligation of confidentiality to the Company or any of its Affiliates.

71.    "Confidential Information" is defined therein as follows:

"Confidential Information" means any and all information of the Company and its Affiliates that is not generally known by those with whom they compete or do business, or with whom any of them plans to compete or do business and any and all information, publicly known in whole or in part or not, which, if disclosed by the Company or its Affiliates would assist in competition against them. Confidential Information includes without limitation such information relating to (i) the development, research, testing, manufacturing, marketing and financial activities of the Company and its Affiliates, (ii) the Products, (iii) the costs, sources of supply, financial performance and strategic plans of the Company and its Affiliates, (iv) the identity and special needs of the customers of the Company and its Affiliates and (v) the people and organizations with whom the Company and its Affiliates have business relationships and the nature and substance of those relationships. Confidential Information also includes any information that the Company or any of its Affiliates have received, or may receive hereafter, belonging to customers or others with any understanding, expressed or implied, that the information would not be disclosed.

72.    Navarrete's and Poffenberger's Pinnacle Agreements also contain a provision relating to the "Protection of Documents." Specifically, section 3(b) states:

>All documents, records and files, of whatever kind and description, relating to the business, present or otherwise, of the Company and its Affiliates and any copies, in whole or in part, thereof (collectively, the "Documents"), whether or not prepared by you, shall be the sole and exclusive property of the Company.   You agree to safeguard all Documents and to surrender to the Company, at the time your employment terminates or at such earlier time or times as the Company or its designee may specify, all Documents and other property of the Company and its Affiliates then in your possession or control.

73.   Navarrete's and Poffenberger's Pinnacle Agreements also each contained obligations not to compete and not to solicit; Navarrete for a period of one year following the date his employment terminates, and Poffenberger for a period of six months following the date his employment terminates.  Specifically, section 3(d) of Navarrete's Pinnacle Agreement states, in relevant part:

>You acknowledge that in your employment with the Company you will have access to Confidential Information which, if disclosed, would assist in competition against the Company and its Affiliates and that you will also generate goodwill for the Company and its Affiliates in the course of your employment.  Therefore, you agree that the following restrictions on your activities during and after your employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates:

>(i) You agree that, while you are employed by the Company and during the twelve (12) months immediately following the date your employment with the Company terminates, you will not provide services, directly or indirectly, whether as an owner, employee, independent contractor or otherwise, whether with or without compensation, to any Person who competes with the Company or with any of its Known Affiliates (as defined below) in any state within the United States in which the Company or any of the Known Affiliates is doing business or is in active planning to do business at any time during your employment or ant the time your employment with the Company terminates . . . .

>(ii) You agree that, while you are employed by the Company and during the twelve (12) months immediately following the date your employment with the Company terminates, you will not, directly or indirectly, (a) solicit or encourage any customer of the Company or any of its Known Affiliates to terminate or diminish its relationship with them; or (b) seek to persuade any such customer of the Company or any of its Known Affiliates to conduct with anyone else any business which such customer conducts or could conduct with the Company or any of the

Known Affiliates; provided, however, that after your employment with the Company terminates these restrictions shall apply only with respect to those Persons who have been a customer of the Company or one of the Known Affiliates at any time during the six (6) months immediately preceding the date your employment with the Company terminates and only if you have performed work with respect to such Person during your employment with the Company or been introduced to, or otherwise had contact with, such Person as a result of your employment or other associations with the Company or one of its Known Affiliates or had access to Confidential Information which would assist your solicitation of such Person in competition with the Company or one of its Known Affiliates.

74.     Poffenberger's Pinnacle Agreement contains identical language, with the exception that the duration of his post-termination obligations is six (6) months immediately following the date of his employment with the Company.

75.     Furthermore, Navarrete and Poffenberger each agreed, subject to certain exceptions, for a period of twelve months and six months, respectively, after separation of employment, not to hire or solicit for hiring any employee of the Company, or solicit any independent contractor to terminate its relationship with the Company.

76.     Navarrete and Poffenberger each agreed that the restrictions in the Pinnacle Agreement were reasonable and proper, and that any breach thereof would be irreparable. Accordingly, they each agreed that the Company, in addition to other rights and remedies, "shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by you of any of these covenants."

77.     While different in form, Willis's Pinnacle Agreement also contains a provision obligating him to not misuse or disclose confidential information.

78.     Willis's Pinnacle Agreement also contains restrictive covenants against the solicitation of customers for a period of two years after separation of employment. Specifically:

To the fullest extent permitted by applicable law, during the term of Employee's employment with [the Company] and for a period of two years after the termination of Employee's employment with [the

Company] Employee, for him/herself or on behalf of any entity, in any capacity, shall not, directly or indirectly, solicit or obtain any contractual freight handling business or warehouse staffing business from any customer of [the Company] … with whom Employee had contact while employed by [the Company].

79.     And, Willis's Pinnacle Agreement also contains a restrictive covenant against the solicitation of employees or independent contractors of the Company for a period of two years after separation of employment.

