# EXHIBIT D

## CAPSTONE LOGISTICS HOLDINGS, INC.

### 2014 Equity Incentive Plan

### RESTRICTED STOCK AWARD AGREEMENT

THIS AGREEMENT (the "Award Agreement"), is made effective as of July 6, 2015 (the "Date of Grant"), by and between Capstone Logistics Holdings, Inc., a Delaware corporation (the "Company"), and Steve Willis (the "Participant"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Capstone Logistics Holdings, Inc. 2014 Equity Incentive Plan (the "Plan").

### R E C I T A L S:

**WHEREAS**, the Company has adopted the Plan, which is incorporated herein by reference and made a part of this Award Agreement; and

**WHEREAS**, the Committee has determined that it would be in the best interests of the Company and its stockholders to grant the restricted stock award provided for herein to the Participant pursuant to the Plan and the terms set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1.    Restricted Stock Award. Subject to the terms and conditions of the Plan and this Award Agreement, the Company hereby grants to the Participant 210.645 Shares of Restricted Stock (the "Restricted Shares"), which shall vest in accordance with Section 3 hereof. The fair market value of the Restricted Shares at the time of transfer (determined without regard to any lapse restriction, as defined in Treasury Regulation Section 1.83-3(i)) shall be equal to $449.64 per share.

2.    Certificates. A certificate or certificates representing the Restricted Shares shall be issued by the Company and shall be registered in the name of the Participant on the stock transfer books of the Company promptly following execution of this Award Agreement by the Participant, but shall remain in the physical custody of the Company or its designee at all times prior to the time that the Restricted Shares vest in accordance with Section 3 hereof. As a condition to the receipt of this Award Agreement, the Participant shall deliver to the Company a stock power, duly endorsed in blank, relating to the Restricted Shares. Each certificate representing the Restricted Shares shall bear the following legend:

> *"The ownership and transferability of this certificate and these shares are subject to the terms and conditions (including forfeiture) of the Capstone Logistics Holdings, Inc. 2014 Equity Incentive Plan and a Restricted Stock Award Agreement entered into between the registered owner and Capstone Logistics Holdings, Inc. Copies of such Plan and Agreement are on file in the executive offices of Capstone Logistics Holdings, Inc."*

As soon as administratively practicable, but not later than sixty (60) days, following the vesting of the Restricted Shares, and upon the satisfaction of all other applicable conditions, including, but not limited to, the payment by the Participant of all applicable withholding taxes, the Company shall deliver or cause to be delivered to the Participant, or in the case of Participant's death, Participant's beneficiary, a certificate or certificates for the applicable Shares of Restricted Stock which shall not bear the legend described above, but may bear such other legends as the Company deems advisable.

3.    Vesting and Forfeiture.

a.    Vesting. Subject to the terms set forth in the Plan, the Restricted Shares shall vest upon a Change in Control in the following percentages if the following performance criteria have been achieved as of such Change in Control:

i.    twenty-five percent (25%) of the Restricted Shares shall vest upon such Change in Control if the Resolute Holders have received, with respect to Cash Invested, Net Cash Proceeds of at least 2.0 times the Cash Invested;

ii.    an additional twenty-five percent (25%) of the Restricted Shares shall vest upon such Change in Control if (i) the Resolute Holders' IRR, is equal to or greater than 20% and (ii) the Resolute Holders have received, with respect to Cash Invested, Net Cash Proceeds of at least 2.0 times the Cash Invested; and

iii.    the remaining fifty percent (50%) of the Restricted Shares shall vest upon such Change in Control if (i) the Resolute Holders' IRR, is equal to or greater than 25% and (ii) the Resolute Holders have received, with respect to Cash Invested, Net Cash Proceeds of at least 2.5 times the Cash Invested.

Any Restricted Shares which do not vest upon a Change in Control pursuant to this Section 3(a) shall be forfeited by the Participant without any consideration.

"IRR" means, on any date, the annual percentage rate (compounded annually) which, when used as the discount rate to calculate the net present value of all Net Cash Proceeds received by the Resolute Holders in respect of Cash Invested through and including such date, causes such net present value to equal the net present value of the Cash Invested (based on the actual dates such amounts were received or paid).

