# EXHIBIT F

## AMENDMENT
## TO
## EMPLOYMENT AGREEMENT

This Amendment to Employment Agreement (this "Amendment") is by and between Pinnacle Workforce Logistics, L.L.C., f/k/a Roadlink Workforce Solutions, L.L.C., a Delaware limited liability company (the "Company") and David Poffenberger (the "Executive").

### RECITALS

WHEREAS, the Company and the Executive are parties to that certain employment letter agreement, dated as of June 7, 2012 (as amended from time to time, the "Employment Agreement");

WHEREAS, this Amendment is subject to and will become effective upon the consummation of the transactions contemplated by that certain Agreement and Plan of Merger (the "Merger Agreement") by and among RWS Holdings, LLC, a Delaware limited liability company, Capstone Logistics, LLC, a Delaware limited liability company ("Buyer"), and certain other parties thereto dated of even date herewith (the date such transactions are consummated, the "Effective Date"); and

WHEREAS, in connection with the transactions contemplated by the Merger Agreement, the Company and the Executive desire to amend the Employment Agreement according to the terms and conditions set forth in this Amendment.

NOW, THEREFORE, in consideration of the mutual promises, agreements, and consideration set forth below, the parties agree to the following terms:

### TERMS

1.      Effectiveness.  Sections 2, 3 and 4 of this Amendment shall become effective on the Effective Date.   In the event that the transactions contemplated by the Merger Agreement are not consummated or the Merger Agreement is terminated in accordance with its terms, this Amendment shall be null and void ab initio.

2.      Position and Duties.  Section 1(a) of the Employment Agreement shall be deleted in its entirety and replaced with the following:

"(a)      You will be employed by the Company on a full-time basis as its Senior Vice President of Operations, but subject to reassignment to another executive position from time to time as the Company shall determine.  In addition, you may be asked from time to time to serve as a director or officer of one or more of the Company's Affiliates (as defined below) without further compensation."

3.      Compensation and Benefits.

(a)      Section 2(a) of the Employment Agreement shall be deleted in its entirety and replaced with the following:

"The Company will pay you a base salary at the rate of $250,000 per year, payable in accordance with the regular payroll practices of the Company and subject to modification from time to time by the Company in its discretion."

(b)     The third and fourth sentences of Section 2(b) of the Employment Agreement shall be deleted in their entirety and replaced with the following:

"The actual amount of any bonus awarded to you will be determined in the discretion of the Company, based on your performance and that of the Company against goals established annually in the discretion of the Company; provided, however, that, with respect to fiscal year 2015, your annual bonus goal shall be an amount of $125,000 but the actual amount of such bonus with respect to fiscal year 2015 shall in no event be less than the amount determined by multiplying (x) $62,500 by (y) a fraction, the numerator of which is the number of days elapsed in calendar year 2015 from and after the Effective Date and the denominator of which is 365. For purposes of this Section 2(b), "Effective Date" means the date upon which the transactions contemplated by that certain Agreement and Plan of Merger by and among RWS Holdings, LLC, a Delaware limited liability company, Capstone Logistics, LLC, a Delaware limited liability company, and certain other parties thereto dated [on or about] May [7], 2015, are consummated. The annual bonus, if any, shall be payable within two and one-half months following the conclusion of the fiscal year to which the bonus applies, unless it is administratively or economically impracticable to make the payment within that period, in which case, payment will be made as soon as reasonably practicable thereafter but in no event later than the last day of the fiscal year following the fiscal year to which the bonus applies."

(c)     The first sentence of Section 2(g) of the Employment Agreement shall be deleted in its entirety and replaced with the following:

"In the event you are required to relocate your residence as a result of the relocation of your primary workplace by the Company, the Company will reimburse, in accordance with its policies, the reasonable packing and moving expenses and certain other reasonable expenses associated with the relocation of your primary household in an amount not to exceed $15,000."

4.     Notices. Section 12 of the Employment Agreement shall be deleted in its entirety and replaced with the following:

"Unless otherwise expressly provided in this Agreement, any notices provided for in this Agreement shall be in writing and shall be effective when delivered in person, consigned to a reputable national courier service or deposited in the United States mail, postage prepaid, and addressed to you at your last known address on the books of the Company or, in the case of the Company, to it c/o Capstone Logistics, LLC, 6525 The Corners Pkwy, Ste. 520, Peachtree Corners, GA 30092, Attn: Chief Executive Officer, or to such other address as either party may specify by notice to the other actually received."