## VI.     The Individual Defendants' Respective Resignations and Capstone's Discovery of Their Unlawful Conduct.

### A.     Navarrete

80.     Navarrete was forced to resign from Capstone in disgrace, effective May 21, 2016, after improprieties relating to a certain customer came to light.

81.     Specifically in 2012 and 2013, while serving as Pinnacle's President, Navarrete negotiated and signed two separate "consulting agreements" with an employee of one of Pinnacle's largest customers.  This customer employee had responsibility for, and eventually signing authority over, that customer's contracts with Pinnacle.  These "consulting agreements" were not disclosed to the customer.

82.     Pursuant to these consulting agreements, Navarrete authorized, and Pinnacle made, payments to this customer employee totaling almost $600,000 over a four-year period.  In return, the customer employee secured the extension of contracts between the customer and Pinnacle with pricing terms that the customer later determined to be well-above market and unreasonably favorable to Pinnacle.

83.     When this arrangement came to light in the Spring of 2016, almost a year after Capstone's acquisition of Pinnacle and after the customer employee in question had retired, Capstone was forced to make a large cash payment to the customer and to substantially re-work the contract to Capstone's great disadvantage in order to salvage the customer relationship.

20

84.     In connection with his separation, Navarrete executed an agreement in which he expressly reaffirmed his post-termination obligations to the Company, including the restrictive covenants contained in the RSA Agreement and his Pinnacle Agreement.

85.     As President of Pinnacle both before and after the merger, Navarrete used his own personal computer to perform Company business.  Upon information and belief, that computer still contains Company information, including Capstone's confidential and trade secret information.  At the time of his departure, in violation of Company policy, Navarrete failed to return any confidential Company information that resided on his computer.

86.     Upon information and belief, after his separation from Capstone, Navarrete began plotting his revenge to start a competing business, but without having to put in the years of time and resources necessary to  build branding, goodwill, or cultivate customer relationships.

87.     Instead, armed with a war chest of around $3 million paid to him by Capstone as part of the Pinnacle Acquisition, Navarrete's plan is to simply steal customer relationships and goodwill from Capstone by, among other methods, recruiting the Capstone employees who managed those relationships and conspiring with them to purloin other confidential information from the Company so they could hit the ground running.

88.     Unbeknownst to Capstone at the time, on February 23, 2017, Navarrete registered Humano as a limited liability company in California.  That very same day, Navarrete updated his registration to the website www.humano.net.

**B.      Poffenberger**

89.     At around the same time that Navarrete formed Humano, Poffenberger was in the process of negotiating his exit from Capstone, having just announced his resignation days before. Poffenberger's separation from Capstone was made effective March 11, 2017.

90.     As part of his separation, Poffenberger executed a separation agreement on March 3, 2017 in which he expressly reaffirmed his post-termination obligations to the Company, including the restrictive covenants contained in the RSA Agreement and his Pinnacle Agreement.

91.     Poffenberger's separation was made effective approximately 30 days after his resignation.   At no time during this period did Poffenberger give any indication that he was planning to join Humano or to work for a direct competitor.   To the contrary, he lied and told Steve Taylor, the Chief Executive Officer, Rick Tomcho, the Chief Operating Officer, and others within Capstone that he was planning to either teach at a local community college or work for a non-competing third-party logistics provider.

92.     Poffenberger returned his work computer in a non-functional state, having completely wiped it of its contents.

93.     Poffenberger's corporate email activity nevertheless confirms that he was regularly accessing Capstone's servers up until his last week of employment, and thus had access through his work computer to Company confidential and trade secret information.   Indeed, Poffenberger, as part of an e-mail distribution network of high level executives, regularly received reports and real time information relating to the Company's customers and current financial performance.

94.     Upon information and belief, Poffenberger's computer also contained confidential information belonging to Capstone before he reformatted his computer.   Upon information and belief, Poffenberger reformatted his computer before returning it in an effort to conceal his digital footprint, thus destroying any evidence of his activities on that computer, including whether he extracted, downloaded, copied, or otherwise misused Company data.

95.     Both Poffenberger's computer and the information contained therein is the property of Capstone.   Poffenberger knowingly violated Company policy, as set forth in the Handbook, when he destroyed the contents of his work computer before returning it.

96.     A review of Poffenberger's Capstone emails in the weeks before his departure also revealed that he was taking steps to divert business to Humano and poach Capstone's employees for Humano's benefit.

97.     For example, shortly before tendering his resignation, on Friday evening, January 20, 2017, Poffenberger forwarded from his Capstone email account to his personal email account at djpoff@aol.com, pricing information relating to each one of the Company's customer sites. The covering email sent to "VP Operations" accompanying the price list states:

> Here is the EOY VS pricing by site for the network.  I am having my guys review pricing and cash handling at all sites during visits to make sure we are capturing all due revenue.  This report will serve as a guide to where we appear to be low compared to comparable sites.  It will also point you in the right direction if there are sites that can afford a VS price increase.