"Cash Invested" means, on any date, without duplication, all cash invested by the Resolute Holders in the Company on or before such date, whether in the form of a common equity investment, preferred equity investment or other equity-like investment, but shall not include and debt-like investments made by the Resolute Holders in the Company.

"Net Cash Proceeds" means, on any date, without duplication, any cash proceeds, dividends, or distributions actually received by the Resolute Holders with respect to the Resolute Securities, less all reasonable costs or expenses (including without limitation, legal or other advisor costs), fees (including, without limitation, banking fees), commissions or discounts payable by the Resolute Holders or their affiliates in connection with, arising out of or relating to any sale or

other disposition of Resolute Securities; provided, however, that "Net Cash Proceeds" shall not include any advisory, management, monitoring, transaction or other fees or any indemnification payments or expense reimbursement recovered by the Resolute Stockholders or their affiliates.

"Resolute Securities" means all Securities purchased by the Resolute Holders on or after the date hereof.

"Securities" and "Resolute Holders" shall have the meanings given them in the Stockholders' Agreement.

        b.    Forfeiture. If the Participant's employment with the Company is terminated for any reason, the Restricted Shares, to the extent not then-vested, shall be forfeited by the Participant without any consideration; provided, however, that if the Participant's employment is terminated by the Company without Cause or by the Participant with Good Reason, then:

        i.    if such termination of employment occurs after the second anniversary and prior to the third anniversary of the Date of Grant, eighty percent (80%) of the Restricted Shares shall be forfeited by the Participant without any consideration and twenty percent (20%) of the Restricted Shares will continue to be eligible for vesting pursuant to Section 3(a) hereto;

        ii.    if such termination of employment occurs on or after the third anniversary and prior to the fourth anniversary of the date of grant, then sixty percent (60%) of the Restricted Shares shall be forfeited by the Participant without any consideration and forty percent (40%) of the Restricted Shares will continue to be eligible for vesting pursuant to Section 3(a) hereto;

        iii.    if such termination of employment occurs on or after the fourth anniversary and prior to the fifth anniversary of the date of grant, then forty percent (40%) of the Restricted Shares shall be forfeited by the Participant without any consideration and sixty percent (60%) of the Restricted Shares will continue to be eligible for vesting pursuant to Section 3(a) hereto; and

        iv.    if such termination of employment occurs on or after the fifth anniversary of the date of grant, then one hundred (100%) of the Restricted Shares will continue to be eligible for vesting pursuant to Section 3(a) hereto.

Notwithstanding the foregoing, if (i) the Participant's employment is terminated for any reason other than by the Company without Cause or by the Participant with Good Reason or (ii) at any time during the Restrictive Period, Participant breaches the restrictive covenants contained in Section 8 hereto, all the Restricted Shares then outstanding shall be forfeited by the Participant without any consideration.

        4.    Transferability. Unless otherwise determined by the Committee or as expressly provided in the Plan or the Stockholders' Agreement, the Participant shall not be permitted to transfer or assign the Restricted Shares.

5.    <u>Compliance with Securities Act</u>.

       a.    The issuance and delivery of Restricted Shares pursuant to this Award Agreement shall comply with (or be exempt from) all applicable requirements of law, including, without limitation, the Securities Act of 1933, as amended, the rules and regulations promulgated thereunder, state securities laws and regulations, and the regulations of any stock exchange or other securities market on which the Company's securities may then be traded. The Company shall not be obligated to file any registration statement under any applicable securities laws to permit the purchase or issuance of any Shares under this Award Agreement, and accordingly any certificates for Shares or documents granting Awards may have an appropriate legend or statement of applicable restrictions endorsed thereon. If the Company deems it necessary to ensure that the issuance of Shares under this Award Agreement is not required to be registered under any applicable securities laws, the Participant shall deliver to the Company an agreement or certificate containing such representations, warranties and covenants as the Company may reasonably require.

       b.    The Restricted Shares have not been registered under the Securities Act. The Restricted Shares are being issued to the Participant in reliance upon either (i) the exemption from such registration provided by Rule 701 promulgated under the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder (the "<u>Securities Act</u>") for stock issuances under compensatory benefit plans such as the Plan or, (ii) the exemptions under Section 4(2) and Regulation D of the Securities Act.