5.     Amendments. Each of the Company and the Executive agree that, from the date of this Amendment through the Effective Date, neither this Amendment nor the Employment Agreement (notwithstanding anything to the contrary in Section 11 of the Employment Agreement) may be amended or otherwise modified without the prior written consent of Buyer. Each of the Company and the Executive agree that Buyer shall be an express third party beneficiary under this Amendment for purposes of this Section 7. Except as set forth in the preceding sentence, nothing set forth in this Amendment shall be construed to confer upon or give any person other than the Company and the Executive any benefits, rights or remedies under or by reason of any provisions of this Amendment.

2

6.      General.

(a)      By executing this Amendment, the Executive acknowledges that the terms of this Amendment and any amendment to the Employment Agreement pursuant to the terms hereof do not, and shall not be deemed to, constitute "Good Reason" for purposes of the Employment Agreement.

(b)      Except as specifically provided in this Amendment, the Employment Agreement will remain in full force and effect and is hereby ratified and confirmed.  To the extent a conflict arises between the terms of the Employment Agreement and this Amendment, the terms of this Amendment shall prevail.

(c)      This Amendment shall be construed under and enforced in accordance with the laws of the State of Georgia, without regard to the conflicts of law provisions thereof. This Amendment constitutes the sole and entire agreement of the parties with respect to amendment of the Employment Agreement and supersedes all prior verbal and written understandings and agreements between the parties relating to its subject matter.  Subject to Section 5, this Amendment may not be modified except in a writing signed by both parties.

(d)      This Amendment may be executed in one or more counterparts, each of which shall be deemed an original and shall have the same effect as if the signatures hereto and thereto were on the same instrument.

[Remainder of page intentionally left blank]

3

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

PINNACLE WORKFORCE LOGISTICS, L.L.C.

By:
Name: Pedro Navarrete
Title: President

DAVID POFFENBERGER

   Shipment Receipt

## Address Information
**Ship to:**
Luke Ashworth
Weil, Gotshal & Manges LLP
767 Fifth Avenue

New York, NY
10153
US
212 310 8973

**Ship from:**
Mindy Cox
Capstone Logistics

6525 The Corners Pkwy
Suite 520
NORCROSS, GA
30092
US
770-724-0566

## Shipment Information:
Tracking no.: 773808234550
Ship date: 06/11/2015
Estimated shipping charges: 15.76

## Package Information
Pricing option: FedEx Standard Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.50  LBS
Declared Value: 0.00  USD
Special Services:
Pickup/Drop-off: Use an already scheduled pickup at my location

## Billing Information:
Bill transportation to: Capstone-011
Your reference:  Transaction
P.O. no.:
Invoice no.:
Department no.:

---

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details. The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

https://www.fedex.com/shipping/html/en//PrintIFrame.html                                    6/11/2015



Mr. David Poffenberger
16868 Suttles Drive
Riverside, CA 92504

Re: Amendment to terms of Employment Agreement

Dear David,

     Reference is made to that certain letter agreement dated June 7, 2012, by and between you and RoadLink Workforce Solutions, L.L.C. relating to the terms of your employment (the "Agreement"). Effective as of January 1, 2014, Section 2(a) of the Agreement is amended to increase your base salary to $250,000 per year. Except as modified hereby, the text of the Agreement will remain unchanged and in full force and effect.

*[Signature Page Follows]*

Sincerely yours,

Pinnacle Workforce Logistics, L.L.C. (f/k/a
Roadlink Workforce Solutions, L.L.C.)


By:
Name: Pedro Navarrete
Title: President



Accepted and Agreed:

Signature:
David Poffenberger

Mr. David Poffenberger
16868 Suttles Drive
Riverside, CA 92504

Dear David:

      This letter reaffirms your employment with RoadLink Workforce Solutions, L.L.C., a Delaware limited liability company (the "Company"), which commenced on March 30, 2009, under the terms and conditions that follow:

1.     **Position and Duties.**

      (a)    You will be employed by the Company on a full-time basis as its Senior Vice President of Operations, subject to reassignment to another executive position from time to time as the Company shall determine. In addition, you may be asked from time to time to serve as a director or officer of one or more of the Company's Affiliates without further compensation.