98.     The pricing information attached to the email is considered confidential as defined in the RSA Agreements and the Pinnacle Agreements, and would be particularly dangerous to the Company if it were to be disclosed to a competitor.

99.     Upon information and belief, Poffenberger had no legitimate business reason to forward this email to his personal email account.  A review of Poffenberger's e-mail activity confirms that he did not routinely send work information to his personal email account, if ever, in the performance of his duties and responsibilities for the Company.

100.     A review of Capstone's database activity logs in the weeks before Poffenberger announced his resignation also shows that, on or about January 9, 2017, he accessed and downloaded information from Capstone's private intranet database.  While Plaintiffs are unable to ascertain specifically what information he downloaded, the database logs show that he was

reviewing information that identifies the names, titles, departments and phone numbers of every single one of Capstone's employees who also have access to Capstone's intranet. This information is considered confidential to the company.

101.    That same day, Poffenberger also accessed information relating to the site of Customer X -- one of Capstone's largest customers and a customer that Humano is currently soliciting -- that would enable him to see the revenues, equipment fees, employee pay and other financial information related to that customer site. This information is also confidential and highly proprietary to the company.

102.    A review of Poffenberger's Capstone email account further revealed that in the days leading up to his separation from the Company, he was in close contact with DPI -- a customer of the Company for which Poffenberger was responsible -- about his impending separation from the Company. By email dated March 4, 2017, Poffenberger writes in response to an inquiry from Christopher Erklenz ("Erklenz") as to whether he is in charge of the customer's account, "Yes for now I am in charge ... but I gave notice 30 days ago and my last day is this coming Friday. I would appreciate it if you'd let me give you a call on Monday we have a conversation about what's next." The subsequent emails reveal that Poffenberger then spoke by telephone with the customer contact, and arranged for an in-person meeting.

103.    DPI eventually terminated its seven-year relationship with Capstone by sending a notice of termination, dated May 26, 2017. DPI was a significant customer, with four sites (in California, Colorado, Maryland and Oregon) generating over $600,000 in profits annually.

104.    After receiving the termination notice, Rick Tomcho met with Erklenz on May 31, 2017. At that time, Erklenz stated that he had nearly finalized a contract with a new provider (which Capstone did not yet know was Humano).

24

105.    The next day, Poffenberger appeared at Capstone's DPI Maryland site and began soliciting the Company's employees there.  It was only then that Capstone learned of Humano's existence, that Humano was competing against Capstone, and that Humano had been awarded DPI's business.  When Tomcho called Erklenz about the incident, Erklenz confirmed that he had been dealing with Poffenberger for some time.

**C.    Willis**

106.    On May 19, 2017, just one week before DPI gave notice, Willis tendered his resignation.  Willis's last day with Capstone was June 2, 2017. Willis executed a separation agreement on May 27, 2017 in which he expressly reaffirmed his post-termination obligations to the Company, including the restrictive covenants contained in the RSA Agreement and his Pinnacle Agreement.

107.    Like Poffenberger, Willis gave no indication that he intended to work for a competitor.  Instead, he claimed that he was planning to manage a distribution center for a non-competing third-party logistics provider twenty minutes from his home so that he could spend more time with his family.  Because the Company had no reason to believe he was lying, or that he was in fact planning to team up with Navarrete and Poffenberger, Willis was left in place as the Company responded to DPI's termination notice in favor of his future employer.

108.    Further, Willis was scheduled to meet with Rick Tomcho on June 1, 2017 to return his work computer.  Willis canceled the meeting on short notice and therefore failed to return the computer on that date as arranged.  When Willis eventually did return his computer, Capstone learned that he, like Poffenberger, "wiped" his computer by re-installing the operating system between May 31 and June 1, 2017.

109.    Willis's corporate email activity nevertheless confirms that he was regularly accessing Capstone's servers up until June 1, 2017 when the Company cut off his access to

email.  Until that date, Willis had access through his work computer to Company confidential and trade secret information.  Indeed, Willis, as part of an e-mail distribution network of high level executives, regularly received reports and real time information relating to the Company's customers and current financial performance.

110.    Upon information and belief, Willis's computer also contained confidential information belonging to Capstone prior to him reformatting his computer.  Upon information and belief, Willis reformatted his computer before returning it in an effort to conceal his digital footprint, thus destroying any evidence of his activities on that computer, including whether he extracted, downloaded, copied, or otherwise misused Company data.

111.    Both Willis's computer and the information contained therein is the property of Capstone.  Willis knowingly violated Company policy, as set forth in the Handbook, when he destroyed the contents of his work computer.

**D.    Rojas.**

112.    On May 26, 2017, Mario Rojas, Senior Director of Partnership, announced his resignation effective June 9, 2017.  When asked by his manager about his future plans, Mr. Rojas claimed he felt uncomfortable discussing the matter.

113.    Prior to his resignation, Rojas was dedicated to managing the Company's relationship with Customer X -- the same customer about which Poffenberger was researching on the database before he resigned.  When Capstone approached Customer X to advise that Mr. Rojas was leaving the Company, the customer claimed to have already known.  Upon information and belief, Rojas was recruited by the other Defendants to join Humano as an expedited means to steal that customer relationship.