       c.    The Participant hereby confirms that he or she has been informed that the Restricted Shares are "restricted securities" under the Securities Act which may not be resold or transferred unless they are first registered under the Securities Act or unless an exemption from such registration is available. Accordingly, the Participant hereby represents and acknowledges as follows:

          i.    The Restricted Shares are being acquired for investment, and not with a view to sale or distribution thereof;

          ii.    The Participant is prepared to hold the Restricted Shares for an indefinite period and is aware that Rule 144 promulgated under the Securities Act (which exempts certain resales of securities) is not presently available to exempt the resale of the Restricted Shares from the registration requirements of the Securities Act; and

          iii.    The Participant is an "accredited investor" within the meaning of Rule 501 (e) of Regulation D of the Securities Act by virtue of the Participant's position with the Company, income, assets or otherwise.

       6.    <u>Rights as Stockholder</u>. The Participant shall have no voting rights as a stockholder with respect to any shares of Stock until the Restricted Shares vest. The Participant shall have the right to receive dividends on the Restricted Shares (the "<u>Dividends</u>") subject to the remainder of this <u>Section 6</u>. The Dividends, if any, shall be held by the Company and shall be subject to forfeiture until such time that the Restricted Shares on which the Dividends were distributed vest in accordance with <u>Section 3(a)</u> above. The Dividends shall be released to the

Participant at such time, if ever, that the Restricted Shares on which the Dividends were distributed vest in accordance with Section 3(a) above. Upon a forfeiture as described in Section 3(b) hereto, the Participant shall no longer have any rights as a holder of such Shares.

7.    Certain Agreements. The Participant hereby further acknowledges and agrees that the Restricted Shares are and shall be subject to the terms and provisions of, and as a condition to the grant and effectiveness of this Award, the Participant shall enter into and execute, the Stockholders' Agreement dated August 22, 2014, as amended or modified from time to time, among the Company and the other persons named therein (the "Stockholders' Agreement").

8.    Non-Competition; Non-Solicitation.

a.    Definitions. For purposes of this Section 8, the following terms shall have the following meanings unless the context indicates otherwise:

"Business" shall have the meaning set forth in the Stockholders' Agreement.

"Competitor" shall have the meaning set forth in the Stockholders' Agreement.

"Customer" means any customer of the Company or any of its Subsidiaries that (i) has purchased, or entered into a contract to purchase, products or services from the Company or any of its Subsidiaries during the two (2) year period preceding the date of termination of the Participant's employment, (ii) was called upon or solicited in writing by the Company or any of its Subsidiaries (or their predecessors) during such two (2) year period, or (iii) was a distributor, sales representative, agent or broker for the Company or any of its Subsidiaries (or their predecessors) during such two (2) year period.

"Restricted Period" means the period ending on the two (2) year anniversary of the termination of Participant's employment by the Company or any of its Subsidiaries.

b.    Confidentiality. Participant recognizes and acknowledges that Participant has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries (the "Confidential Information"), and that such Confidential Information constitutes valuable, special and unique property of the Company. The term Confidential Information will be interpreted to include all information of any sort (whether or embodied in a tangible or intangible form) that is (i) related to the Company's and its Subsidiaries' current or potential business (including information received by the Company or any of its Subsidiaries for third parties), and (ii) is not generally or publicly known.. Participant agrees not to disclose or use for Participant's own account any Confidential Information without the Board's prior written consent, except (A) if the Confidential Information is a matter of public knowledge on the date hereof, (B) to the extent that any Confidential Information becomes generally known to and available for use by the public other than as a result of Participant's acts or omissions; (C) to the extent that any Confidential Information is required to be disclosed pursuant to any applicable law or court order; or (D) to Participant's attorneys and accountants or other representatives; provided that, in the case of subsection (D) hereof, Participant shall cause

each Person receiving such Confidential Information to be informed that such Confidential Information is confidential and subject to this Agreement and to agree not to disclose or use such information except as provided herein.  Participant acknowledges and agrees that all notes, records, reports, sketches, plans, unpublished memoranda or other documents, whether in paper or electronic form (and copies thereof), held by Participant concerning any information relating to the Company's and its Subsidiaries' business, whether confidential or not, are the property of the Company and will be promptly delivered to it upon the termination of Participant's ownership of Participant's Securities.