      (b)    You agree to perform the duties of your position and such other duties as may reasonably be assigned to you from time to time. You also agree that, while employed by the Company, you will devote your full business time and your best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and its Affiliates and to the discharge of your duties and responsibilities for them.

2.     **Compensation and Benefits.** During your employment as compensation in full for all services performed by you for the Company and its Affiliates, the Company will provide you the following pay and benefits:

      (a)    **Base Salary.** The Company will pay you a base salary at the rate of $225,000 per year, payable in accordance with the regular payroll practices of the Company and subject to increase from time to time by the Company in its discretion.

      (b)    **Bonus Compensation.** For each fiscal year completed during your employment with the Company, you will be eligible to be considered by the Company for an annual bonus. Your target bonus will be 50% percent of your base salary. The actual amount of any bonus awarded you will be determined in the discretion of the Company, based on your performance and that of the Company against goals established annually in the discretion of the Company. The annual bonus, if any, shall be payable within two and one-half months following the conclusion of the fiscal year to which the bonus applies, unless it is administratively or

economically impracticable to make the payment within that period, in which case, payment will be made as a soon as reasonably practicable thereafter.

(c) **Participation in Employee Benefit Plans.** You will be entitled to participate in all employee benefit plans made available by the Company from time to time to its executives generally, except to the extent such plans are duplicative of benefits otherwise provided you under this Agreement (e.g., a severance pay plan). These benefits currently include an executive health plan. Your participation in Company benefit plans will be subject to the terms of the applicable plan documents and generally applicable Company policies.

(d) **Vacations.** You will be entitled to earn vacation at the rate set annually by the Company, which will not be less than the amount accrued in 2009, in addition to holidays observed by the Company. Vacation may be taken at such times and intervals as you shall determine, subject to the business needs of the Company and the prior approval of the person to whom you report.

(e) **Business Expenses.** The Company will pay or reimburse you for all reasonable business expenses incurred or paid by you in the performance of your duties and responsibilities for the Company, subject to any maximum annual limit and other restrictions on such expenses set by the Company and to such reasonable substantiation and documentation as it may specify from time to time.

(f) **Car Allowance.** The Company will provide you a car allowance in periodic installments, with the amount of such allowance being $800 per month.

(g) **Relocation Expenses.** In the event you are required to relocate your residence as a result of the relocation of your primary workplace by the Company, the Company will reimburse, in accordance with its policies, the reasonable packing and moving expenses and certain other reasonable expenses associated with the relocation of your primary household. Reimbursement of expenses is subject to such reasonable substantiation and documentation as the Company may specify from time to time.

3. **Confidential Information and Restricted Activities.**

(a) **Confidential Information.** You acknowledge that the Company and its Affiliates continually develop Confidential Information, that you may develop Confidential Information for the Company and its Affiliates and that you may learn of Confidential Information during the course of employment with the Company. You agree to comply with the policies and procedures of the Company and its Affiliates for protecting Confidential Information and also agree not to disclose to any Person or use any Confidential Information obtained by you incident to your employment or other association with the Company or any of its Affiliates, other than as required for the proper performance of your duties and responsibilities to the Company and its Affiliates or as required by applicable law after notice to the Company and a reasonable opportunity for it to protect Confidential Information. You understand that this restriction shall continue to apply after your employment terminates, regardless of the reason for such termination, for so long as such Confidential Information

2

remains confidential or, if sooner, until the expiration of three years following the date your employment with the Company terminates. The obligations of confidentiality imposed by this Section 3(a) shall not apply to Confidential Information that becomes generally known to the public hereafter through no act of yours in breach of this Agreement and no act of any other Person in breach of an obligation of confidentiality to the Company or any of its Affiliates.

      (b)    **Protection of Documents.** All documents, records and files, of whatever kind and description, relating to the business, present or otherwise, of the Company and its Affiliates and any copies, in whole or in part, thereof (collectively, the "Documents"), whether or not prepared by you, shall be the sole and exclusive property of the Company. You agree to safeguard all Documents and to surrender to the Company, at the time your employment terminates or at such earlier time or times as the Company or its designee may specify, all Documents and other property of the Company and its Affiliates then in your possession or control.