114.    Despite leaving the Company on June 9, 2017, Rojas did not ship his computer back to Capstone until June 19, 2017, over a week later.  Upon receiving it on June 21, 2017, the

Company learned that Rojas had also "wiped" the computer by reinstalling the operating system on June 17, 2017.

115.    However, after Rojas reformatted the computer, on June 18, 2017, Rojas connected a USB flash drive to the computer.  Rojas neither disclosed to the Company the existence of the flash drive, nor did he return it.  A forensic investigation of the computer revealed that the flash drive contains at least 35 files.  By their file names, the files on the flash drive appear to relate to Capstone's customers, financials, associate payroll, and organizational charts, among other confidential information.

116.    Furthermore, on June 18th, despite having already left the Company for over a week, Rojas opened two files from the flash drives, one of which relates to a Capstone site for Customer X.  Upon information and belief, Rojas did so under the direction, with the knowledge of, and/or for the benefit of the other Defendants.  Indeed, the Company has learned that Defendants have solicited and are still soliciting Customer X.

117.    Finally, like Willis, Rojas's corporate email activity confirms that he was regularly accessing Capstone's servers up until June 1, 2017 when the Company cut off his access to email.  Until that date, Rojas had access through his work computer to Company confidential and trade secret information.  Indeed, Rojas, as part of an e-mail distribution network of high level executives, regularly received reports and real time information relating to the Company's customers and current financial performance.

118.    Upon information and belief, Rojas's computer also contained confidential information belonging to Capstone prior to him reformatting his computer.  Upon information and belief, Rojas reformatted his computer before returning it in an effort to conceal his digital footprint, thus destroying any evidence of his activities, including whether he extracted,

downloaded, copied, or otherwise used Company data, albeit not as successfully as the other Defendants.

119.    Both Rojas's computer and the information contained therein is the property of Capstone.  Rojas knowingly violated Company policy, as set forth in the Handbook, when he destroyed the contents of his work computer.

## VII.    **Defendants' Continued Solicitation of Customers and Associates.**

120.    Once Humano revealed itself, it quickly become apparent that Defendants had been recruiting other Company employees for at least several weeks prior.  On May 12, 2017, Joe Valentine, Senior Business Analyst, announced his resignation effective that day.  As Senior Business Analyst in the Company's Business Intelligence department, Valentine was responsible for providing reporting upon the Company's operational performance, and preparing budgets down to the site level.  He had extensive access to Capstone's confidential information, including load-level Company performance data for 2 years and Company financial data back to 2012.

121.    As a remote employee, he used a personal desktop computer for work purposes, and Valentine did not return any confidential upon the termination of his employment with the Company.  Upon information and belief, Valentine is now employed at Humano.

122.    On May 18, 2017, Claudia Rojas, one of the Company's best recruiters, announced her resignation effective June 2, 2017, the same day as Willis's last day at the Company.  Upon information and belief, Ms. Rojas is now employed at Humano.

123.    Furthermore, on or about June 1, 2017, Poffenberger and another Humano employee, Sarah O'Neill (herself a former employee of the Company), directly solicited the Company's employees at its DPI site in Maryland to join Humano. It was reported to the Company that Poffenberger made offers to the Company's management personnel at that site

knowing their exact salaries with the Company, and to the Company's warehouse associate knowing their wages.

124.   Later, Willis also visited the site and solicited the Company's employees in person.  Capstone was made aware that text messages containing offers were sent to all of the Company's employees there.

125.   Additionally, Poffenberger and Willis solicited Company employees at its DPI site in Colorado on June 8, 2017.

126.   Ultimately, the Defendants hired 28 warehouse associates, 4 Team Leads, and 2 Site Managers from the Company's four DPI sites throughout the country.

127.   As further evidence that Defendants have retained Plaintiffs' confidential information, on June 12, 2017, Poffenberger mis-sent an email to Willis's Capstone email address, forwarding outlook contact information for the customer contact at DPI.  This email further confirms that Defendants have unlawfully retained their customer contacts from their tenure at Capstone and are working together, in concert with each other, to compete against Capstone and solicit its customers, in violation of Company policy and their contractual and legal obligations to Capstone.

128.   Upon information and belief, to this day, Defendants continue to actively solicit Capstone's customers, some of which are based in New York, and its employees.  As recently as June 21, 2017, the Company learned that Humano had attempted to solicit yet another customer. The operations manager at the customer site advised Capstone that he had fielded calls from Humano, but assured Capstone that its business would remain with Capstone.

**VIII.   <u>The Irreparable Harm to Capstone.</u>**

129.   With the departures of the Individual Defendants and other employees whom they poached, along with Defendants' knowledge of Capstone's closely guarded confidential and

trade secret information and their improper solicitation of significant customers, Plaintiffs stand to lose millions of dollars in business and the loss of value of their goodwill, customer relationships, trade secrets and confidential and proprietary information, which cannot be adequately addressed at law.