        c.    <u>Nonsolicitation</u>.  During the Restricted Period, the Participant shall not, directly or indirectly, and will cause the Participant's employees, agents and affiliates not to, induce or attempt to induce any employee, sales representative, consultant or other agent of the Company or any of the Company Subsidiaries to terminate his, her or its relationship with, or breach any agreement with, the Company or such Company Subsidiary, <u>provided</u> that any general solicitation not specifically directed to the employees, sales representatives, consultants or other agents of the Company or any of the Company Subsidiaries shall not constitute a breach of this <u>Section 8(c)</u>.

        d.    <u>Noncompetition</u>.  During the Restricted Period, the Participant shall not, directly or indirectly, and will cause its employees, agents and affiliates not to, either directly or indirectly, (i) contact or solicit any Customer for the purpose of providing products or services competitive with those offered by the Company and the Company Subsidiaries as of the date hereof, (ii) request or advise any Customer or any supplier or vendor to the Company or any Company Subsidiary to withdraw, curtail or cancel any of its business or relations with the Company or such Company Subsidiary, as applicable, or (iii) participate in the Business.

        e.    <u>Nondisparagement</u>.  The Participant shall not, directly or indirectly, make any statement, whether in commercial or noncommercial speech, disparaging or criticizing in any way the Company or any of its affiliates or any of their respective officers or employees, or knowingly engage in any other conduct or make any other statement that is likely to impair the goodwill or reputation of the Company or any of its affiliates.  This <u>Section 8(e)</u> does not, in any way, restrict or impede the Participant from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation or order or testifying truthfully under oath.

        f.    <u>Enforcement</u>.  If, at the time of enforcement of any provision of <u>Sections 8(c)</u>, <u>8(d)</u> or <u>8(e)</u>, a court shall hold that the duration, scope or area restrictions stated therein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the restrictions contained therein to cover the maximum period, scope and area permitted by law.  Because Participant has access to Confidential Information, the parties hereto agree that money damages would not be an adequate remedy for any breach of <u>Sections 8(b)</u>, <u>8(c)</u>, <u>8(d)</u> or <u>8(e)</u>.  Therefore, in the event of a breach or threatened breach of <u>Sections  8(b)</u>, <u>8(c)</u>, <u>8(d)</u> or <u>8(e)</u>, the Company or any of its successors or

assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security and without proving actual damages). In addition, in the event of a breach or violation by Participant of any provision of Sections 8(c), 8(d) or 8(e), the Restricted Period shall be tolled until such breach or violation has been duly cured. The existence of any claim or cause of action by Participant against the Company or any of its affiliates, whether predicated on this Agreement or otherwise, will not constitute a defense to the enforcement by the Company of the provisions of Sections 8(b), 8(c), 8(d) or 8(e), which Sections will be enforceable notwithstanding the existence of any breach by the Company.

       g.    Further Acknowledgments. Participant expressly agrees and acknowledges that the restrictions contained in Sections 8(b), 8(c), 8(d) and 8(e) do not preclude Participant from earning a livelihood, nor do they unreasonably impose limitations on Participant's ability to earn a living. In addition, Participant agrees and acknowledges that the potential harm to the Company of the non-enforcement of Sections 8(b), 8(c), 8(d) and 8(e) outweighs any harm to Participant of his or her enforcement by injunction or otherwise. Participant acknowledges that Participant has carefully read this Agreement and has given careful consideration to the restraints imposed upon Participant, and is in full accord as to their necessity for the reasonable and proper protection of the Confidential Information. Participant expressly acknowledges and agrees that (i) each and every restriction imposed by this Agreement is reasonable with respect to subject matter and time period and such restrictions are necessary to protect the Company's interest in, and value of, the Company (including, without limitation, the goodwill inherent therein), and (ii) the Company would not have consummated the transactions contemplated herein without the restrictions contained in Sections 8(b), 8(c), 8(d) and 8(e). Participant understands and agrees that the restrictions and covenants contained in Sections 8(b), 8(c), 8(d) and 8(e) are in addition to, and not in lieu of, any non-competition, non-solicitation or other similar obligations contained in any other agreements between Participant and the Company.