      (c)    **Assignment of Rights to Intellectual Property.** You agree to promptly and fully disclose all intellectual property to the Company. Further, you hereby assign and agree to assign to the Company (or as otherwise directed by the Company), your full right, title and interest in and to all intellectual property. You agree to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution, and delivery of instruments of further assurance or confirmation) requested by the Company to assign the intellectual property to the Company and to permit the Company to enforce any patent, copyrights or other proprietary rights to the intellectual property. You agree not charge the Company for time spent in complying with these obligations. All copyrightable works that you create shall be considered "work made for hire" and shall, upon creation, be owned exclusively by the Company.

      (d)    **Non-Competition.** You acknowledge that in your employment with the Company you will have access to Confidential Information which, if disclosed, would assist in competition against the Company and its Affiliates and that you will also generate goodwill for the Company and its Affiliates in the course of your employment. Therefore, you agree that the following restrictions on your activities during and after your employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates:

      (i)    You agree that, while you are employed by the Company and during the six (6) months immediately following the date your employment with the Company terminates, you will not provide services, directly or indirectly, whether as an owner, employee, independent contractor or otherwise, whether with or without compensation, to any Person who competes with the Company or with any of its Known Affiliates (as defined below) in any state within the United States in which the Company or any of the Known Affiliates is doing business or is in active planning to do business at any time during your employment or at the time your employment with the Company terminates. The foregoing, however, shall not prevent your passive ownership of 5% or less of the equity securities of any publicly traded company. For purposes of this Agreement, an Affiliate of the Company shall be a "Known Affiliate" only if, during your employment with the Company, you have had access to the Confidential Information

or customers of that Affiliate or with other Persons with whom the Affiliate has a business relationship such that you would have an unfair competitive advantage if you were to leave employment with the Company and commence services on your own behalf or on behalf of another Person in competition with that Affiliate.

(ii)     You agree that, while you are employed by the Company and during the six (6) months immediately following the date your employment with the Company terminates, you will not, directly or indirectly, (a) solicit or encourage any customer of the Company or any of its Known Affiliates to terminate or diminish its relationship with them; or (b) seek to persuade any such customer of the Company or any of its Known Affiliates to conduct with anyone else any business which such customer conducts or could conduct with the Company or any of the Known Affiliates: provided, however, that after your employment with the Company terminates these restrictions shall apply only with respect to those Persons who have been a customer of the Company or one of the Known Affiliates at any time during the six (6) months immediately preceding the date your employment with the Company terminates and only if you have performed work with respect to such Person during your employment with the Company or been introduced to, or otherwise had contact with, such Person as a result of your employment or other associations with the Company or one of its Known Affiliates or have had access to Confidential Information which would assist your solicitation of such Person in competition with the Company or one of its Known Affiliates.

(e)     You agree that, while you are employed by the Company and for the six (6) months immediately following the date your employment with the Company terminates, you will not, and will not assist any other Person to, directly or indirectly, (a) hire or solicit for hiring any employee of the Company or any of its Known Affiliates or seek to persuade any employee of the Company or any of its Known Affiliates to discontinue employment or (b) solicit or encourage any independent contractor providing services to the Company or any of the Known Affiliates to terminate or diminish its relationship with them: provided, however, that after your employment with the Company terminates these restrictions shall apply only with respect to those Persons who have been an employee of the Company or a Known Affiliate or an independent contractor providing services to the Company or a Known Affiliate at any time during the six (6) month period immediately preceding the date your employment with the Company terminated and with whom you had contact or as to whom you had access to Confidential Information which, in either case, would assist you in the solicitation of such employee or independent contractor.

(f)     In signing this Agreement, you give the Company assurance that you have carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed on you under this Section 3. You agree without reservation that these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates, that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area and that these restraints will not, individually or in the aggregate, prevent you from obtaining other suitable employment during the period in which you are bound by these restraints. You further agree that, were you to breach any of the covenants contained in this Section 3, the damage to the Company and its Affiliates would be irreparable. You therefore agree that the Company, in addition to any other remedies available to it, shall be

4

entitled to preliminary and permanent injunctive relief against any breach or threatened breach by you of any of those covenants, without having to post bond. You and the Company further agree that, in the event that any provision of this Section 3 is determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. It is also agreed that each of the Company's Affiliates shall have the right to enforce all of your obligations to that Affiliate under this Agreement, including without limitation pursuant to this Section 3.  The parties intend to and hereby confer jurisdiction to enforce the obligations set forth in this Section 3 upon the courts of any jurisdiction within the United States in which a breach of such obligations occurred.  Each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objections to venue laid therein.  If the courts of any one or more jurisdictions hold such obligations unenforceable by reason of the breadth of their scope or otherwise, it is the intention of the parties that such determination not bar or in any way affect the Company's right to the relief provided for under this Agreement in the courts of any other jurisdiction within the United States, as to breaches of such obligations in such other respective jurisdictions, such obligations as they relate to each jurisdiction being, for this purpose, severable into diverse and independent obligations.