130. Defendants' conduct is particularly egregious in that they were paid, as shareholders of Pinnacle prior to the Pinnacle Acquisition, millions of dollars for the goodwill and customer relationships they are now seeking to steal.

131. Defendants are breaching their non-compete agreements, unfairly competing against Plaintiffs, and tortiously interfering with customer contracts.

132. Defendants will have (and have gained) an unfair competitive advantage in targeting Capstone's customers using its confidential and trade secret information and poaching its employees.

133. Defendants' activities have resulted in Plaintiffs losing actual business, costing Plaintiffs potential millions of dollars.

134. All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Plaintiffs, including the loss of value of confidential and/or trade secret information, the loss of long standing customer relationships, loss of goodwill, as well as damage to Plaintiffs' reputation as an industry leader. Money alone cannot make Plaintiffs whole.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Breach of Contract Against the Equity Defendants: RSA Agreements)**

135. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 134 of the Complaint as if fully set forth herein.

136. The RSA Agreements are each a duly executed and enforceable contract, giving rise to legal obligations between each of the Equity Defendants and Plaintiffs.

137.    Pursuant to the RSA Agreements, the Equity Defendants each agreed, among other things not to use or disclose Plaintiffs' confidential information other than in the performance of duties for and authorized by Plaintiffs.

138.    Pursuant to the RSA Agreements, each Equity Defendant also agreed that he would not, directly or indirectly, solicit customers of the Company, or offer services to a customer that competes with the Company, or engage in a competing business as defined therein for a period of two years after separation of employment.

139.    Pursuant to the RSA Agreements, each Equity Defendant further agreed that he would not, directly or indirectly, solicit employees of the Company or induce them to leave the Company for a period of two years after separation of employment.

140.    Plaintiffs provided consideration for and fully performed their obligations under the Agreement by, *inter alia*, employing each Equity Defendant, providing them with access to Capstone's confidential and trade secret information, allowing them to participate in Capstone, Inc.'s equity incentive plan, and enabling them to use Capstone's goodwill up until separation of employment.

141.    The restrictive covenants in the RSA Agreements are supported by adequate consideration and are valid and enforceable under Delaware and New York law.

142.    The restrictive covenants in the RSA Agreements are necessary and tailored to protect Capstone's legitimate business interests, including but not limited to Capstone's goodwill, customers, and confidential and proprietary business information.

143.    Each of the Equity Defendants breached his obligations under the RSA Agreement after leaving the Company by, *inter alia*, (1) engaging in the logistics business in direct competition with Capstone; (2) actively soliciting Capstone's customers and inducing them to terminate their relationships with Capstone; (3) offering products and services in direct

competition with Capstone; (4) diverting business away from the Company for Humano's benefit; (5) soliciting and hiring other employees of Capstone on behalf of Humano; and (6) failing to return and using Capstone's confidential and trade secret information to compete unfairly, solicit customers and employees, including information relating to the Company's customers, pricing, distribution centers and salary information, among other data.

144.    Upon information and belief, the Equity Defendants' breaches of these covenants continue to this day, and will continue unless and until they are ordered to abide by the obligations to which they each agreed when they executed the RSA Agreement.

145.    As a direct result of the Equity Defendants' breaches, Plaintiffs are suffering and will continue to suffer irreparable injury, including loss of business expectancies, customers, employees, their confidential information, and damage to goodwill, for which a remedy at law is inadequate -- as the Equity Defendants expressly acknowledged in the RSA Agreement. Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

146.    In addition, as a consequence of the Equity Defendants' breaches of the Agreement, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Breach of Contract Against the Equity Defendants: Pinnacle Agreements)**

147.    Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 146 of the Complaint as if fully set forth herein.

148.    The Pinnacle Agreements are each a duly executed and enforceable contract, giving rise to legal obligations between each of the Equity Defendants and Plaintiffs.

149.    Pursuant to the Pinnacle Agreements, the Equity Defendants each agreed, among other things not to use or disclose Plaintiffs' confidential information other than in the performance of duties for and authorized by Plaintiffs.

150.    Pursuant to the Pinnacle Agreements, each Equity Defendant also agreed that he would not solicit certain customers of Capstone for a certain period after separation of employment.

151.    Pursuant to the Pinnacle Agreements, each Equity Defendant further agreed that he would not, directly or indirectly, solicit employees of the Company or induce them to leave the Company for a certain period after separation of employment.

152.    Pursuant to Navarrete's and Poffenberger's Pinnacle Agreements, they each also separately agreed not to offer services to a customer that competes with Capstone anywhere in the United States for a certain period after separation of employment.

153.    Plaintiffs provided consideration for and fully performed its obligations under the Agreement by, *inter alia*, employing each Equity Defendant, providing them with access to Capstone's confidential and trade secret information, and enabling them to use Capstone's goodwill up until separation of employment.

154.    The restrictive covenants in the Pinnacle Agreements are supported by adequate consideration and are valid and enforceable under New York and other applicable law.