       9.    Withholding Taxes. The Company shall have the power and the right to deduct or withhold automatically from any payment or Shares deliverable under this Award Agreement, or require the Participant to remit to the Company, the minimum statutory amount to satisfy federal, state, and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising as a result of this Award Agreement.

       10.    Effect Upon Employment. Nothing in this Award Agreement or the Plan shall be construed to impose any obligation upon the Company or any Subsidiary to employ or retain in its employ, or continue its involvement with, the Participant or interfere in any way with any right of the Company or any of its Subsidiaries or affiliates to terminate such employment at any time for any reason whatsoever (whether for cause or without cause) without liability to the Company or any of its Subsidiaries or affiliates.

       11.    Section 83(b) Election. The Participant shall make an election with the Internal Revenue Service (the "IRS") under Section 83(b) of the Code and the regulations promulgated thereunder ("83(b) Election") and the Participant shall provide a copy of such form to the

Company promptly following its filing, which is required under current law to be filed with the IRS no later than thirty (30) days after the Date of Grant of the Restricted Shares. The form for making an 83(b) Election is attached hereto as Exhibit A. The Participant is advised to consult with his or her own tax advisors regarding the purchase and holding of the Restricted Shares, and the Company shall bear no liability for and the Participant shall be responsible for any consequence of the Participant making an 83(b) Election. The Participant acknowledges that it is his or her sole responsibility, and not the Company's, to file a timely election under Code Section 83(b), even if the Participant requests the Company or its representatives to make this filing on his or her behalf.

12.     General Provisions.

    a.     Amendment. This Award Agreement, including the Plan, contains the full and complete understanding and agreement of the parties hereto as to the subject matter hereof, and except as permitted under the terms of the Plan, this Award Agreement may not be modified or amended, nor may any provision hereof be waived, except by a further written agreement duly signed by the Company and Participant. The waiver by either of the parties hereto of any provision hereof in any instance shall not operate as a waiver or any other provision hereof or in any other instance.

    b.     Binding Effect. This Award Agreement shall inure to the benefit of and be binding upon the parties hereto and, to the extent provided herein and in the Plan, their respective heirs, executors, administrators, representatives, successors and assigns.

    c.     Incentive Equity Plan; Construction. The Participant hereby acknowledges receipt of a copy of the Plan. Except as otherwise provided in this Award Agreement, all of the terms and conditions of the Plan are incorporated herein by reference and this Award Agreement is subject to such terms and conditions in all respects. In case of any conflict between the Plan and this Award Agreement, this Award Agreement shall control. The titles of the sections of this Award Agreement and of the Plan are included for convenience only and shall not be construed as modifying or affecting their provisions. The masculine gender shall include both sexes; the singular shall include the plural and the plural the singular unless the context otherwise requires.

    d.     Exclusive Agreement. The Participant hereby acknowledges and agrees that by signing this Award Agreement, the Participant voluntarily and irrevocably forfeits any and all rights, title, and interests the Participant has or may have had in, to and under (a) any award agreement or other similar document pursuant to which the Company (or any Subsidiary or affiliate thereof) may have previously granted, or offered to grant, Restricted Shares in the Company (or any Subsidiary or affiliate thereof) to the Participant and (b) any oral or written commitment or promise regarding Restricted Shares that the Company (or any Subsidiary or affiliate thereof) may have made to the Participant.

    e.     Survival. Section 3 through Section 12 of this Award Agreement and any defined terms used in such Sections shall survive the termination of the Participant's employment by the Company or its Subsidiaries.

f.     Mutual Waiver of Jury Trial.  THE COMPANY AND PARTICIPANT WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AFFILIATE OF ANY OTHER SUCH PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.  THE COMPANY AND PARTICIPANT AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

g.     Choice of Law; Exclusive Venue.  THIS AGREEMENT, AND ALL ISSUES AND QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT AND THE PLAN WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN DELAWARE.  THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PLAN MUST BE BROUGHT EXCLUSIVELY IN A COURT OF COMPETENT JURISDICTION LOCATED WITHIN THE SOUTHERN DISTRICT OF NEW YORK, WHETHER A STATE OR A FEDERAL COURT (COLLECTIVELY THE "DESIGNATED COURTS").  EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DESIGNATED COURTS.  NO LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN ANY OTHER FORUM.  EACH PARTY HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE DESIGNATED COURTS HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE.

h.     Notices.  Any notice in connection with this Award Agreement shall be deemed to have been properly delivered if it is in writing and is delivered in hand, by reputable overnight delivery service or sent by registered or certified mail, return receipt requested, to the party addressed as follows, unless another address has been substituted by notice so given:

To the Participant:     To his or her address as listed on the books of the Company.