     4.    **Termination of Employment.** Your employment under this Agreement shall continue until terminated pursuant to this Section 4.

     (a)    **By the Company.** (i) The Company may terminate your employment for cause upon notice to you setting forth in reasonable detail the nature of the Cause. The following, as determined in the reasonable judgment of the Company or its designee, shall constitute Cause for termination: (A) your failure to perform (other than by reason of disability), or material negligence in the performance of, your duties and responsibilities to the Company or any of its Affiliates; (B) your material breach of this Agreement or any other agreement between you and the Company or any of its Affiliates; or (C) other conduct by you that is, or could reasonably be expected to be, harmful to the business, interests or reputation of the Company or any of its Affiliates. (ii) The Company also may terminate your employment at any time other than for Cause upon notice to you.

     (b)    **By you for Good Reason.** You may terminate your employment hereunder for Good Reason, upon notice to the Company setting forth in reasonable detail the nature of such Good Reason. The following shall constitute Good Reason for termination by you: (i) material diminution in your responsibilities, duties, or authority; provided, however, that the Company's failure to continue your appropriate appointment or election as a director or officer of any of its Affiliates, a change in reporting relationships resulting from direct or indirect control of the Company (or a successor corporation) by another corporation and any diminution of the business of the Company or any of its Affiliates or any sale or transfer of equity, property or other assets of the Company or any of its Affiliates shall not constitute "Good Reason" or (ii) material failure of the Company to provide you the Base Salary in accordance with the terms of Section 2(a) hereof, excluding an inadvertent failure which is cured within ten (10) business days following receipt of notice from you specifying in detail the nature of such failure. In the event

of termination in accordance with this Section 4(b), and provided that no benefits are payable to you under separate severance agreement or an executive severance plan as a result of such termination or, if any such benefits are payable, you waive your rights thereto, then in addition to Final Compensation, you will be entitled to a Final Bonus payout to be pro-rated for the year in which termination occurs, and to have been entitled to receive had you been terminated by the Company other than for Cause in accordance with Section 4(a) above; provided that you satisfy all conditions to such entitlement, including without limitation the signing of a timely and effective Employee Release (as hereinafter defined).

(c)     You may terminate your employment at any time upon 30 days' notice to the Company. The Company may elect to waive some or all of that notice period and in that event will pay you your base salary for the first 30 days of the notice period, or portion thereof, waived.

(d)     This Agreement shall automatically terminate in the event of your death during employment. In the event you become disabled during employment and, as a result, are unable to continue to perform substantially all of your duties and responsibilities under this Agreement, the Company will continue to pay you your base salary and to provide you benefits in accordance with Section 2(c) above, to the extent permitted by plan terms, for up to a total of twelve (12) weeks of disability during any period of three hundred and sixty-five (365) consecutive calendar days. If you are unable to return to work after a total of twelve (12) weeks of disability, the Company may terminate your employment upon notice to you. If any question shall arise as to whether you are disabled to the extent that you are unable to perform substantially all of your duties and responsibilities for the Company and its Affiliates, you shall, at the Company's request, submit to a medical examination by a physician selected by the Company to whom you or your guardian, if any, has no reasonable objection to determine whether you are so disabled and such determination shall for the purposes of this Agreement be conclusive of the issue. If such a question arises and you fail to submit to the requested medical examination, the Company's determination of the issue shall be binding on you.

5.     **Severance Payments and Other Matters Related to Termination.**

(a)     In the event of termination of your employment with the Company, howsoever occurring, the Company will pay you any base salary earned, but not paid, for the last payroll period of your employment, through the date of termination, and pay for any vacation accrued but not used to that date and the Company will reimburse any reimbursable business expenses incurred by you on or before the date your employment with the Company terminates, provided you submit those expenses and any required documentation and substantiation within 60 days following the date your employment terminates (together, "Final Compensation").