155.    The restrictive covenants in the Pinnacle Agreements are necessary and tailored to protect Capstone's legitimate business interests, including but not limited to Capstone's goodwill, relationships, and customers, and confidential and proprietary business information.

156.    Each of the Equity Defendants breached his obligations under their respective Pinnacle Agreements Agreement after leaving the Company by, *inter alia*, (1) engaging in the logistics business in direct competition with Capstone; (2) actively soliciting Capstone's customers and inducing them to terminate their relationships with Capstone; (3) offering products and services in direct competition with Capstone; (4) diverting business away from the Company for Humano's benefit; (5) soliciting and hiring other employees of Capstone on behalf

33

of Humano; and (6) failing to return and misusing Capstone's confidential and trade secret information to compete unfairly, solicit customers and employees, including information relating to the Company's customers, pricing, distribution centers and salary information, among other data.

157. Upon information and belief, the Equity Defendants' breaches of these covenants continue to this day, and will continue unless and until they are ordered to abide by the obligations to which they each agreed when they executed their respective Pinnacle Agreements.

158. As a direct result of the Equity Defendants' breaches, Plaintiffs are suffering and will continue to suffer irreparable injury, including loss of business expectancies, customers, employees, their confidential information, and damage to goodwill, for which a remedy at law is inadequate -- as the Equity Defendants expressly acknowledged in their agreements with the Company. Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

159. In addition, as a consequence of the Equity Defendants' breaches of the Agreement, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Defendant Poffenberger)

160. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 159 of the Complaint as if fully set forth herein.

161. In his capacity as Senior Vice President of Operations, Poffenberger was placed in a position of trust and confidence, and was expected to devote his full time to the management and promotion of the Company's business interests.

162. As a result of this special relationship, Poffenberger owed certain fiduciary duties to Capstone including a duty of loyalty and honesty, and a duty not to act in any way contrary to the interests of Capstone, including, but not limited to, a duty, while still employed with

34

Capstone and being compensated by the Company: (a) not to compete with Capstone, (b) not to usurp corporate opportunities or divert business on behalf of another, (c) not to solicit Capstone's customers or employees on behalf of another, (d) not to misuse or misappropriate the Company's confidential or trade secret information, and (e) not to be deceitful to the Company.

163.    Notwithstanding these obligations and duties, and in violation thereof, Poffenberger breached his fiduciary duty of loyalty and honesty to Capstone by, among other willful acts of misconduct, (a) simultaneously working for the benefit of Navarrete and Humano while still employed with Capstone, (b) aiding and abetting Navarrete and Humano's efforts to misappropriate Capstone's confidential information and solicit Capstone's customers and employees; (c) extracting data belonging to Capstone out of Capstone's control and into his own personal email account or personal possession for Defendants' benefit; (d) soliciting DPI to leave Capstone and join Humano; and/or (e) destroying Company data on his work computer knowing it would to impede the Company's investigation.

164.    As a consequence of Poffenberger's breach of his fiduciary duty of loyalty to Capstone, Plaintiffs have been injured and face irreparable injury.  Plaintiffs are threatened with loss of business expectancies, losing customers and employees, further misuse of their confidential and trade secret information, and loss of goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this court.

165.    In addition, as a consequence of Poffenberger's breach of his fiduciary duty, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Breach of Fiduciary Duty Against Defendants Willis and Rojas)**

166.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 of the Complaint as if fully set forth herein.

35

167.   In their roles as executives of the Company, Willis and Rojas were each placed in a position of trust and confidence, and each was expected to devote his full time to the management and promotion of the Company's business interests.

168.   As a result of this special relationship, Willis and Rojas each owed certain fiduciary duties to Capstone including a duty of loyalty and honesty, and a duty not to act in any way contrary to the interests of Capstone, including, but not limited to, a duty, while still employed with Capstone and being compensated by the Company: (a) not to compete with Capstone, (b) not to usurp corporate opportunities or divert business on behalf of another, (c) not to solicit Capstone's customers or employees on behalf of another, (d) not to misuse or misappropriate the Company's confidential or trade secret information, and (e) not to be deceitful to the Company.

169.   Notwithstanding these obligations and duties, and in violation thereof, Willis and Rojas each breached his fiduciary duty of loyalty and honesty to Capstone by, among other willful acts of misconduct, (a) simultaneously working for the benefit of Navarrete, Poffenberger and Humano while still employed with Capstone, (b) aiding and abetting Navarrete, Poffenberger, and Humano's efforts to misappropriate Capstone's confidential information and solicit Capstone's customers and employees; and/or (c) destroying Company data on his work computer knowing it would impede the Company's investigation.

170.   In addition, Rojas breached his fiduciary duty of loyalty and honesty to Capstone by extracting data from the Company onto a USB flash drive without the Company's knowledge or authorization.  Upon information and belief, Rojas stole data from the Company in concert with and/or for the benefit of the other Defendants.

171.   As a consequence of Willis's and Rojas's breaches of their fiduciary duties of loyalty to Capstone, Plaintiffs have been injured and face irreparable injury.  Plaintiffs are

threatened with loss of business expectancies, losing customers and employees, further misuse of their confidential and trade secret information, and loss of goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of this court.