To the Company:

6525 The Corners Parkway, Suite 520

Norcross, GA 30092-3353

Attn:  Steven Taylor

Fax:  (770) 414-5848

with a copy to:        Weil, Gotshal & Manges LLP
                       767 Fifth Avenue
                       New York, New York 10153
                       Attn:  Michael E. Weisser
                       Facsimile:  (212) 310-8007

\*        \*        \*        \*        \*

IN WITNESS WHEREOF, the parties hereto have executed this Award Agreement as of the date first written above.

PARTICIPANT:

Steve Willis

Address:    ~~17437 Olive Tree Circle~~  4422 Nogal Ave
Yorba Linda, CA 92886

[STEVE WILLIS – RESTRICTED STOCK AWARD AGREEMENT]

CAPSTONE LOGISTICS HOLDINGS, INC.

By: _____
Name: Steven Taylor
Title: Chief Executive Officer

## PARTIALLY-RECOURSE PROMISSORY NOTE

$49,960.08

Dated: July 6, 2015

FOR VALUE RECEIVED, the undersigned, Steve Willis, an individual residing at 17437 Olive Tree Circle, Yorba Linda, CA 92886 (the "Borrower"), HEREBY UNCONDITIONALLY PROMISES TO PAY to the order of Capstone Logistics Acquisition, Inc., a Delaware corporation (the "Lender") and a wholly-owned indirect subsidiary of Capstone Logistics Holdings, Inc. ("Holdings"), on the Termination Date (as defined below) the principal amount of Forty Nine Thousand Nine Hundred Sixty Dollars and Eight Cents (US$49,960.08) in lawful money of the United States of America ("U.S. Dollars" or "US$") and in same day funds or by certified check.

### ARTICLE I.

### DEFINITIONS

SECTION 1.1.    Certain Defined Terms.    As used in this Note, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Award Agreement" means the restricted stock award agreement pursuant to which the Restricted Shares were granted to the Borrower by Holdings.

"Borrower" has the meaning specified in the recital of parties to this Note.

"Business Day" means a day of the year on which banks are not required or authorized to close in the State of New York.

"Holdings" has the meaning specified in the recital of parties to this Note.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Lender" has the meaning specified in the recital of parties to this Note.

"Loan" has the meaning specified in Section 2.1 hereof.

"Note" means this Promissory Note dated as of the date hereof.

"Person" means an individual, a corporation, an association, a joint venture, a partnership, a limited liability company, an estate, a trust an unincorporated organization and any other entity or organization, governmental or otherwise.

"Plan" means the Capstone Logistics Holdings, Inc. 2014 Equity Incentive Plan

"Prime Rate" means an interest rate per annum equal to the prime rate as published in The Wall Street Journal Eastern Edition on the date hereof.

"Restricted Shares" means the Shares of Restricted Stock of Holdings granted on July 6, 2015.

"Stockholders' Agreement" means that Stockholders' Agreement dated August 22, 2014, as amended or modified from time to time, among Holdings and the other persons named therein.

"Termination Date" means on the earliest to occur of (i) the tenth (10th) anniversary of the date of this Loan, (ii) any event with respect to Borrower, which, in any such case if the Loan were to remain outstanding on and after such date, would result in a violation of Section 402 of the Sarbanes – Oxley Act of 2002, (iii) an event described in Section 4.1 hereof, (iv) a Change in Control (as defined in the Plan), or (v) an Initial Public Offering (as defined in the Stockholders' Agreement).

SECTION 1.2.    Computation of Time Periods.    In this Note in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

SECTION 1.3.    Other Terms.  All other terms not defined in this Note shall have the meaning assigned to such terms in the Plan or the Award Agreement.