(b)     In the event of termination of your employment by the Company other than for Cause or termination of your employment for Good Reason, the Company, in addition to Final Compensation, shall provide you the following severance benefits: (i) the Company will pay you, as severance pay, your base salary for the period of six (6) months from the date of termination and (ii) the Company will continue to contribute to the premium cost of your participation and that of your eligible dependents in the Company's group health and dental plans

for the period of six (6) months following the date your employment terminates or until you become eligible for coverage under the health, or dental plan of another employer, whichever is less, provided, that you are eligible and elect to continue such participation under the federal law generally known as COBRA or other applicable law and under plan terms that you pay the remainder of the premium cost by payroll deduction and that you notify the Company promptly if you become eligible for participation in the health or dental plan of another employer prior to the expiration of six (6) months following the termination of your employment with the Company. Any obligation of the Company to provide you severance and other benefits pursuant to this Section 5(b) is conditioned, however, on your signing a timely and effective release of claims in the form attached to this Agreement as Exhibit A (the "Employee Release"). All severance pay will be in the form of salary continuation payable in accordance with the normal payroll practices of the Company and will begin at the Company's next regular payroll period that is at least five business days following the later of the effective date of the Employee Release or the date the Employee Release, signed by you, is received by the Company, but shall be retroactive to the day immediately following the date of termination. The Employee Release creates legally binding obligations and the Company advises you to seek the advice of an attorney before signing it.

(c)     Except for any right you may have under COBRA to continue participation in the Company's group health and dental plans, benefits shall terminate in accordance with the terms of the applicable benefit plans based on the date of termination of your employment, without regard to any continuation of base salary or other payment to you following termination.

(d)     Provisions of this Agreement shall survive any termination if so provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including without limitation your obligations under Section 3 of this Agreement. The obligation of the Company to make payments to you or on your behalf under Section 5(b) is expressly conditioned upon your continued full performance of obligations under Section 3 hereof.

(e)     If at the time of your separation from service you are a "specified employee," as defined here, any and all amounts payable under Section 5(b) in connection with such separation from service that constitute deferred compensation subject to Section 409A of the Internal Revenue Code of 1986, as amended, ("Section 409A"), as determined by the Company in its sole discretion, and that would (but for this sentence) be payable within six months following such separation from service, shall instead be paid on the date that follows the date of such separation from service by six months. For purposes of the preceding sentence, "separation from service" shall be determined in a manner consistent with subsection (a)(2)(A)(i) of Section 409A and the term "specified employee" shall mean an individual determined by the Company to be a specified employee as defined in subsection (a)(2)(B)(i) of Section 409A.

6.     **Definitions.** For purposes of this Agreement, the following definitions will apply:

      (a)    "Affiliates" means all persons and entities directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, contract or equity interest.

      (b)    "Confidential Information" means any and all information of the Company and its Affiliates that is not generally known by those with whom they compete or do business, or with whom any of them plans to compete or do business and any and all information, publicly known in whole or in part or not, which, if disclosed by the Company or its Affiliates would assist in competition against them. Confidential Information includes without limitation such information relating to (i) the development, research, testing, manufacturing, marketing and financial activities of the Company and its Affiliates, (ii) the Products, (iii) the costs, sources of supply, financial performance and strategic plans of the Company and its Affiliates, (iv) the identity and special needs of the customers of the Company and its Affiliates and (v) the people and organizations with whom the Company and its Affiliates have business relationships and the nature and substance of those relationships. Confidential Information also includes any information that the Company or any of its Affiliates has received, or may receive hereafter, belonging to customers or others with any understanding, expressed or implied, that the information would not be disclosed.

      (c)    "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust or any other entity or organization, other than the Company or any of its Affiliates.

      (d)    "Products" mean all products planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by the Company or any of its Affiliates, together with all services provided or planned by the Company or any of its Affiliates, during the your employment.

      7.    **Conflicting Agreements**. You hereby represent and warrant that your signing of this Agreement and the performance of your obligations under it will not breach or be in conflict with any other agreement to which you are a party or are bound and that you are not now subject to any covenants against competition or similar covenants or any court order that could affect the performance of your obligations under this Agreement. You agree that you will not disclose to or use on behalf of the Company any proprietary information of any Person without that Person's consent.