172.    In addition, as a consequence of Willis's and Rojas's breaches of their fiduciary duties, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Misappropriation of Trade Secrets, 18 U.S.C. § 182, Against All Defendants)**

173.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 172 of the Complaint as if fully set forth herein.

174.    By virtue of his employment with the Company and his performance of responsibilities for the Company, each Individual Defendant was given access to and possessed trade secrets and confidential information of Capstone, including *inter alia*, access to confidential customer contracts and information relating to the Company's pricing, customer sites, distribution centers, carrier information, its cost-per-unit model, employee salaries, among other information.

175.    Such information was developed and maintained by Capstone at great time, cost and expense to Capstone, and is maintained on password protected networks accessible only by certain Capstone employees with need to use such information on the Company's behalf.

176.    In addition, customers entrust Capstone with its confidential information, to which the Individual Defendants also had access.

177.    Capstone derives independent economic value from the trade secrets and confidential information entrusted to the Individual Defendants; such information is not generally known or readily ascertainable by proper means by other persons who can obtain

economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

178.    Such information is considered a trade secret under the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 *et seq.*, because Capstone derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.  18 U.S.C. § 1839.

179.    Defendants acquired Plaintiffs' trade secrets by improper means and without authorization, including Poffenberger emailing confidential pricing information relating to all of Capstone's customer sites to his personal email account, and Defendants' use of confidential salary information to solicit other Capstone employees.

180.    Defendants have used and/or disclosed Plaintiffs' trade secrets without express or implied consent.

181.    Defendants knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Capstone at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Capstone's competitors; (5) would provide significant benefit to a competitor seeking to compete with Capstone; and (6) is critical to Capstone's ability to conduct its business successfully.

182.    Defendants actually misappropriated and/or threaten to inevitably misappropriate Capstone's trade secrets and confidential information without Capstone's consent.

183.    Defendants will be or are unjustly enriched by the misappropriation and/or threatened misappropriation of Capstone's trade secrets and confidential information, and, unless

restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Capstone's trade secrets and confidential information.

184.   Defendants' actual and/or threatened misappropriation has been willful and malicious.

185.   As a result of the threatened and/or actual misappropriation of Capstone's trade secrets and confidential information, Plaintiffs will be threatened with loss of business expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

186.   In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unfair Competition Against All Defendants)

187.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 186 of the Complaint as if fully set forth herein.

188.   By virtue of their employment with the Company and performance of their responsibilities, the Individual Defendants were given access to and possessed confidential information of the Company, as set forth above.

189.   Defendants undertook the foregoing acts of misconduct, including soliciting customers to move their business to Humano, soliciting employees of the Company to join Humano, and misappropriating and using Capstone's confidential information for their own self-interests and to gain an unfair competitive advantage in competing with Capstone.

190.   As a consequence of Defendants' unfair competition, Plaintiffs have been injured and face irreparable injury.  Plaintiffs are threatened with loss of business expectancies, losing customers and employees, further misuse of their confidential information, and loss of goodwill

in amounts which are impossible to determine, unless Defendants are enjoined and restrained by order of this court.

191.    In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and costs.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Tortious Interference With Prospective Economic Advantage
### Against All Defendants)

192.    Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 191 of the Complaint as if fully set forth herein.

193.    Until the events giving rise to this action, Capstone had maintained valid business relationships, or the expectancy of business relationships, with its customers.  Capstone had the reasonable expectation that these relationships and prospective relationships would continue and would not be unjustifiably disrupted.

194.    Defendants were and remain aware of these customer relationships and/or expectancies.

195.    Notwithstanding their knowledge of the existence of these relationships and expectancies, Defendants intentionally and unjustifiably interfered with Capstone's business relationships with its customers by soliciting them to terminate their relationships with Capstone and move their business to Humano.

196.    As a result of Defendants' tortious interference with Capstone's business relationships with its customers, Plaintiffs will be threatened with loss of business expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

197.   In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Tortious Interference With Contract
### Against Defendants Navarrete and Poffenberger)

198.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 through 197 of the Complaint as if fully set forth herein.

199.   Plaintiffs have a contractual relationship, through the RSA Agreements and the Pinnacle Agreements with each of the Equity Defendants, whereby they are each obligated to refrain from soliciting Capstone's customers and to refrain from using and disclosing Capstone's confidential, proprietary, and/or trade secret information.

200.   The Equity Defendants are each fully aware that they each signed these agreements and the restrictive covenants contained therein.

201.   Despite having knowledge of the RSA Agreements and the Pinnacle Agreements, defendant Navarrete induced, permitted or incentivized Poffenberger and Willis to violate their contractual obligations to Plaintiffs, without justification, by, among other things, encouraging and supporting their solicitation and servicing of Capstone's customers on behalf of Humano.

202.   Despite having knowledge of the RSA Agreements and the Pinnacle Agreements, defendant Poffenberger induced, permitted or incentivized Willis to violate their contractual obligations to Plaintiffs, without justification, by, among other things, encouraging and supporting their solicitation and servicing of Capstone's customers on behalf of Humano.