## ARTICLE II.

### AMOUNT AND TERMS OF THE LOAN

SECTION 2.1.    The Loan.  The Lender agrees, on the terms and conditions hereinafter set forth and on the terms and conditions set forth in this Note with respect to the subject matter hereof, all of which are incorporated herein by reference, to make a loan (the "Loan") to the Borrower on the date hereof in the amount set forth above in U.S. Dollars and in same day funds.  Notwithstanding the foregoing, the Borrower hereby directs the Lender to pay to the Internal Revenue Service or other applicable taxing authority such portion of the Loan amount that is sufficient to satisfy the obligation of Holdings or any of its affiliates to withhold any taxes in connection with the grant of Restricted Shares to the Borrower pursuant

to the Award Agreement.  The Borrower acknowledges and agrees that, regardless of the foregoing direction, the Loan amount shall be deemed to have been received in full by the Borrower pursuant to the terms of this Note.

SECTION 2.2.     Repayment.  Except as otherwise provided herein, the Borrower shall repay the aggregate unpaid principal amount of the Loan and all accrued, but unpaid interest thereon in a lump sum on the Termination Date.  The Borrower may prepay the aggregate unpaid principal amount of the Loan and all accrued, but unpaid interest thereon, or any portion thereof, at any time prior to the Termination Date without penalty. Any vested cash payments (including cash distributions) with respect to the Restricted Shares made by the Lender or Holdings to the Borrower on or prior to the Termination Date shall be used to prepay the Loan (including accrued interest) in the amount of such cash payment upon such payment being or becoming vested.

SECTION 2.3.     Interest.  The Borrower shall pay interest on the unpaid principal amount of this Note from the date of this Note until this Note shall be paid in full at a rate per annum, compounded annually, equal at all times to the Prime Rate.  Interest shall accrue and be paid as provided in Section 2.2 above.

SECTION 2.4.     Payments and Computations.  The Borrower shall make each payment hereunder not later than 3:00 P.M. (New York time) on the day when due in U.S. Dollars to the Lender at its address referred to in Section 5.2 in same day funds.  All computations of interest shall be made by the Lender on the basis of a year of 365 or 366 days, as the case may be, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.

SECTION 2.5.     Payment on Non-Business Days.  Whenever any payment under any Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

SECTION 2.6.     Recourse.  The Lender's recourse against the Borrower with respect to the Loan shall not be limited to a foreclosure on the Restricted Shares and the Lender shall have recourse against any of the Borrower's real, personal, tangible or intangible assets for an amount equal to 30% the aggregate principal and interest on the Loan.

SECTION 2.7.     Security.  Borrower hereby grants to Lender a security interest in the Restricted Shares as collateral security for the prompt and complete payment and performance when due of Borrower's obligations hereunder.

ARTICLE III.

COVENANTS OF THE BORROWER

SECTION 3.1.     Affirmative Covenants.  So long as this Note shall remain unpaid, the Borrower will, unless the Lender shall otherwise consent in writing:

(a)     Compliance with Laws, Etc.  Comply in all material respects with all applicable laws, rules, regulations and orders, such compliance to include, without limitation,

paying before the same become delinquent all taxes, assessments and governmental charges imposed upon the Borrower or upon the property of the Borrower except to the extent contested in good faith.

    (b)   <u>Reporting Requirements</u>.  Furnish to the Lender:

       (i)   as soon as possible and in any event within five days after the occurrence of each Event of Default and each event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, continuing on the date of such statement, a statement of the Borrower setting forth details of such Event of Default or event and the action which the Borrower has taken and proposes to take with respect thereto; and

       (ii)   such other information respecting the condition or operations, financial or otherwise, of the Borrower as the Lender may from time to time reasonably request.

ARTICLE IIII.