      8.    **Withholding**. All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

      9.    **Assignment**. Neither you nor the Company may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without your consent to one of its Affiliates or to any Person with whom the Company shall hereafter affect a reorganization, consolidate with, or merge into or to whom it transfers all or substantially all of its properties or assets. This Agreement shall inure to the

benefit of and be binding upon you and the Company and each of our respective successors, executors, administrators, heirs, and permitted assigns.

10.     **Severability.**  If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.     **Miscellaneous.**  This Agreement sets forth the entire agreement between you and the Company and replaces all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the terms and conditions of your employment with the Company. This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and an expressly authorized representative of the Company. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. Subject to Section 3(f), in which case the enforcing court shall apply the laws of its home state, this is a Georgia contract and shall be governed and construed in accordance with the laws of the State of Georgia , without regard to the conflict of laws principles thereof.

12.     **Notices.**  Unless otherwise expressly provided in this Agreement, any notices provided for in this Agreement shall be in writing and shall be effective when delivered in person, consigned to a reputable national courier service or deposited in the United States mail, postage prepaid, and addressed to you at your last known address on the books of the Company or, in the case of the Company, to it c/o the President of RoadLink Workforce Solutions, L.L.C. at his principal place of business, or to such other address as either party may specify by notice to the other actually received.

At the time you sign and return it this letter will take effect as a binding agreement between you and the Company on the basis set forth above. The enclosed copy is for your records.


[Signature Page Follows]

Sincerely yours,
RoadLink Workforce Solutions, L.L.C.

By

Name:  Pedro Navarrete
Title:  President

Accepted and Agreed:

Signature:

David Poffenberger

Date:  6 - 7 - 2012

## EXHIBIT A

### RELEASE OF CLAIMS

FOR AND IN CONSIDERATION OF the benefits to be provided me in connection with the termination of my employment, as set forth in the letter agreement of employment between me and RoadLink Workforce Solutions, L.L.C. (the "Company") effective as of [date] (the "Agreement"), which are conditioned on my signing this Release of Claims and to which I am not otherwise entitled, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I, on my own behalf and on behalf of my heirs, executors, administrators, beneficiaries, representatives and assigns, and all others connected with or claiming through me, hereby release and forever discharge the Company, its Affiliates (as defined in the Agreement) and all of their respective past, present and future officers, directors, trustees, shareholders, employees, agents, general and limited partners, members, managers, joint venturers, representatives, successors and assigns, and all others connected with any of them, both individually and in their official capacities, from any and all causes of action, rights or claims of any type or description, known or unknown, which I have had in the past, now have, or might now have, through the date of my signing of this Release of Claims, in any way resulting from, arising out of or connected with my employment by the Company or any of its Affiliates or the termination of that employment or pursuant to any federal, state, or local law, regulation, or other requirement (including without limitation Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the federal Family and Medical Leave Act, and the fair employment practices laws of the state or states in which I have been employed by the Company or any of its Affiliates, each as amended from time to time).

Excluded from the scope of this Release of Claims is (i) any claim arising under the terms of the Agreement after the effective date of this Release of Claim and (ii) any right of indemnification or contribution that I have pursuant to the certificate of formation, operating agreement, or other governing documents of the Company or any of its Affiliates.

In signing this Release of Claims, I acknowledge my understanding that I may not sign it prior to the termination of my employment, but that I may consider the terms of this Release of Claims for up to twenty-one (21) days from the date my employment with the Company terminates. I also acknowledge that I am advised by the Company and its Affiliates to seek the advice of an attorney prior to signing this Release of Claims; that I have had sufficient time to consider this Release of Claims and to consult with an attorney, if I wished to do so, or to consult with any other person of my choosing before signing; and that I am signing this Release of Claims voluntarily and with a full understanding of its terms.

I further acknowledge that, in signing this Release of Claims, I have not relied on any promises or representations, express or implied, that are not set forth expressly in the Agreement. I understand that I may revoke this Release of Claims at any time within seven (7) days of the date of my signing by written notice to the Company c/o President at his principal place of business or to such other address as the Company may specify by notice to me and that this Release of Claims will take effect only upon the expiration of such seven-day revocation period and only if I have not timely revoked it.

Intending to be legally bound, I have signed this Release of Claims under seal as of the date written below.

Signature: _____

David Poffenberger

Date Signed: _____