203.   The wrongful actions described above were calculated to cause damage to Plaintiffs in operating their lawful businesses.

204.    The wrongful actions described above were done for the unlawful purpose of causing damage and loss to Plaintiffs, without right or justification on the part of Defendants.

205.    Upon information and belief, Navarrete's and Poffenberger's tortious interference was malicious as it was accomplished through a coordinated scheme to violate their contractual duties to Plaintiffs, to misappropriate and misuse Plaintiffs' confidential and trade secret information, and to convert Plaintiffs' customers to Humano while damaging Plaintiffs' goodwill and ability to compete.

206.    As a result of Navarrete's and Poffenberger's tortious interference, Plaintiffs have been injured and face irreparable injury.  Plaintiffs are threatened with loss of business expectancies, losing customers, employees, its competitive advantage and goodwill in amounts which may be impossible to determine, unless Defendants are permanently enjoined and restrained by order of this Court.

207.    In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary duty Against Navarrete and Poffenberger)

208.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 207 as if fully set forth herein.

209.    Defendants Navarrete and Poffenberger were both fully aware that Willis and Rojas, as executives of Capstone, each owed a fiduciary duty to Capstone, including, among other things, a duty (a) not to compete with Capstone, (b) not to usurp corporate opportunities or divert business on behalf of another, (c) not to solicit Capstone's customers or employees on behalf of another, (d) not to misuse or misappropriate the Company's confidential or trade secret information, and (e) not to be deceitful to the Company.

210.     Despite this knowledge, Navarrete and Poffenberger aided, induced, permitted or incentivized Willis and Rojas to violate their fiduciary duties, without justification, by among other things, (a) directing or conspiring with them to solicit customers and other Capstone employees while Willis and Rojas were still employed with the Company, (b) authorizing or conspiring with them to steal, misappropriate and/or misuse Capstone's confidential information, (c) solicit Capstone's employees on behalf of Humano; and (d) destroying Company data on their work computers knowing it would impede the Company's investigation.

211.     Thereafter, Willis and Rojas breached their fiduciary duties to Plaintiffs as set forth above.

212.     As active participants and beneficiaries in the scheme to solicit and recruit Capstone's customers and workforce, and steal Capstone's confidential and trade secret information, Navarrete and Poffenberger are aware of their role in the overall illegal activities undertaken by Willis and Rojas.

213.     As a result of Navarrete's and Poffenberger's aiding and abetting Willis and Rojas in breaching their fiduciary duties, Plaintiffs have been injured and face irreparable injury. Plaintiffs are threatened with loss of business expectancies, losing customers, employees, its competitive advantage and goodwill in amounts which may be impossible to determine, unless Defendants are permanently enjoined and restrained by order of this Court.

214.     In addition, Plaintiffs seek actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter Judgment in its favor and an Order against Defendants that grants the following relief:

1.     An injunction that:

43

(a)    Preliminarily and permanently enjoins each Equity Defendant from violating his restrictive covenants with Plaintiffs;

(b)    Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, from accessing, using or disclosing any of Plaintiffs' confidential, proprietary and trade secret information;

(c)    Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, for a period of two (2) years from, directly or indirectly, engaging in or providing workforce logistics services in direct competition with Plaintiffs;

(d)    Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, for a period of two (2) years following entry of judgment against them, from, directly or indirectly, soliciting or moving the business of any of Plaintiffs' customers, and/or accepting business from any of Plaintiffs' customers;

(e)    Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, for a period of two (2) years following entry of judgment against them, from persuading any of Plaintiffs' customers to cease doing business with Plaintiffs and/or persuading any of Plaintiffs' customers to conduct business with another business competitive with Plaintiffs;

(f)    Preliminarily and prospective enjoins Defendants, and all parties in active concert or participation with them, for a period of two (2) years following entry of judgment against them, from, directly or indirectly, soliciting or hiring any of Plaintiffs' employees, or encouraging or inducing any of them to leave Plaintiffs' employ.

2.    Orders that Defendants, and all parties in active concert or participation with them, to return to Plaintiffs all originals and copies of all files, devices, electronic media and/or documents that contain or relate to Plaintiffs' confidential, proprietary and trade secret information;

3.    Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

4.    Punitive damages in an amount to be proven at trial due to Defendants' willful and malicious conduct;

5.    Costs and expenses incurred herein, including reasonable attorneys' fees and interest;

6.    All other relief as the Court may deem just, equitable and proper.

Dated:  New York, New York
        June 26, 2017

Respectfully submitted,

SEYFARTH SHAW LLP

By:_____
        James S. Yu, Esq.
        620 Eighth Avenue
        New York, New York  10018-1405
        (212) 218-5500
        Email: jyu@seyfarth.com

*Attorneys for Plaintiffs*
Capstone Logistics Holdings, Inc.,
Capstone Logistics, LLC, and
Pinnacle Workforce Logistics, L.L.C.