EVENTS OF DEFAULT

    SECTION 4.1.   <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

    (a)   The Borrower shall fail to pay any principal of, or interest on, this Note or any other amount under any other Loan Document within 30 days after the same becomes due and payable;

    (b)   The Borrower shall fail to perform or observe (i) any term, covenant or agreement contained in Section 3.1 or (ii) any other term, covenant or agreement contained in any Loan Document on the part of the Borrower to be performed or observed if such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Borrower by the Lender;

    (c)   The Borrower shall admit in writing his inability to pay his debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower seeking to adjudicate the Borrower bankrupt or insolvent, or seeking liquidation, protection, relief, or composition of the Borrower or of his debts under any law relating to bankruptcy, insolvency or relief of debtors, or seeking the entry of an order for relief for the Borrower or for any substantial part of his property and, in the case of any such proceeding instituted against the Borrower (but not instituted by the Borrower), either such proceeding shall remain undismissed or unstayed for a period of 30 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against the Borrower or for any substantial part of his property) shall occur;

then, the Lender may, by notice to the Borrower, declare this Note, all interest thereon and all other amounts payable under this Note to be forthwith due and payable, whereupon this Note, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly

waived by the Borrower; provided, that, in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Federal Bankruptcy Code, this Note, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

ARTICLE V.

MISCELLANEOUS

SECTION 5.1.    Amendments, Etc.   No amendment or waiver of any provision of this Note, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 5.2.    Notices, Etc.   All notices and other communications provided for hereunder shall be in writing (including telecopier, telegraphic, telex or cable communication) and mailed, telecopied, telegraphed, telexed, cabled or delivered, if to the Borrower, at his address as indicated in the recital of parties to this Note; and if to the Lender, at its principal executive offices; or, as to each party, at such other address and to such other individual as shall be designated by such party in a written notice to the other party. All such notices and communications shall, when mailed, telecopied, telegraphed, telexed or cabled, be effective when deposited in the mails, telecopied, delivered to the telegraph company, confirmed by telex answerback or delivered to the cable company, respectively.

SECTION 5.3.    No Waiver; Remedies.   No failure on the part of the Lender to exercise, and no delay in exercising, any right under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies provided in this Note are cumulative and not exclusive of any remedies provided by law.

SECTION 5.4.    Binding Effect.   This Note shall (a) be binding upon the Borrower and his personal representatives, estate, heirs, devisees, legatees and assigns, (b) inure to the benefit of the Borrower and his assigns and (c) be binding upon and inure to the benefit of the Lender and its respective successors and assigns, except that the Borrower shall not have the right to assign his rights hereunder or any interest herein without the prior written consent of the Lender.

SECTION 5.5.    Governing Law.   This Note shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to its conflict of law principles.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Borrower has executed and the Lender has caused this Note to be executed by its officer thereunto duly authorized, in each case, as of the date first above written.

_____
Steve Willis, as Borrower

CONSENTED TO AND ACKNOWLEDGED:

Capstone Logistics Acquisition, Inc.
as Lender

By:

Name:  Steven M. Taylor
Title:   Chief Executive Officer

[STEVE WILLIS – PROMISSORY NOTE]

## STOCK POWER

FOR VALUE RECEIVED, Steve Willis hereby conveys, assigns and transfers unto

_____, 210,645 shares of common stock of Capstone Logistics Holdings,

Inc., a Delaware corporation (the "Company"), standing in its name on the books of said

Company and represented by Certificate No. RS-36, and does hereby irrevocably constitute and

appoint Matthew Sedgwick attorney to transfer the said stock on the books of said Company

with full power of substitution in the premises.

Dated: _____

_____
Steve Willis

## FORM OF JOINDER AGREEMENT

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Stockholders' Agreement (the "Stockholders' Agreement") dated as of August 22, 2014 and as may be amended from time to time by and among Capstone Logistics Holdings, Inc. (the "Company"), and the other parties named therein.  Capitalized terms used but not defined in this Joinder Agreement shall have the meanings ascribed to such terms in the Stockholders' Agreement.  The undersigned acknowledges and agrees that (a) the Securities Transferred to the undersigned shall continue to be subject to the Stockholders' Agreement, (b) as to such Securities the undersigned shall be bound by the restrictions of the Stockholders' Agreement and shall take such other actions and execute such other documents as the Company reasonably requests, and (c) for all purposes of the Stockholders' Agreement, the undersigned shall be included within the term  Stockholder and that the Securities Transferred to the undersigned shall be included in the term "Restricted Securities.  The address and facsimile number to which notices may be sent to the undersigned are as follows:

Name: _Steven John Willis_

Address: _4422 Nogal Ave_
_Yorba Linda, Ca 92886_

Facsimile No: _____

Date: _7-22-15_____

_[signature]_

Steve Willis