UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :

CAPSTONE LOGISTICS HOLDINGS, INC.,    :
CAPSTONE LOGISTICS, LLC, and PINNACLE  :
WORKFORCE LOGISTICS, L.L.C.,        :     Civil Action No. 17-cv-4819
                                       :     (GBD)
               Plaintiffs,        :

    - against -                   :

PEDRO NAVARRETE, DAVID POFFENBERGER, :
STEVEN WILLIS, MARIO ROJAS, and HUMANO  :
LLC,                                     :
                                 :
               Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**███████████████████ FINDINGS OF
FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
<u>ISSUANCE OF PRELIMINARY INJUNCTION</u>**

Dated:   New York, New York
         October 25, 2018

## SUMMARY OF PRIOR FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.       On July 20, 2017 this Court held a hearing on Plaintiffs'[1] motion for a preliminary injunction based upon an expedited discovery record.  After hearing argument, this Court issued a narrowly tailored injunction enjoining Defendants[2] from soliciting or attempting to do business with Capstone's current customers, soliciting or hiring Capstone's employees, and using Defendants' confidential, proprietary and trade secret information, as reflected in its July 28, 2017 written Order.  [Dkt. 86.]

2.       More specifically, after finding that Plaintiffs demonstrated a likelihood of success on the merits of their claims and that they will suffer irrepable harm in the absence of injunctive relief, the July 28, 2017 Order preliminarily and prospectively enjoined the Defendants as follows:

- Defendants shall not, directly or indirectly, access, use, disclose, disseminate, or otherwise misappropriate any of Plaintiffs' confidential and proprietary information and trade secrets;

- Defendants shall not hire any of Plaintiffs' current employees, or directly or indirectly, induce or attempt to induce any employee, sales representative, consultant, or other agent of Plaintiffs to terminate his, her or its relationship with, or breach any agreement with Plaintiffs;

- Defendants shall not, directly or indirectly: (i) contact, solicit, service, or conduct business with any current customer of Plaintiffs for the purpose of providing products or services competitive with those offered by Plainitffs; (ii) request or advise any current customer or any supplier or vendor to withdraw, curtail, or cancel any of its business ore relations with Plaintiffs.

3.       The July 28, 2017 Order also directed Defendants to preserve and not destroy, damage or alter in any way all potentially relevant evidence in this action, and to return to Plaintiffs

---

[1] "Plaintiffs" means Capstone Logistics Holdings, Inc., Capstone Logistics, LLC, and Pinnacle Workforce Logistics, L.L.C., and any of their subsidiaries.
[2] "Defendants" means Pedro Navarrete, David Poffenberger, Steven Willis, Mario Rojas, Humano, LLC, and their employees, agents and affiliates.

all Capstone property and all files or documents containing Capstone information or data of any kind. [Dkt. 86.]

4.      As to the restraints prohibiting the solicitation of customers and employees, this Court found that the Plaintiffs demonstrated a likelihood of success that the non-solicitation provisions contained in the subject Restricted Stock Award Agreements (the "RSA Agreements") at issue are enforceable against the Equity Defendants.[3]  (Transcript of Hearing, "Tr.," dated July 20, 2017, at 91, attached as Yu Decl., Ex. 1.)

5.      This Court further found that Delaware law applied to the enforcement of the non-solicitation provisions in the RSA Agreements because the parties agreed to be bound by the Delaware choice of law provision contained therein.  (*Id.* at 91; 98.)  In this regard, the Court rejected Defendants' argument with respect to the application of California law.  (*Id.*)  In rejecting the application of California law, this Court found that Humano's business and its connection with California was irrelevant to the choice of law issue and that when Defendants executed the RSA Agreements, they were not working for a company whose majority of sites were in California, nor were a majority of their customers in California.  (*Id.* at 76-77.)  The Court further found that the RSA Agreements were not employment agreements but were signed in connection with Defendants' stock award.  (*Id.* at 74.)

6.      This Court also found that Defendants' communications with Capstone's customers and employees, as described in the record, amounted to solicitation, as prohibited by the RSA Agreements.  (*Id.* at 51-58.)  Furthermore, this Court found that Capstone demonstrated a likelihood of irreparable injury based on loss of goodwill.  (*Id.* at 59, 89.)

---

[3] The Equity Defendants are Navarrete, Poffenberger and Willis, who each signed the RSA Agreement.

7.      As to the injunction against the use of Capstone's confidential, proprietary and trade secret information, this Court found that Capstone demonstrated that a loss or misuse of its proprietary information will likely cause irreparable injury. (*Id.* at 59, 89-91.) This Court also accepted the representations of Defendants' counsel on the record that they would not use or disclose, and would in fact return, any and all files or documents containing Capstone information or data of any kind. (*Id.* at 90.)

8.      On June 21, 2018, this Court held a hearing on a motion by Defendants to modify the injunction, which was denied. [Dkt. 250.] At that hearing, this Court clarified that the preliminary injunction applies to all of Humano's agents and is to remain in place at least through May 2019 when all of the Defendants' restrictive covenants expire. (Transcript of Hearing, dated June 21, 2018, at 11-13, Yu Decl., Ex. 2.) The Court further made clear that the injunction prohibits Defendants from doing business, attempting to do business, or discussing providing any business with any customer of Capstone, and that the term "customer" contained no exceptions and was without regard to the number of sites that Capstone serviced for any current customer. (*Id.*)

* * *

9.      This Court is now directed by the Court of Appeals on remand to make appropriate findings of fact and conclusions of law concerning Plaintiffs' entitlement to injunctive relief. Accordingly, the restraints in the July 28, 2017 preliminary injunction are **REINSTATED** based upon the following findings of fact and conclusions of law, which are drawn both from the record that was then before this Court at the July 20, 2017 hearing and the entire discovery record now before this Court.

## INDEX OF CITATIONS TO DEPOSITION TESTIMONY

| | | |
|---|---|---|
| Navarrete Dep. I | 07-12-17 Deposition of P. Navarrete | Yu Decl., Ex. 3 |
| Navarrete Dep. II | 05-23-18 Deposition of P. Navarrete | Yu Decl., Ex. 4 |
| Navarrete Dep. III | 08-16-18 Deposition of P. Navarrete | Yu Decl., Ex. 5 |
| Poffenberger Dep. I | 07-11-17 Deposition of D. Poffenberger | Yu Decl., Ex. 6 |
| Poffenberger Dep. II | 05-18-18 Deposition of D. Poffenberger | Yu Decl., Ex. 7 |
| Poffenberger Dep. III | 08-06-18 Deposition of D. Poffenberger | Yu Decl., Ex. 8 |
| Willis Dep. I | 07-12-17 Deposition of S. Willis | Yu Decl., Ex. 9 |
| Willis Dep. II | 05-17-18 Deposition of S. Willis | Yu Decl., Ex. 10 |
| Rojas Dep. | 07-11-17 Deposition of M. Rojas | Yu Decl., Ex. 11 |
| Valentine Dep. I | 07-17-17 Deposition of J. Valentine | Yu Decl., Ex. 12 |
| Valentine Dep. II | 05-16-18 Deposition of J. Valentine | Yu Decl., Ex. 13 |
| O'Neill Dep. I | 07-17-17 Deposition of S. O'Neill | Yu Decl., Ex. 14 |
| O'Neill Dep. II | 05-24-18 Deposition of S. O'Neill | Yu Decl., Ex. 15 |
| Fletcher Dep. | 05-22-18 Deposition of M. Fletcher | Yu Decl., Ex. 16 |
| Townsend Dep. | 08-01-18 Deposition of T. Townsend | Yu Decl., Ex. 17 |
| C. Rojas Dep. | 07-14-17 Deposition of C. Rojas | Yu Decl., Ex. 18 |
| Allen Dep. | 08-13-18 Deposition of J. Allen | Yu Decl., Ex. 19 |
| Shelton Dep. | 08-14-18 Deposition of M. Shelton | Yu Decl., Ex. 20 |
| Erklenz Dep. | 05-28-18 Deposition of C. Erklenz | Yu Decl., Ex. 21 |
| Oswalt Dep. | 08-24-18 Deposition of T. Oswalt | Yu Decl., Ex. 23 |

## FINDINGS OF FACT

## I.    CAPSTONE

### A.    Capstone's Business and Its Confidential and Trade Secret Information

10.    Capstone is one of the nation's largest non-asset-based warehouse labor providers. Capstone's core business employs a workforce trained to provide various logistics services in its customers' warehouses and distribution centers ("customer sites"). Among the services provided by Capstone are warehouse and distribution unloading and shipping, pallet management, freight hauling, plant maintenance, and warehouse labor services, among other operations. Capstone unloads over five million loads per year across a network of hundreds of operating locations and distribution centers throughout the United States and Canada. Capstone serves distribution and manufacturing operations in a variety of industries, including retail, food service, and home

improvement. Many of Capstone's customers have national operations. (Declaration of Rick Tomcho, dated September 14, 2018 ("Tomcho Decl."), ¶¶ 3-5.)

11.    Because customers entrust the handling of their business to Capstone, an essential aspect of Capstone's business is protecting its customer relationships and goodwill. These relationships are critical to Capstone's success because long-term business relationships with established customers allow Capstone to maintain its strategic position in the industry. Capstone's retention of its customer relationships results not only from its successful and efficient performance of a broad range of logistics services, but also by its continuous efforts and investment of substantial money and resources to improving innovations for customers over time, about which Capstone has developed trade secret information. (*Id.* ¶ 8.)

12.    Each customer contract is extensively negotiated based upon a customer's specific and particular needs, and is deemed highly confidential. Capstone uses a proprietary methodology to determine prices per load based upon the operations of each customer site, the carrier, and any applicable rebates. Capstone uses a proprietary methodology to determine prices per load based upon the operations of each customer site, the carrier, and any applicable rebates. Broadly speaking, a "cost-per-unit" pricing model method – which simply refers to the cost charged to the customer per unit, where a case, or a pallet or a truck can constitute the unit, by way of example – is typical in the industry, but what makes Capstone's model proprietary is how it goes about identifying the proper cost per unit using tools and data that is proprietary. So while certain information, such as the rates a vendor's carrier will be charged to unload a truck, may be publicly available, that is merely a piece of the overall puzzle and there are other variables that are not public and determine the competitiveness of overall pricing. Rebate percentages going back to the vendor are proprietary, backhaul and logistics pricing is proprietary, the forms and templates and

the documents Capstone uses to assess an opportunity when it visits a site to determine pricing are all proprietary. (*Id.* ¶ 6.)

13.     Other factors, such as signing bonuses, unique carrier pricing information, compensation information relating to each Capstone employee, staggered pricing structures, confidential contracts with certain customers, duration of pricing arrangements, and the years of data Capstone has compiled or acquired about the industry relating to Capstone's business practices, projections and finances, are all proprietary and confidential. (*Id.*)

14.     In addition, Capstone uses a proprietary, dynamic operating and reporting system which enables it to accurately capture multiple data points for each activity performed.  This provides customers with, among other things, enhanced data analysis and information for any period of time and at any level of the operational hierarchy to help improve performance. (*Id.* ¶ 7.)

15.     In sum, Capstone's confidential information includes, but is not limited to, contracts negotiated with each of Capstone's customers, its cost-per-unit model based upon years of experience and application, pricing information, customer sites, distribution centers, proprietary technology, carrier information, negotiated rebates, compensation information relating to each Capstone employee, the years of data Capstone has compiled or acquired about the industry, and other strategic information relating to Capstone's business practices, projections and finances. (*Id.* ¶ 10.)

16.     The foregoing confidential and trade secret information is not generally known to the public.  Such information would give a competitor who acquired it an unfair competitive advantage by, among other things: (a) not having to expend the time and resources to develop the customer relationships or information as Capstone has; and (b) allowing the competitor to unfairly

compete against Capstone by having access to such information, such as pricing and performance data. (*Id.* ¶¶ 11-12.)[4]

17.    Capstone protects its confidential and trade secret information by, among other safeguards: (a) requiring employees to sign non-disclosure agreements; (b) requiring certain executives and managers to sign agreements containing covenants against competition and the solicitation of customers and employees; (c) storing information on password protected computers and servers; (d) limiting access to confidential information to select employees; (e) requiring employees to acknowledge that all property on Capstone's computers is Capstone's property; and (f) requiring employees to return all Company information upon termination. Capstone's policies with respect to its property and treatment of confidential information are described in Capstone's Associate Handbook (the "Capstone Handbook"). (Tomcho Decl., Ex. A.)

**B.    Capstone and the Resolute Fund III, L.P.**

18.    On August 22, 2014, Resolute Fund III, L.P. (the "Resolute Fund"), a Delaware limited partnership that was the investment vehicle for The Jordan Company, a private equity firm

---

[4] The discovery record confirms that much of this information is confidential and constitutes a legitimate protectable interest. Defendants' depositions confirmed that all of this information and the customer data maintained by Capstone are considered confidential and that they would not share this information with a competitor. For example, Defendants and Pinnacle's former CEO all testified that pricing information, and particularly details as to Plaintiffs' margins and methods of calculating rebates, is confidential. (*See* Navarrete Dep. I at 161:9-22 (method of calculating rebates is confidential); Willis Dep. I at 165:6-166:15 (pricing information, including margin and rebate information, contract terms, and P&L); Rojas Dep. 52:10-54:25, 139:10-13 (pay models, Capstone and customer financials, map scales, presentations on upcoming initiatives, contracts); Shelton Dep. at 53:25-55:5 (client data, employee data, employee salaries, customer contracts, pricing and rebate information, pricing methodologies, backhaul rates, marketing plans, and technology infrastructure).) While Navarrete testified that Humano's method of calculating rebates is different from Capstone's method, it is strikingly similar to the legacy Pinnacle method. (Tomcho Supp. Decl. ¶ 6, n.1). By virtue of Capstone's acquisition of Pinnacle, that methodology still belongs to Capstone. (*Id.*) Theo Townsend similarly testified that the software and documentation that he developed for Pinnacle to track logistics data is confidential. (Townsend Dep. 128:17-129:4; 133:11-13.) In 2013, Poffenberger submitted a sworn Declaration on behalf of Pinnacle's predecessor, Roadlink Workforce Solutions, in a lawsuit it filed against another employee for misappropriation of trade secrets. (Yu Decl., Ex. 23.) In that document, Poffenberger maintained that information concerning its personnel, customer lists, rates and schedules and client communications, all of which has since been acquired by Capstone, are confidential and constitute trade secret information. Humano itself requires its employees to sign employment agreements containing confidentiality obligations and restrictive covenants. (Yu Decl. Ex. 24.)

headquartered in New York, acquired a controlling interest in Capstone. In connection with this acquisition, Capstone, Inc., the Resolute Fund, and other shareholders in Capstone Inc., all of whom were management employees of Capstone, entered into a Stockholders' Agreement dated August 22, 2014 (the "Stockholders' Agreement"). (Declaration of Steven Taylor, dated September 14, 2018 ("Taylor Decl.") ¶¶ 7-8, and Ex. A.)

19.    The Stockholders' Agreement addresses several issues related to the operation of Capstone Inc., including restrictions applicable to management shareholders of Capstone Inc.: (§5.1), non-solicitation (§5.2), noncompetition (§5.3), and non-disparagement (§5.4). *Id.* (Taylor Decl. ¶ 8.)

20.    The Stockholders' Agreement also contains a section (§6.13) that provides for Delaware choice of law and exclusive venue in the federal and state courts located within the Southern District of New York. (Taylor Decl. ¶ 9.) Specifically, it provides

> THIS AGREEMENT, AND ALL ISSUES AND QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAWS RULES (WHETHER OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN DELAWARE. THE PARTIES AGREE THAT ALL DISPUTES, LEGAL ACTIONS, SUITS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE BROUGHT EXCLUSIVELY IN A COURT OF COMPETENT JURISDICTION LOCATED WITHIN THE SOUTHERN DISTRICT OF NEW YORK, WHETHER A STATE OR FEDERAL COURT (COLLECTIVELY THE "DESIGNATED COURTS"). EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DESIGNATED COURTS. NO LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE BROUGHT IN ANY OTHER FORUM. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL CLAIMS OF IMMUNITY FROM JURISDICTION AND ANY RIGHT TO OBJECT ON THE BASIS THAT ANY DISPUTE, ACTION, SUIT OR PROCEEDING BROUGHT IN THE DESIGNATED COURTS HAS BEEN BROUGHT IN AN IMPROPER OR INCONVENIENT FORUM OR VENUE.

21.     The Southern District of New York was chosen as the exclusive venue for disputes arising under the Stockholders Agreement because that is where The Resolute Fund is headquartered.  (Taylor Decl. ¶ 10.)

22.     Capstone LLC is a Delaware limited liability company wholly owned by Capstone Inc.  (Taylor Decl. ¶ 4.)

23.     Capstone Inc. is a Delaware corporation and its parent company, CL Group Holdings LLC, is a Delaware limited liability company.  (Taylor Decl. ¶ 3.)

24.     Capstone's principal place of business is in Peachtree Corners, Georgia.  (Tomcho Decl. ¶ 96.)

### C.     Capstone's June 12, 2015 Acquisition of Pinnacle

25.     In early 2015, Capstone was approached by investment bankers seeking to gauge its interest in acquiring Pinnacle.  At the time, Pinnacle was a competitor of Capstone, operating 98 sites in 26 states and 2 provinces in Canada.  (Tomcho Decl. ¶ 18.)

26.     The marketing materials provided by Pinnacle to Capstone stressed the "sticky" nature of Pinnacle's customer relationships, such as UNFI, CVS, Home Depot, and DPI, reporting an average tenure of 11 years and a 90% year-over-year customer retention rate.  This was a critical factor in Capstone's valuation of Pinnacle.  Because Pinnacle, like Capstone, did not own the buildings it operated in or the equipment that it utilized, its value rested primarily in its customer contracts and the goodwill associated with those relationships.  (Tomcho Decl. ¶ 19.)

27.     Navarrete ███████████████████████████████ ███████████████████████████████████████ actively presented to Capstone in person and, along with Poffenberger and Shelton, helped prepare the marketing

presentation materials for those meetings with Capstone.  (*Id.* at 82:9-85:3; 90:11-91:1; 95:16-96:21, Yu Decl., Ex. 25, 26.)

28.    On May 8, 2015, Capstone entered into an agreement to acquire Pinnacle and its affiliates, and the transaction closed on June 12, 2015 ("the Pinnacle Acquisition").  (Tomcho Decl. ¶ 20.)

29.    Pinnacle is a Delaware limited liability company wholly owned by RWS Holdings LLC, which is now wholly owned by Capstone LLC. (Taylor Decl. ¶ 5.)

## II.    THE INDIVIDUAL DEFENDANTS

### A.    The Individual Defendants' Respective Roles with Capstone

30.    Each of the Individual Defendants continued in their same respective roles with Capstone after the acquisition.   (Tomcho Decl. ¶ 21.)

31.    Navarrete served as President from 2010 through May 21, 2016.  In that role, he had overall responsibility for Capstone's customer-facing operations across the country and in Canada.  (*Id.* ¶ 22.)

32.    Poffenberger served as Senior Vice President of Operations from 2009 through March 11, 2017.   Poffenberger bore ultimate responsibility for Capstone's operational performance for, and relationship with, the national customers assigned to him, including CVS, Home Depot, UNFI and DPI.  (*Id.* ¶ 23; Poffenberger Dep. I, at 30:14-17.)

33.    Willis served as Vice President of Operations until June 2, 2017.  Willis was responsible for Capstone's operational performance with respect to the customers assigned to him, many with national operations, as well as maintaining Capstone's relationships with those customers from the site-level up to corporate management. (Tomcho Decl. ¶ 24.)

34.    Although Rojas, who resides in Texas, held a number of titles over the years (most recently Senior Director of Partnership), his job duties remained constant.  Both before and after

the Pinnacle Acquisition, Rojas functioned as a senior account executive for UNFI, one of Capstone's largest customers with sites nationwide.  (Tomcho Decl. ¶ 25.)

35.    As a function of their positions within Capstone, each of the Individual Defendants had access to a substantial amount of Capstone's trade secret information, including confidential information relating to each one of Capstone's customers and their contracts, as well as information relating to pricing, margins, rebates, customer sites, distribution centers, and employee salaries, among other information.    Each Individual Defendant was also responsible for maintaining Capstone's goodwill and relationship with their assigned customers.  (Tomcho Decl. ¶ 27; Willis Dep. I, at 17:1-17:14, 34:4-25; Poffenberger Dep. I, at 47:7-47:14, 67:3-68:2, 112:23-113:20).

### B.    The Individual Defendants' Sale of Their Ownership Interests in Pinnacle

36.    As senior executives of Pinnacle, each of the Individual Defendants maintained an ownership interest in Pinnacle.  The merger agreement reflecting Capstone's acquisition of Pinnacle (the "Merger Agreement") identified Navarrete, Poffenberger, Willis and Rojas as holders of Common Units and "Sellers." (Declaration of Jonathan Davis, dated September 14, 2018 ("Davis Decl."), Ex. 1, Merger Agreement § 1.2.)

37.    Each of the Individual Defendants as a "Seller" signed and delivered a Letter of Transmittal in connection with the closing of the merger.  Each of the Individual Defendants also signed and delivered Joinders to the Merger Agreement, by which they agreed to sell their interests in Pinnacle, become a party to and be bound by the Merger Agreement.  (*Id.* ¶ 9, Exs. 2, 3; Navarrete Dep. III, at 96:11-15.)

38.    As a result of the Pinnacle Acquisition, Navarrete received just shy of $3 million, Poffenberger received over $1 million, and Willis and Rojas each received approximately $120,000.  (Taylor Decl. ¶ 17; Davis Decl. ¶ 10, Ex. 4 (Funds Flow Memorandum).)  These

amounts do not include additional funds in escrow that were released to them and additional amounts in connection with certain tax refunds. (Taylor Decl. ¶ 17.)

39.    The Individual Defendants were therefore "Sellers" as defined by the Merger Agreement; their tender of their Common Units was a condition of the obligation of Capstone to close; the Individual Defendants did indeed tender their Common Units in connection with the transaction and the Individual Defendants were paid substantial consideration for their shares. (Davis Decl. ¶ 12.)

40.    Having sold their ownership interests in Pinnacle for $4 million, the Individual Defendants accordingly sold the ownership interest they maintained with respect to Pinnacle, its customers and the associated goodwill. (Taylor Decl. ¶ 19.)

## C.    The Restricted Stock Award Agreements Signed by Navarrate, Poffenberger and Willis in Connection with the Pinnacle Acquisition

41.    In further connection with the Pinnacle Acquisition, the Equity Defendants each agreed to participate in an equity incentive plan by executing the RSA Agreement with Capstone Inc. The RSA Agreement provides ownership of restricted shares in Capstone Inc., thus allowing participants to share in any increase in Capstone's value. (Tomcho Decl. ¶ 29, Exs. B, C, D).

42.    Given the expected increase in the enterprise value of Capstone, the Equity Defendants had the potential to receive millions for their restricted shares. (Taylor Decl. ¶ 24, Ex. C; Yu Decl., Ex. 68, 69.)

43.    As with all RSA Agreements executed by all participants since the Stockholders' Agreement took effect, the RSA Agreements executed by the Equity Defendants contain a Delaware choice of law provision and provided for exclusive venue in New York. (*See, e.g.*, Tomcho Decl., Ex. B, § 12(g).) The Delaware choice of law provision and New York forum

selection clause are identical to those contained in the Stockholders' Agreement. (Taylor Decl. ¶ 14.)

44.     Section 7 of the RSA Agreements, entitled "Certain Agreements," makes that tie between the Stockholder Agreement and the RSA Agreement abundantly clear. It expressly states that the participant acknowledges and agrees " that the restricted shares are and shall be subject to the terms and provisions of… the Stockholders Agreement dated June 22, 2014 as amended or modified from time to time among the company and the other persons named therein." (*Id.* ¶ 21.)

45.     Except for variations relating to number of shares, the RSA Agreements signed by each and every management grantee were identical, containing the same Delaware choice of law provision and New York forum selection clause. (*Id.* ¶ 15.) This ensures a consistent, predictable and uniform intepretation of this Delaware-based equity plan given its particpants resided in multiple states around the country. (*Id.* ¶ 14.)

46.     Each of the Equity Defendants received the RSA Agreement **prior to** the Pinnacle Acquisition as part of a package of documents the Equity Defendants were expected to sign in connection with the sale of Pinnacle and its customer relationships. (Yu Decl., Ex. 68, 69; Taylor Decl. ¶ 23, and Exs. B, C.)

47.     Navarrete, Poffenberger and Willis each testified that they signed their respective RSA Agreements in connection with the sale. (Navarrete Dep. I, at 232:20-24 ("I was told that was part of the deal, if you will."); Navarrete Dep. III, at 96:11-15 (testifying that he no longer had equity interest in Pinnacle); Poffenberger Dep. I, at 162:12-17 ("There were two documents that got my attention [as part of the transaction between Pinnacle and Capstone]. One was the restricted stock award and one was a promissory note."); Willis Dep. I, at 123:1-3 ("Q: And as a result of the acquisition by Capstone, you agreed to participate in a stock award plan? A: Yes."). This was

further confirmed by Mike Shelton, Pinancle's CEO at the time of the Pinnacle Acquistion. (Shelton Dep. 105:17-20.)

48.     The Equity Defendants signed them without voicing any concerns. (Taylor Decl. ¶ 23.) They testified that they intended to honor the restrictive covenants therein when they signed the agreements. (*See*, e.g., Poffenberger Dep. I, at 186:25-188:14.)

49.     In connection with the sale of Pinnacle, and in consideration for their share of equity, the transition in ownership and transfer of goodwill to Capstone, and the Equity Defendants' access to Capstone's trade secrets and other proprietary information as owners of Capstone, the RSA Agreement contains express non-compete and non-solicitation covenants governing the protection and treatment of Capstone's confidential information. Specifically, Section 8(b) of the RSA Agreement sets out the definition of "Confidential Information," the Equity Defendants' confidentiality obligations, and their obligation to return confidential information upon termination of their ownership in the securities. (Tomcho Decl. ¶ 35, Ex. B, § 8(b).)

50.     With respect to non-solicitation of employees, in Section 8(c), the Equity Defendants each agreed that, for a period of two years from the date of separation of employment (the "Restricted Period"), he will "not, directly or indirectly . . . induce or attempt to induce any employee, sales representative, consultant or other agent of the Company to terminate his, her or its relationship with, or breach any agreement with, the Company," with limited exceptions. (*Id.* § 8(c).)

51.     Furthermore, each Equity Defendants also agreed in Section 8(d), among other things, that during the Restricted Period, he will not, directly or indirectly, "contact or solicit any Customer for the purpose of providing products or services competitive with those offered by the

Company and the Company Subsidiaries as of the date hereof, (ii) request or advise any Customer or any supplier or vendor to the Company or any Company Subsidiary to withdraw, curtail or cancel any of its business or relations with the Company or such Company Subsidiary, as applicable, or (iii) participate in the Business." The term "Business" is defined as having the same meaning set forth in the Stockholders' Agreement. (*Id.* § 8(d).)

52.    The foregoing restrictive covenants are essential to protect Capstone's confidential and trade secret information and its ability to develop and maintain its customer base, including the customers that Capstone purchased from Defendants. Each Equity Defendant accordingly recognized that in the event of a breach or threatened breach of the restrictive covenants, "money damages would not be an adequate remedy." (*Id.* § 8(b).)

53.    Each Equity Defendant also agreed in § 8(g) that these restrictions did not prevent him from earning a livelihood and that these restrictions are reasonably necessary to protect confidential information. (*Id.* § 8(b).)

54.    The RSA Agreements are not employment agreements. They are equity agreements that provide an ownership interest in Capstone. (Taylor Decl. ¶ 25.) Each of the Individual Defendants, including Rojas, signed separate employment agreements. (Tomcho Decl. ¶ 41, and Ex. F.)

## III.    THE INDIVIDUAL DEFENDANTS' ███████████████ SPECIFIC CONDUCT IN VIOLATION OF THE RSA AGREEMENTS

### A.    Defendant Navarrete

#### 1.    Navarette's Resignation from Capstone and Formation of Humano as a Competing Business

55.    Navarrete resigned from Capstone, effective May 21, 2016. (Tomcho Decl. ¶ 42.) Upon his separation, Navarrete executed an agreement expressly reaffirming his post-termination

obligations to Capstone, including the restrictive covenants in the RSA Agreement. (Tomcho Decl., Ex. G.)

56.     Pursuant to his separation agreement, Navarrete also received certain severance benefits, including the continued payment of his base salary of $375,000 for an additional 12 months, which Capstone ceased paying once it learned of his misconduct. Capstone further agreed to forgive a certain Partially-Recourse Promissory Note with a face value of $182,394.00, subject to certain conditions. (Tomcho Decl. ¶ 47.)

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████

58.     Several months after his separation from Capstone, on February 23, 2017, Navarrete registered Humano as a limited liability company, which currently provides and offers workforce logistics services that competes with Capstone. (Tomcho Decl. ¶ 50.)

59.     That same day, Navarrete updated his registration to the website www.humano.net. (Tomcho Decl. ¶ 50.)

### 2.     Navarette and Poffenger's Solicitation of UNFI, DPI, CVS, and Home Depot on Behalf of Humano

60.     From February through July 2017, Navarrete initiated contact and, along with Poffenberger, had multiple calls and meetings with several of Capstone's top customers, including DPI, UNFI, Home Depot, CVS, and Dollar General for the purpose of soliciting these customers to do business with Humano. (Navarrete Dep. I, at 68:13 to 70:20 (describing in-person meetings with DPI in late March and early May); 90:5-16 (initiating contact with CVS); 97:20-100:23 (describing meeting with CVS and assistance with CVS RFP); 102:11-103:21 (initiating contact with Home Depot and describing draft master services agreement with Home Depot); 112:17-

113:1 (initiating contact with UNFI); 113:23-137:16 (describing meetings with UNFI and preparation of contract for UNFI); Yu Decl., Ex. 27 (CVS PowerPoint Presentation); Yu Decl., Ex. 28 (UNFI RFP Response); Yu Decl.., Ex. 30 (DPI PowerPoint presentation); Yu Dep., Ex. 29 (Dollar General).

61.    DPI, UNFI, Home Depot and CVS were among Pinnacle's top ten customers at the time of the Pinnacle Acquistion.  (Davis Decl., Ex. 5.)

62.    More specifically, on May 3, 2017, Navarrete and Poffenberger prepared a PowerPoint presentation for UNFI that contemplated a four year contract to become UNFI's exclusive logistics North American provider, effectively taking over all of Capstone's sites around the country.  (Yu Decl., Ex. 32; Navarrete Dep. III, at 46:9-20; Poffenberger Dep. III, at 25:7-26:25, 27:1-28:1)  The presentation touted Defendants' "experience" working with UNFI.  (*Id.*)

63.    Thereafter, on May 11, 2017, Navarrete and Poffenberger submitted a response to an RFP from UNFI, claiming, "Bottom line is we know UNFI." (Yu Decl., Ex. 28.) On June 14, 2017, Defendants met with UNFI representatives and submitted an updated PowerPoint Presentation substantially similar to the May 3, 2017 PowerPoint presentation. (Yu Decl., Ex. 32.) This culminated in Humano presenting UNFI with a proposed contract on June 22, 2017 for all of its sites, including New York.  (Yu Decl., Ex. 34, Navarrete Dep. III, at 37-38:25, 1-12.)

64.    On June 22, 2017, Navarrete and Poffenberger also presented a PowerPoint presentation specific to UNFI's Moreno Valley site, which was at the time serviced by Capstone. (Yu Decl., Ex. 36.)  As a result of Defendants' solicitation of UNFI during the previous weeks, UNFI was prepared to transition that site from Capstone to Humano.  (Poffenberger Dep. III, at 36:17-37:5.)

65.    Similarly, in May 2017, Humano met with CVS personnel in Rhode Island and submitted a presentation, dated May 24, 2017, which also contemplated a takeover of its sites all around the country.  (Yu Decl., Ex. 27.)

66.    During his negotiations with DPI, Navarrete drafted a proposed contract to DPI, using a copy of Capstone's confidential contract with DPI.  (Poffenberger Dep. I, at 257:20 to 258:23; Yu Decl., Ex. 37.)  He and Poffenberger did so by converting a copy of Capstone's contract with DPI to Word format as a starting point for Humano's draft.  *Id.*

67.    DPI eventually moved its business to Humano, terminating its seven-year relationship with Capstone.  (Tomcho Decl. ¶ 56.)

68.    Navarrete drafted DPI's May 26, 2017 termination notice.  (Navarrete Dep. 86:7-14.)  DPI was a significant customer of Capstone, with sites in Colorado, Maryland, California, and Oregon generating over $600,000 in profits annually.  (Tomcho Decl. ¶ 56.)  Humano is currently providing logistics services at each of those sites.  (Navarrete Dep. I, at 60:12-17.)

### B.    Defendant Poffenberger

#### 1.    Poffenberger's Work as a Humano Agent While Employed By Capstone

69.    Around the same time that Navarrete formed Humano, Poffenberger was negotiating his exit from Capstone, having just announced his resignation, effective March 11, 2017.  Poffenberger executed a separation agreement on March 3, 2017 in which he reaffirmed his post-termination obligations to Capstone, including the restrictive covenants in the RSA Agreement.  (Tomcho Decl. ¶¶ 51-52, and Ex. H.)

70.    Pursuant to his separation agreement, Poffenberger also received certain severance benefits, including the continued payment of his base salary of $260,484.64 for an additional 3 months█████████████████████████████████████████████.  Capstone further

agreed to forgive a certain Partially-Recourse Promissory Note with a face value of $89,378.58 subject to certain conditions. (Tomcho Decl. ¶ 53.)

71.    Before signing his separation agreement, however, Poffenberger was already working with Humano. As early as March 2, 2018, Poffenberger was already using a Humano email account to participate on Humano's behalf in negotations with representatives of MobileFrame, LLC to discuss the purchase of a license to enable Humano to develop a workforce logistics management software competitive to Capstone's MobilTrak called Genesis. (Yu Decl., Ex. 38.)

72.    Poffenberger gave no indication to Capstone that he had joined Humano. Instead, he told Capstone that he was planning to teach at a community college or work for a non-competing third-party logistics provider. Prior to leaving, Poffenberger returned his work computer ████████ ████████████, having completely erased all content. (Tomcho Decl. ¶¶ 54, 71.)

73.    Poffenberger's emails revealed that in the weeks before his departure, ████████ ███████████████████████████████████████████████████████████████████ on January 20, 2017, Poffenberger forwarded to his personal email account a pricing report relating to each of Capstone's customer sites, including information where sites appear to be comparatively low in pricing. The information is not only confidential, but would be particularly useful to a competitor. A review of Poffenberger's e-mail activity confirmed that he did not routinely send work information to his personal email account, if ever, while at Capstone. (Tomcho Decl. ¶¶ 76-78, and Ex. K.)

74.    Capstone's database activity logs show that on January 9, 2017, Poffenberger downloaded information from Capstone's private intranet database identifying names, titles, departments and phone numbers of every Capstone employee with access to Capstone's intranet.

That same day, Poffenberger also accessed information relating to revenues, equipment fees, employee pay and other financial information of a UNFI site. (Tomcho Decl. ¶80.)

> 2.    Poffenberger's Solicitation of DPI and His ███████ Use of Capstone
>        Confidential Information as Part of that Effort.

75.    ████████████████████████████████████████████████████████████

████████ On March 4, 2017, **while still employed by Capstone**, Poffenberger replied to an inquiry from Christopher Erklenz ("Erklenz"), who had just joined DPI and assumed responsibility for its relationship with Capstone, "I gave notice 30 days ago and my last day is this coming Friday. I would appreciate it if you'd let me give you a call on Monday we have a conversation about what's next." The subsequent emails reveal that Poffenberger then spoke by telephone with Erklenz and arranged an in-person meeting. (Tomcho Decl. ¶ 55, Ex. I.)

76.    Before Poffenberger's last day, on March 10, 2017, Poffenberger shared a Capstone document entitled "DPI Prices December 2010.xlsx" from his personal email account with Erklenz. (Yu Decl., Ex. 40.) A month later, on March 31, 2017 Poffenberger sent to DPI, at Erklenz's request, a copy of Capstone's contract with DPI from his personal email account

████████████████████████████████████████████. (*Cf.* Yu Decl., Ex. 41 with Navarrete Dep. I, 146:15-18.) An email from Erklenz to others within DPI dated June 13, 2017 confirms that Poffenberger helped divert Capstone's business to Humano. (Yu Decl., Ex. 42.)

77.    Erklenz confirmed at his deposition that Navarrete and Poffenberger solicited DPI in March and April of 2017 in an effort to transition its business from Capstone to Humano. (Erklenz Dep. 69:16-71:11; 73:3-4 ("[P]edro was pitching a business or a service offering"); 86:23-87:3 ("essentially [Navarrete] was pitching his company over Capstone and "he wanted [DPI] to move away from Capstone into his new company."); 110:8-24 (testifying Poffenberger wanted Erklenz to meet with Navarrete).

78.    Erklenz further confirmed at his deposition that on May 17, 2017, Navarrete and Poffenberger gave Erklenz a formal PowerPoint presentation that included the Humano name. (Erklenz Dep. 147:8 to 148:16., and Yu Decl., Ex. 30.)

### 3.    Forensic Evidence of Poffenberger's Computer Devices Confirmed that Poffenberger ███████ Retained Capstone Files and Solicited DPI.

79.    After the District Court directed Defendants to produce all electronic devices that contain or may have contained Capstone information, on July 6, 2017, Poffenberger returned an additional USB drive which contained approximately 3,700 active files, many of which are confidential Capstone documents. (Declaration of Jim Vaughn, dated July 18, 2017 ("7-18-17 Vaughn Decl. ¶¶ 20, and Ex. B [Dkt. 66] ("7-18-17 Vaughn Decl"); Declaration of Jim Vaughn, dated September 14, 2018 ("Vaughn Decl.") ¶¶ 38-39.)

80.    Forensic discovery revealed that this same device had been inserted into Poffenberger's Humano work computer. (Declaration of Jim Vaughn in Support of Opposition to Modify, dated May 31, 2018 ¶ 27, and Ex. A. ("5-31-18 Vaughn Decl.") [Dkt. 196].)

81.    A forensic analysis of the USB drive further uncovered a deleted spreadsheet identified as "DPI Start Up Plan humano.xlsx" (the "DPI Startup Plan"). The embedded file creation date showed April 27, 2011 and was last modified by Poffenberger on May 24, 2017. (7-18-17 Vaughn Decl. ¶ 21, and Ex. C.) The DPI Startup Plan demonstrates Humano's efforts to displace Capstone's relationship with DPI. (Yu Decl., Ex. 43.)

82.    A forensic investigation of Poffenberger's computer also revealed that in April 2017, several weeks after leaving Capstone, Poffenberger used a USB drive to access on his Humano computer a confidential Capstone Focus Report containing confidential customer financial information████████████████████████████████████████. (5-31-18 Vaughn Decl. ¶ 27, Ex. A. [Dkt. 196].)

### C.    Defendant Willis

83.    On May 19, 2017, Willis tendered his resignation effective June 2, 2017.    Willis executed a separation agreement on May 27, 2017 expressly reaffirming his post-termination obligations to Capstone. (Tomcho Decl. ¶ 59, and Ex. J.)

84.    Willis gave no indication to Capstone that he intended to work for a competitor. Instead, he claimed that he was planning to manage a distribution center. Because Capstone had no reason to distrust him, Willis was left in place as Capstone responded to DPI's termination notice. (Tomcho Decl. ¶¶ 60-61.)

85.    The record evidence shows that Willis began working for Humano before his last day at Capstone. On May 19, 2017, Willis already had a Humano email account in which he received a request from Poffenberger to discuss a presentation to CVS, even though he was not set to leave Capstone for another two weeks. (Yu Decl., Ex. 51.) Willis was also identified in the DPI Startup Plan as working on certain tasks as early as May 23, 2017. (7-17-17 Vaughn Decl., Ex. C [Dkt. 66-3].) This included critical functions such as "Task 2: Determine if office space is available within client facility" and "Task 5: Meet with recruiting to review staff and set up site recruiting plan ..." (*Id.*)

86.    On May 24, 2017, Willis emailed a copy of the DPI Startup Plan to Sarah O'Neill ("O'Neill," another former Capstone employee who serves as Humano's VP Human Resources), with a copy to Carolyn Cook ("Cook," Humano's Controller, also a former Capstone employee) and Poffenberger. This email noted that the DPI Startup Plan was for "review on our call." (Yu Decl., Ex. 44.) Similarly, on May 30, 2017, Willis emailed a revised version of the DPI Startup Plan to various Humano personnel asking them to send updates to Willis. (Yu Decl., Ex. 45.)

87.    Willis was thus aware that Humano was replacing Capstone's services for DPI prior to DPI's May 26, 2017 notice of termination. Willis's Humano emails on that day show that he

was servicing DPI for Humano, even though he was still employed by Capstone. (*See, e.g.*, Yu Decl., Ex. 46.) Willis made no effort to advise Capstone of Humano's initiatives.

88.     Willis failed to return his work computer on June 1, 2017, as originally scheduled. (Tomcho Decl. ¶ 85.) Instead, on that day Willis authored two spreadsheets for Humano entitled "DPI onsite contact list.xlsx" and "DPI Onsite contact list-Copy2.xlsx." (Vaughn Decl. ¶¶ 42-43.) When Willis eventually returned the computer, he had re-installed the operating system, effectively reformatting the computer and deleting all content. (Tomcho Decl. ¶ 85; Vaughn Decl. ¶ 12.)

**D.     Defendant Rojas**

89.     On May 26, 2017, Rojas announced his resignation effective June 9, 2017. Prior to resigning, Rojas managed Capstone's relationship with UNFI. (Tomcho Decl. ¶¶ 62-63.)

90.     Rojas also began working for Humano before his last day at Capstone. For example, on June 6, 2017, he already had a Humano email account in which he received an email from Willis containing instructions to help transition the Capstone employees at DPI's Colorado site to Humano. (Yu Decl., Ex. 52.) In that email, Willis also directed O'Neill to send Rojas a "script" that she had used to recruit Capstone's employees in DPI's Maryland site. (Willis Dep. II at 127:23-128:7; Yu Decl., Ex. 47.)

91.     On June 7, 2017, Rojas provided input into a pitch presentation that Navarrete was preparing on Humano's behalf for UNFI's national team in South Carolina. (Rojas Dep., at 130:16-131:25; Yu Decl., Ex. 49.) Navarrete testified that he was leaning on Rojas's experience working with UNFI. (Navarrete Dep. III, at 50:15-51:5.) On that day, Rojas was also copied on emails regarding Navarrete's and Poffenberger's presentations to UNFI and thus knew, while still in Capstone's employ, that Humano was soliciting UNFI, the same customer that he was

responsible for servicing for Capstone. (Rojas Dep., at 178:24-179:12; Navarrete Dep. III, at 50:15-51: 5; Yu Decl., Ex. 49.)

92.    On June 10, 2017, Rojas sent an email with Navarrete and Poffenberger attaching his "risk assessment" of UNFI site managers, based on his experience as a Capstone employee and management of the UNFI relationship on Capstone's behalf. (Poffenberger Dep. III, at 29:7-16; Yu Decl., Ex. 50.) The risk assessment was used to assist with a pitch meeting that was scheduled with UNFI. (Poffenberger Dep. III, at 32:2-22.)

93.    Rojas did not return his computer to Capstone until June 19, 2017. Upon receiving it, Capstone learned that Rojas had also reformatted the computer by reinstalling the operating system, thus destroying all content therein. (Tomcho Decl. ¶ 89; Vaughn Decl. ¶ 14.)

94.    A forensic investigation revealed that shortly after Rojas reformatted the computer, Rojas connected a USB drive to the computer. That drive contains approximately 1,067 active files, most of which relate to Capstone's customers, financials, associate payroll, and organizational charts, among other confidential information. Hundreds of these files display dates evidencing that they were placed on the drive between 2014 and 2016, contradicting Rojas's testimony that he purchased the drive that same weekend to transition files back to Capstone. (Vaughn Decl. ¶¶ 17; *cf.* Rojas Dep. at 126:1-9.)

95.    On June 18, 2017, while working for Humano, Rojas opened two files from the drive, one of which was a zip folder containing files relating to a Capstone site for UNFI. (Vaughn Decl. ¶ 15.)

E.    **Defendants' Solicitation and Hiring of Other Capstone Employees**

96.    On May 12, 2017, Valentine, Capstone's Senior Business Analyst, announced his resignation, effective May 20, 2017. Valentine was responsible for providing reports regarding Capstone's operational performance, and preparing budgets per site level. He had extensive access

to Capstone's confidential information, including load-level performance and financial data since 2012. (Tomcho Decl. ¶ 65.)

97.    Although Valentine claimed to have commenced employment with Humano on May 29, 2017 (Valentine Dep. I, at 40:17-25) the record evidence indicates that he began performing services for Humano much earlier.  Capstone forensically recovered a Humano email dated May 19, 2017 (before Valentine's last day with Capstone), in which Willis (who was also still with Capstone), asked Valentine to review a presentation that Humano was preparing for CVS. (Yu Decl., Ex. 51.)  This email also contradicts Valentine's testimony that he did not receive a Humano email account until he officially joined on May 29.  (Valentine Dep. I, at 25:23-25.)

98.    On May 18, 2017, Claudia Rojas, one of the Company's best associate recruiters, resigned effective June 2, 2017.  She is now at Humano.  (Tomcho Decl. ¶ 66; Navarrete Dep. I, at 198:16-23.)

99.    Other former Capstone employees currently associated with Humano, either as an employee or consultant, include O'Neill (Human Resources), Theo Townsend ("Townsend") (Information Technology), Matt Fletcher ("Fletcher") (Information Technology), and Carolyn Cook ("Cook") (Controller).  (Navarrete Dep. I, at 42:4-12; Townsend Dep. at 60:4-7; Fletcher Dep. at 15:25-16:1.)

100.   Townsend, Fletcher, and Valentine were the principal architects of Capstone's proprietary MobilTrak technology.  (Declaration of Gene Weiland, dated March 5, 2018 ("3-5-18 Weiland Decl."), at ¶¶ 23-35 [Dkt. 153].)  Defendants have engaged them to replicate MobilTrak for Humano through a new workforce logistics called Genesis.  (Townsend Dep. at 39:4-17; 92:11-14.)

101.    In addition, the record is replete with evidence describing Defendants' efforts to recruit Capstone's site managers and warehouse associates at various sites nationwide. *See, e.g.*, Declaration of Justin Presson ¶¶ 3-6 [Dkt. 67] (describing how O'Neill met with and solicited DPI associates in Maryland before Capstone had an opportunity to speak to them); Yu Decl., Ex. 47 (authoring a script that she sent to Poffenberger for his review and approval that she and others used to recruit and capture Capstone associates); Poffenberger Dep. III, at 19:12-25.

102.    For example, on May 25, 2017 Poffenberger authored an email (which included Willis who was still at Capstone), identifying an agenda for discussion topics and attaching the DPI Startup Plan. (Yu Decl., Ex. 43.) One of the discussion topics was that "DPI wants humano to contact the Capstone [site managers] with communication of the change to ensure there is a smooth handoff." *Id.* Willis is identified as a point of contact as early as of May 23, 2017. Poffenberger Dep. III, at 16:17-22; *see also* Poffenberger Dep. III, at 92:21-93:14.)

103.    On May 29, 2017, Poffenberger authored an email in which he indicated that he personally spoke to Capstone's site managers at three DPI sites in Henderson, Colorado, Ontario California, and Tualatin Oregon and solicited them to join Humano. (Yu Decl., Ex. 55.)

104.    In June of 2017, O'Neill, under Defendants' direction, solicited Capstone employees at a DPI site (with the stated goal of taking all of Capstone's employees), knowing the site managers' exact salaries and the warehouse associates' wages for the previous weeks ▮ ████████████████████████████████████████. (Poffenberger Dep. III, at 17:23-18:17; Yu Decl., Ex. 56 (stating "[O'Neill] will also let all know that we want them as employees of our company, communicate a retention incentive, and answer any questions."); Declaration of Brandon Sullivan ("Sullivan Decl.") ¶¶ 4-5 [Dkt. 63].)

105.    Later, Willis, while still in Capstone's employ and supposedly managing the DPI relationship on its behalf, also visited the site and solicited Capstone's employees in person. Capstone was made aware that text messages containing offers were sent to all of the Company's employees there. (Tomcho Decl. ¶ 68.).

106.    On June 9, 2017, Rojas was present at the DPI Colorado site and told Capstone employees to meet with him offsite if they had questions about transitioning to Humano. (Rojas Dep. at 188-89.)

107.    On or about June 12, 2017, at Capstone's DPI Tualatin, Oregon site, Defendants solicited and hired all of Capstone's associates before the expiration of DPI's 30 day termination notice. The former Capstone associates arrived to the site that day wearing Humano uniforms. Because Capstone had no associates available to perform work at the site, Capstone was forced to pull its services from Tualatin prematurely. (Sullivan Decl. ¶¶ 6-7.; Erklenz Dep. at 182:20 to 183:17 ("Humano had offered jobs to folks and either they refused to go to work for Capsotne after that point or they were not allowed to work for Capstone any longer after accepting a future position with Humano.")).

108.    Erklenz confirmed at his deposition that Humano appeared to be soliciting Capstone's site associates before the expiration of DPI's termination notice, during which Capstone was still servicing those sites. (Erklenz Dep. at 124:4-7; 132:1-13; 206:4-209:13; 236:18-239:1.)  He further testified that it was Humano's intent to offer positions to all of Capstone's employees at the DPI sites. (*Id.* at 224:16-225:8.)

109.    At around the same time that Humano was recruiting Capstone's DPI site associates, O'Neill, on behalf of Humano, was also sending LinkedIn messages to multiple Capstone employees. (*See, e.g.*, Yu Decl., Ex. 57.)

27

110.    By the time the District Court's TRO was entered, the Defendants hired 28 warehouse associates, 4 Team Leads, and 2 Site Managers from Capstone's four DPI sites throughout the country. (Tomcho Decl. ¶ 69.)

## IV.    Defendants' ███████████ Destruction of Evidence ████████████████████ ██████████.

111.    As set forth above, defendants Poffenberger, Willis and Rojas each wiped their Capstone-issued computers prior to returning them to Capstone. Such conduct is in contravention of both the Pinnacle Employee Handbook and the Capstone Handbook. (Shelton Dep. at 59:1-60:4; Tomcho Decl., Ex. A.) Both handbooks contain express provisions prohibiting Defendants from destroying any Capstone data from their computers. (*Id.*) Each of the Individual Defendants received a copy of the Capstone Handbook; Navarrete and Poffenberger in particular had input into the content of both the Pinnacle Handbook and the Capstone Handbook. (Declaration of Sally Matteson, dated July 17, 2017 ¶¶ 3-10 [Dkt. 68]; Shelton Dep. at 58:17-21.)

112.    Humano did not issue a litigation hold notice until July 31, 2017. (Yu Decl., Ex. 58.) Several key Humano personnel testified that they were initially not aware of any litigation hold obligations. (Valentine Dep. I at 42:17-20; Rojas Dep. at 216:9 to 217:10; C. Rojas Dep. at 85:21-86:2). Matt Fletcher, Humano's Director of IT who managed Humano's emails and servers initially did not know about this Court's preservation order, could not recall receiving a litigation hold, and does not recall enacting any measures to preserve deleted emails. (Fletcher Dep. at 94:24-95:23; 96:7-97:11). Valentine testified that he thought the litigation hold applied only to files and not emails. (Valentine Dep. II at 30:6-10.)

113.    Other personnel, including Joe Allen, Humano's Vice President of Business Development/Customer Care, testified that he never received a litigation hold or notice to preserve evidence. (Allen Dep. at 128:25-129:17.)

114.    After the TRO was entered, Valentine was found to be in possession of thousands of confidential Capstone files, includings files containing confidential information relating to Capstone's customers (including UNFI, DPI, Home Depot and CVS), while serving as Humano's key business intelligence officer. (Vaughn Decl. ¶ 29.)

115.    On May 23, 2017, Capstone requested that Valentine return his computer, not knowing that he had begun working for Humano; Valentine failed to do so for weeks. (Declaration of Scott Funk, dated July 18, 2017, at ¶¶ 3-4 [Dkt. 69].) After the Court's entry of the TRO and preservation order, Capstone demanded again that all Capstone computer devices in Valentine's possession be returned and reminded him of his preservation obligations. (*Id.*, Ex. B.)

116.    Capstone received confirmation that its demand letter was delivered on July 10, 2017 at 12:30 p.m. (Vaughn Decl. ¶ 28.) Less than one hour later, Valentine installed and executed three data scrubbing programs on the computer's hard drive. One of these programs was designed specifically to erase all traces of USB-connected drives and CD-ROMs. A forensic analysis of Valentine's computer nevertheless revealed that he was in possession of thousands of confidential Capstone files, includings files containing confidential information relating to Capstone's customers (including UNFI, DPI, Home Depot and CVS). By executing these programs, Valentine was able to delete hundreds of Capstone files, many of which were confidential, along with the computer's USB device history and Humano emails residing on the computer ███████████████ ███████████████████████████████████████. (*Id.* ¶¶ 29, and Ex. C.)

117.    Forensic discovery nevertheless revealed that on May 22, 2017, Valentine forwarded a trove of Capstone Excel payroll templates containing specific wage and hour information for dozens of Capstone employees to O'Neill and Carolyn Cook. (HL-SDDF-

0000561 to 565.) These templates (and the data contained therein) are confidential and proprietary information. (Tomcho Decl. ¶ 95.)

118.    On or about July 15, 2017, after the TRO issued, Navarrete installed scrubber software on his Humano computer.  (5-31-18 Vaughn Decl. ¶ 23 [Dkt. 196].)  Navarrete's computer was not imaged until March 2018.  Navarrete also testified (and forensic discovery confirmed) that he routinely deletes business text messages and emails even after this Court's preservation order was entered. (Navarrete Dep. II at 404:21-405:7; 407:13-409:25; Vaughn Decl. ¶ 22.)

119.    Poffenberger wiped his Capstone-issued computer prior to returning it to Capstone. Poffenberger reinstalled the operating system on his Humano computer on June 13, 2017 and reset his mobile device on July 1, 2017. (5-31-18 Vaughn Decl. ¶¶ 7.d, 29 [Dkt. 196].)  Poffenberger also testified that he continued to delete emails in May 2018. (Poffenberger Dep. II at 414:15-415:7.)

120.    Poffenberger was also later found after the July 20, 2017 preliminary injunction hearing to have used his personal AOL email account to communicate with DPI after his departure from Capstone. (*See, e.g.* Yu Decl., Ex. 40, 41.)  In at least two of these emails, Poffenberger is forwarding Capstone files, including Capstone's contract with DPI, to DPI. (*Id.*)  These were not produced by Humano; Poffenberger testified -- after they were produced in discovery by DPI -- that he had deleted those emails. (Poffenberger Dep. II, at 371:2-371:8.)

121.    Willis reset his mobile device on May 18, 2017.  Willis also routinely deletes business text messages with customers (including DPI), emails and LinkedIn messages, and continued to do so at least through May 15, 2018. (Willis Dep. II at 19:4; 21:3-6; 94:1-23, 97:21-98:11; Willis Dep. I at 99-105.)

122.     O'Neill initially testified that she deletes text messages habitually and emails on a case by case basis.  (O'Neill Dep. I, at 39:9 to 45:18.)

123.     Joe Allen, who never received a litigation hold, testified that around April or May 2018, months after the preliminary injunction was entered, Navarrete instructed him to delete an email that Allen had sent regarding Capstone's strengths and weakness relating to a response to an RFP from Dollar General, a current Capstone customer, that Humano was preparing.  (Allen Dep. 130:6 to 133:21.)  Allen followed Navarrete's instruction and deleted the email.  The attachment, which was eventually produced by Allen's counsel on September 11, 2018, stresses that Humano should focus in the RFP on the Individual Defendants' lengthy relationship with Dollar General. (Yu Decl., Ex. 70.)

## V.     Defendants' Continued Solicitation of Other Capstone Customers After Entry of the Preliminary Injunction

### A.     Dollar General

124.     After this Court's entry of a preliminary injunction on July 20, 2018 prohibiting them from contacting Capstone customers for the purpose of providing products or services competitive with those offered by Plaintiffs, Defendants continued to solicit Dollar General, a current Capstone customer.  Willis, Poffenberger, and Navarrete each admitted during their depositions that after this Court's Preliminary Injunction order was entered on July 28, 2018, they continued to contact Dollar General for the purpose of providing workforce logistics services. (Navaraette Dep. II, at 344:25-345:24; Poffenberger Dep. II, at 316:13-318:19; Willis Dep. II, at 24:14-25:5.)

125.     On July 17, 2017, while the TRO prohibiting Defendants from soliciting Capstone's customers was in effect, Defendants, through Joe Allen, initiated contact with Dollar General.  (Yu Decl., Ex. 29.)  Thereafter, as set forth below, between 2017 through 2018,

Defendants continued to communicate with Dollar General for the purpose of providing logistics services identical to those provided by Capstone. (Navarrete Dep. III, at 22:12-20, 23:2-12, 36:4-14, 41:3-6; Poffenberger Dep. III, at 73:13-21.) Defendants were dealing with the same personnel and decision-makers at Dollar General regardless of customer-site. (Tomcho Decl. ¶¶ 108, 111.)

126.    One month after the issuance of the Preliminary Injunction, on August 29, 2017, Defendants submitted a pitch presentation to Dollar General. (*See* Willis Dep. II, at 24:14-25:5; Poffenberger Dep. II at 316:13-318:19; Yu Decl. Ex. 35.)

127.    On or about October 12, 2017, Poffenberger sent an email to Dollar General describing a meeting between Poffenberger and Dollar General for the purpose of obtaining its business for Humano. (Navarrete Dep. II, at 451:23-452:8.)

128.    On May 14, 2018, Navarrete, Poffenberger, Willis, and Allen met with and gave a PowerPoint presentation to representatives of Dollar General to obtain its business. (Willis Dep. II at 25:21-26:4; Poffenberger Dep. II at 321:8-322:16; Navarrete Dep. II at 346:12-347:21; 391:11-21; 393:21-394:16.) The purpose of Humano's meeting was to respond to an RFP for five Dollar General locations. (Poffenberger Dep. II, at 322:18-323:10.) During that meeting, Poffenberger spoke to Dollar General representatives about "the capabilities of [Humano]" and how Humano operated. (Poffenberger Dep. II, at 324:10-325:11.) Navarrete also spoke about "operation capabilities" and a specific rate structure prepared for Dollar General. (Poffenberger Dep. II, at 325:12-25.)

129.    Defendants' solicitation of Dollar General culminated in the submission of a formal proposal to provide unloading services in response to an RFP on or about May 2, 2018. (Yu Decl., Ex. 53.)

130.    Notably, Allen testified on August 13, 2018, over a year after the entry of the Preliminary Injunction, that he had never been provided with the injunction order or the TRO issued by the Court, and thus was unaware of the limitations on his ability to secure business for Humano. Allen further testified that had he known of the injunction, he "would have had a real concern" about his work for Humano because he feared that his conduct on Humano's behalf had violated the injunction. (Allen Dep. at 139:4-5 ("I can be brought into this because I'm doing those things, or was doing those things."))

**B.    CVS**

131.    Poffenberger and Navarrete also presented a proposal to provide logistics services for CVS at its Kansas City distribution center in April 2018, which included pricing information. (Poffenberger Dep. II, at 331:19-334:19; Naverrete Dep. II, at 376:18-377:1; 387:12-388:9; 393:18-20.) This included telephone meetings with CVS representatives to discuss specifics of the RFP and written communications to provide CVS rate quotes. (Navarette Dept. II, at 380:23-381:7; 388:10-398:6.) Communications with CVS continued through May 2018 as part of the RFP. (Navarrete Dep. III, at 41:18-25; Poffenberger Dep. III, at 71:16-72:12.)

132.    Poffenberger was aware that CVS was a customer of Capstone when he left the Company in March 2017, and has no reason to believe that CVS is no longer its customer. (Navarette Dep. II at 334:20-335:1.)

133.    Moreover, Defendants were dealing with the same decision-maker at CVS that Capstone deals with. (Tomcho Decl. ¶ 112.)

**C.    UNFI**

134.    Just prior to this Court's entry of the Preliminary Injunction order, Humano was in the midst of contract negotiations with UNFI. (Navarette Dep. I at 112:17-113:1; 113:19-119:1.)

Despite the injunction, Defendants continued to engage in discussions with UNFI about performing work in competition with Capstone.

135.    On August 2, 2017, the week after the entry of the Preliminary Injunction Defendants' counsel wrote to UNFI ███████████████████████████████ ████████████████████. The email suggested, notwithstanding the preliminary injunction order, that Humano could solicit UNFI if it chose to terminate Capstone, framing the order in a manner that would allow Humano to work with UNFI. (Yu Decl., Ex. 59.)

136.    In October 2017, Humano also offered to provide UNFI with certain "special project" selection work at UNFI's York, Pennsylvania location, at the same time that Capstone was providing those services to UNFI at that site. UNFI apparently chose not to engage Humano further when Capstone provided UNFI with a copy of the Preliminary Injunction enjoining Humano from such competitive activities. (Tomcho Decl. ¶ 107.)

137.    Defendants also continued to attempt to do business with UNFI's subsidiaries. (Poffenberger Dep. III, at 23:7-16.) Contact with UNFI appears to be ongoing. (*Id.*)

**D.    Newell Brands**

138.    Newell Brands is a former customer of Capstone that is now a customer of Humano. (Declaration of Steven Willis, dated June 14, 2018 ¶ 4 [Dkt. 222].) Capstone's relationship with Newell Brands did not terminate until November 26, 2017. While Newell Brands was still a Capstone customer, Willis stated that he had contact with a receiving manager there regarding Humano's capabilities. (*Id.* ¶ 4, Ex. A.)

**VI.    DEFENDANTS' MISAPPROPRIATION OF THE MOBILTRAK TECHNOLOGY AND INFRINGEMENT OF THE MOBILTRAK SOURCE CODE**

**A.    Capstone's MobilTrak Platform.**

34

139.    MobilTrak is a workforce logistics data processing platform originally developed by Pinnacle and its predecessor, Roadlink Workforce Solutions (both of which Navarrete served as President and other Defendants served as officers) before Pinnacle was acquired by Capstone on June 12, 2015.    (Declaration of Gene Weiland, dated February 9, 2018 ("Weiland Decl.") ¶ 4. [Dkt. 153.]

140.    MobilTrak was the technology platform upon which Pinnacle's entire business infrastructure operated.  For example, it provided tools to manage site-level labor based upon anticipated activity and the ability to capture and track vendor and associate information.  It provided real-time information regarding management of labor hours available, scorecards by site to track financial and operational performance, and the ability to perform back office functions such as determining payroll and generating invoices.  MobilTrak also provided reporting tools to customers, such as specific performance trends and vendor scorecards, along with an interface that allowed customers to complete surveys and communicate feedback to Pinnacle.  (*Id.* ¶ 5.)

141.    MobilTrak leverages technology from a third party software platform called MobileFrame, which can be licensed from MobileFrame, LLC.  (*Id.* ¶¶ 4, 8.)

142.    MobilTrak comprises an ecosystem of components and applications that handles and process data from MobileFrame, all of which were independently engineered and coded by Pinnacle's IT team using different languages.  Once the data is input at the front end via MobileFrame, it is then integrated with other information stored in a separate Microsoft SQL database (for example, pricing and rebate information), which can then be processed for various uses and applications, including compiling financial metrics, calculating revenue, providing real

time reporting, determining employee pay, creating credit memos, and generating invoices, among many others.  (*Id.* ¶ 17.)

143.    MobilTrak enables the efficient capture and processing of data to facilitate all aspects of the logistics business for use by thousands of employees across hundreds of customer sites throughout the country, the Company's officers and directors, back office staff, and the customers themselves.  The business logic of how this data is processed and used to drive efficiency and value (in addition to the code itself) is what comprises the critical element of the proprietary nature of MobilTrak.  (*Id.* ¶ 21.)

144.    Without a robust workforce logistics software platform such as MobilTrak, it would be extremely inefficient to effectively perform logistics services nationally across multiple sites for multiple customers.  The development of a technology platform capable of doing so is a significant barrier to entry for start-up competitors in the industry who wish to service large customers with a national footprint, such as the customers with whom Humano is doing business or is attempting to do business.    (*Id.* ¶ 6.)

145.    Nevertheless Humano was able to build a similar platform in just three months, despite the fact that MobilTrak took years to develop and refine, and which Pinnacle had marketed to Capstone prior to its acquisition as a proprietary state-of-the-art technology and one of the leading reasons for its competitive advantage in the industry.  (*Id.* ¶ 7.)

146.    Indeed, at the time that Capstone was considering acquiring Pinnacle in early 2015, Pinnacle prepared various presentations (with input from Navarrete) to Capstone describing its MobilTrak technology as "Cutting-Edge, "proprietary," an "unmatched labor management tool," and how it provides Pinnacle with a "significant competitive advantage," and how "less sophisticated competitors cannot provide a comparable solution."  (Yu Decl., Ex. 25, 26.)

147.    One of the principal architects of MobilTrak is Theo Townsend, a former Pinnacle and Capstone employee.    Townsend was primarily responsible for updating and making improvements to MobilTrak throughout his employment with Pinnacle and Capstone.  In 2014, Townsend made substantial upgrades to MobilTrak, referred to within the organization as MobilTrak 2.0.  The upgrades from planning stages to rollout spanned nearly 12 months.  After Capstone's purchase of Pinnacle on June 12, 2015, Townsend continued developing improvements to MobilTrak.  (Weiland Decl. ¶¶ 23-29.)

148.    Another former Pinnacle employee associated with the development of MobilTrak is Matthew Fletcher.  Prior to the Pinnacle Acquisition, Fletcher served as the Director of Information Technology at Pinnacle.  Fletcher developed, among other things, certain applications that were integrated with MobilTrak, such as "End of Shift" surveys and "Partner Communication Tools," which enabled customers to interface with data on the SQL server.  (*Id.* ¶¶ 30-32.)

149.    Valentine also assisted in the development of certain features within the MobilTrak ecosystem referred to as Excel Trackers.  These are documents created using Microsoft Visual Basic within Microsoft Excel to configure and report on data from Sharepoint Services for various business purposes.  Such purposes include reporting performance metrics at each site, pay calculations, KPI (key performance indicators), staff planning, back office utilities and client presentations.  (*Id.* ¶¶ 33-35.)

150.    As a result of the Pinnacle Acquisition, Capstone now owns MobilTrak. (Townsend Dep. at 72:1-74:1; Shelton Dep. at 164:23-165:17.)

151.    MobileFrame further confirmed at its deposition that they do not own any applications or code built or written by its licensees using MobileFrame.  (Oswalt Dep. 32:24-

33:22.)  MobileFrame further does not dispute that applications built by their licensees are proprietary to their licensees.  (*Id.*)

## B.    Defendants' Replication of MobilTrak.

152.    Humano has developed a similar workforce logistics database platform called Genesis, which was also built using MobileFrame.  (Townsend Dep. at 39:4-40:11; 82:7-83:6.)

153.    Defendants engaged Townsend, the principal architect of MobilTrak, as an independent contractor to develop Genesis (Townsend Dep. at 82:7-83:6.)  Matt Fletcher and Joe Valentine, both of who had a role in developing certain components of MobilTrak, also assisted with the development of Genesis.  (Valentine Dep. II at 14:20-15:9.)

154.    Townsend was instructed to create a platform similar to MobilTrak.  (Townsend Dep. at 84:5-21.)

155.    Humano was able to implement Genesis by June 26, 2017, to support Humano's work at the DPI sites and that had transitioned from Capstone to Humano, effective that day, along with its other customers.  (Townsend Dep. at 88:23-89:3.)

## B.    Defendants' Retention of MobilTrak Files and Documentation.

156.    While at Pinnacle and Capstone, Townsend prepared meticulous documentation concerning the development of the MobilTrak architecture and its associated business logic, which was updated from time to time.  (*See, e.g.* Yu Decl., Ex. 60.)

157.    Defendants' production of Genesis-related materials confirmed that Defendants have, at a minimum, used MobilTrak documentation to develop Genesis.  For example, a side-by-side comparison of the documentation for the back-office applications of both platforms show that the two documents are virtually identical, if not verbatim.  (Yu Decl., Exs. 61, 62, 63.)

158.     Further indicating that Defendants retained MobilTrak documentation for use with Genesis is the fact that many of the sample screenshots incorporated into the documentation are identical.  (*See* Declaration of Wendell Fry, dated Apr. 19, 2018, at ¶¶ 7-8, Ex. C [Dkt. 161], Yu Decl., Ex. 64.)  One such image in particular shows the same Pinnacle and Kroger customer email addresses (which is a Capstone, not a Humano, customer) when compared with the documentation written for the same MobilTrak application.  *Id.*

159.     The training guides prepared by Valentine for both MobilTrak and Genesis are also virtually identical, reveaing that they were copied from Capstone's files.  (Yu Decl., Ex. 65, 66.)  One page of the Geneiss training guide references MobilTrak rather than Genesis.  (Yu Decl., Ex. 67.)

**C.     Evidence that Defendants Copied the MobilTrak Source-Code to Develop Genesis.**

160.     Following Defendants' court ordered production of the Genesis source code, a side-by-side comparison of the MobilTrak and Genesis code revealed within multiple files (many with identical file names) numerous instances of verbatim identical lines of code.  (Yu Decl., Ex. 71.)  The same typographical errors also appear in the same lines of code.  *See, e.g.* (Cite "The Assoicate [sic] Type selection is required!").  Likewise, Capstone's review of the code also revealed use of the identical variable names specific to the industry, such as "UnloadLayer," "Carrier" and "associate hours" to name a few, as well as identical messages to users, such as "This associate must be Active at at least one location!" (*Id.*) ████████████████████████████
████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████

███████████████ **CONCLUSIONS OF LAW**

## I.    LEGAL STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

162.    Plaintiffs are entitled to a preliminary injunction if they can establish (1) "a likelihood of success on the merits," (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction," (3) "the balance of hardships tips in the plaintiff's favor," and (4) "the public interest would not be disserved by the issuance of [the] injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks omitted).  For the reasons discussed below, Plaintiffs satisfy each element.

## II.    CAPSTONE IS LIKELY TO SUCCEED ON ITS BREACH OF CONTRACT CLAIMS

163.    To establish likelihood of success, Capstone need not show that success is an absolute certainty, but only "that the probability of [its] prevailing is better than fifty percent." *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1109-10 (E.D.N.Y. 1991).

164.    Capstone alleges that the Equity Defendants breached the RSA Agreements, which forbid the Equity Defendants, for two years following their Capstone employment, from (1) inducing or attempting to induce Capstone employees to terminate their employment with Capstone; (2) contacting or soliciting any Capstone customer for the purpose of providing products or services competitive with those offered by Capstone; and (3) requesting or advising any Capstone customer to withdraw, curtail, or cancel any of its business or relations with Capstone.

---

████████████████████████████████████
█████████████████████████████

(RSA Agreements, §§ 8(c) and 8(d).) As set forth above, Plaintiffs have established that the Equity Defendants likely breached these contractual provisions.

## A.   Delaware Law Applies to Plaintiffs' Contract Claim

165.   In determining which state's law applies, federal courts sitting in diversity look to the choice-of-law rules of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Accordingly, New York law governs the choice law analysis.

166.   Under New York's choice-of-law rules, "when parties include a choice-of-law provision in a contract, they intend that the law of the chosen state—and no other state—will be applied." *Ministers & Missionaries Benefit Bd. v Snow,* 26 N.Y.3d 466, 476 (2015). The New York Court of Appeals has thus stated that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract." *Id.* at 475. To do otherwise would "contravene the primary purpose of including a choice-of-law provision in a contract—namely, to avoid a conflict-of-laws analysis and its associated time and expense." *Id.* This rule "obviates the application of both common-law conflict-of-laws principles and statutory choice-of-law directives, unless the parties expressly indicate otherwise." *Id.* at 468. *See also 2138747 Ontario, Inc. v. Samsung C & T Corp.*, 144 A.D.3d 122, 128 (1st Dep't 2016) ("*Ontario I*") (*Ministers* "clarif[ied] that New York courts are also prohibited from engaging in a conflict-of-law analysis where the parties include a choice-of-law provision in their contract"). The Court of Appeals recently reiterated this principle when it stated that "the parties' contractual choice of New York's substantive law . . . precluded application of New York's common-law conflict-of-laws principles." *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 31 N.Y.3d 372, 379 (2018) ("*Ontario II*").

167.    The *Ministers* court further noted that ignoring the parties' choice of law "would mean that contracts . . . could be interpreted differently for each [signatory] . . . It seems unlikely that [plaintiff] intended to have its contracts . . . interpreted in many different ways based on the whim and movements of [the signatories]" and pointed to the need for "predictable results" for parties in various jurisdictions, as otherwise plaintiff would need to "keep abreast of the laws of all other states and nations . . . which would invite the very uncertainties that [the parties] presumably intended to avoid." 26 N.Y.3d at 475-76.

168.    Courts since *Ministers* have held in light of that case that New York courts no longer engage in any conflicts analysis where the parties have agreed to a valid choice of law provision.  *In re LIBOR-Based Fin. Instrs. Antitrust Litig.*, 299 F. Supp. 3d 430, 596 n.176 (S.D.N.Y. 2018); *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 144 A.D.3d 122, 128 (1st Dep't 2016) (*Ministers* "clarif[ied] that New York courts are also prohibited from engaging in a conflict-of-law analysis where the parties include a choice-of-law provision in their contract").

169.    All three cases identified by the Second Circuit Court of Appeals in its Summary Order precede the Court of Appeals decision in *Ministers*.  Thus, for example, in *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364 (2015), the court applied the public policy exception from the common law conflict-of-law analysis because the then-binding law held that only contractual choice-of-law provisions *made pursuant to General Obligations Law § 5-1401*[7] precluded application of New York's common law conflict-of-laws principles.  *See IRB–Brasil Resseguros, S.A. v. Inepar Invs., S.A.*, 20 N.Y.3d 310, 315-16 (2012), *cert denied*, 569 U.S. 994 (2013).  It was

---

[7] General Obligations Law § 5-1401 allows parties to any contract arising out of a transaction in the amount of $250,000 or more to designate New York law as controlling, regardless of the parties' contacts with the state, and does "not apply to any contract, agreement or undertaking (a) for labor or personal services." N.Y. Gen. Oblig. Law § 5-1401(1) (McKinney).

only after *Brown & Brown* was decided that the *Ministers* court "extended [the *IRB–Brasil Resseguros*] holding to contracts outside the scope of General Obligations Law § 5–1401." *Ontario* II, 31 N.Y.3d at 379 (citing *Ministers*, 26 N.Y.3d at 473-475).

170.    Moreover, the *Brown v. Brown* court invalidated the parties' Florida choice of law provision because it would "violate the public policy of *this state*" – *i.e.,* New York. *Id.* at 367 (emphasis added).  The court also held that the party seeking to invoke the public policy exception would bear a "'heavy burden" of proving that application of [the chosen] law would be offensive to a fundamental public policy of *this State*" -- again, New York – because the exception is reserved "for those foreign laws that are truly obnoxious." *Brown & Brown*, 25 N.Y.3d at 368-69 (internal citations omitted; emphasis added). [8]

171.    Likewise, in *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624 (2006), the court was required to examine the policy considerations underlying a New York statute to determine whether it "embodie[d] a concept so fundamental to *our law* [i.e., *New York* law]" as to render the law chosen by the parties to govern their contract "truly obnoxious." *Id.* at 629-30.  The court ultimately determined that the plaintiff had "not sustained its 'heavy burden' of proving that application of Florida law would be offensive to a fundamental public policy of *this State* [again, New York]"). *Id.* at 632 (emphasis added).  A similar analysis was conducted in *Integra Optics, Inc. v. Messina*, 52 Misc.3d 1210(A) (N.Y. Sup. Ct. 2016), where the court determined that defendants could not credibly claim that the application of the parties' chosen law "would violate *New York's public policy*." *Id.* at *5 (emphasis added). [9]

---

[8] Additionally, *Brown & Brown* involved the analysis of a choice of law provision in an *employment* agreement, not a restricted stock award agreement made in connection with the sale of a business, as is the case here. *Id.* at 367.

[9] *Integra* also cited *Ministers* for the proposition that "[t]he starting point of the analysis must be the 'basic premises that the courts will generally enforce choice-of-law clauses and that contracts should be interpreted so as to effectuate the parties' intent.'" *Id.* at *5.

172.    Since *Ministers* was handed down, however, the courts of New York have refused to consider the public policy of *foreign states* – including California - to overturn an otherwise valid contractual choice of law provision. *See, e.g.*, *Gottwald v. Sebert*, 79 N.Y.S.3d 7 (App. Div. 2018) (rejecting claim that contract should be terminated for violating California Labor Code §2855, "as the unambiguous New York choice-of-law provisions contained in the agreements preclude the application of that California statue") (citing *Ministers*); *BDC Mgmt. Svcs., LLP et al. v. Singer et al.*, 41 N.Y.S.3d 419 (App. Div. 1st Dep't 2016) (rejecting argument that contract was illegal under New Jersey law where agreement contained New York choice of law provision because "[*Ministers*] precludes this court from considering New Jersey law when adjudicating the parties rights under the Acquisition Agreement.").

173.    In other words, the question is not whether Delaware law would violate *California's* fundamental public policy, but rather whether it would violate *New York's*. This is particularly evident because a requirement that New York courts consider the fundamental public policy of a *foreign law* would swallow whole the *Ministers* holding that courts need not engage in conflicts analysis. Here, there is no argument that application of Delaware law would violate *New York's* fundamental public policy. *See, e.g., TBA Global LLC v. Proscenium Events LLC*, 980 N.Y.S.2d 459 (N.Y. Sup. App. 2014) (finding no conflict between Delaware and New York law regarding enforceability of restrictive covenants).

174.    In this case, the RSA Agreements contain a Delaware choice-of-law provision and provide for exclusive venue in New York. Like the plaintiff in *Ministers*, Capstone (with the Equity Defendants' voluntary agreement) reasonably opted for the uniform enforceability of its equity incentive plan under Delaware law. Therefore, Delaware law governs the RSA Agreements.

175.    Even if this Court were to ignore *Ministers* and engage in a conflicts analysis despite the agreed-upon choice-of-law provision, the Defendants fail to meet their heavy burden to show that California law applies.

176.    The "substantial relationship" approach, as stated in Restatement (Second) of Conflicts of Law § 187(2), provides:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either
>
> (a)    the chosen state has no substantial relationship to the parties . . . or
>
> (b)    application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state . . . .

177.    The Equity Defendants cannot establish any of the conditions under § 187(2) necessary to depart from the application of the designated contractual law, Delaware.

### 1.    Delaware Has a Substantial Relationship to the Parties and This Dispute

178.    Plaintiffs Capstone Inc., Capstone LLC, and Pinnacle are all Delaware entities. (Taylor Decl. ¶¶ 3-5.)  Capstone offered the Equity Defendants, as senior officers, the opportunity to participate in Capstone's equity incentive plan and to receive shares of restricted stock in a Delaware entity in exchange for the terms set forth in the RSA Agreements.  The Equity Defendants executed without complaint the RSA Agreements as part of the Pinnacle Acquisition, not as a condition of employment.  (*Id.*)  They testified that they intended to honor the restrictive covenants therein when they signed the agreements.  *\*See*, e.g., Poffenberger Dep. I, AT 186:25-188:14.)

179.    The equity incentive plan in Capstone Inc., a Delaware corporation, provides the substantial contact with Delaware necessary to apply the parties' agreed-upon choice of law.

*Coface Collections N.A. Inc. v. Newton*, 430 F. App'x 162, 167 (3d Cir. 2011) ("incorporation in Delaware provides an adequate substantial relationship with the state of Delaware," with respect to enforcement of a Delaware choice-of-law provision in a contract); *Barton v. Martha Stewart Living Omnimedia, Inc.*, 2012 WL 4068576, at *4 (S.D.N.Y. Sept. 17, 2012) (defendant's incorporation in Delaware constituted a sufficient connection to Delaware to support a choice-of-law provision).

180.    In addition, many of Capstone's customers, including UNFI, Home Depot, and DPI are Delaware corporations with operations in Delaware.  (Davis Decl. ¶ 13.)

181.    By statute, a choice-of-law provision designating Delaware law "shall conclusively be presumed to be a significant, material, and reasonable relationship with [Delaware] and shall be enforced whether or not there are other relationships with [Delaware]." *See* Del. Code Ann. tit. 6, § 2708(a) (2018).  This indicates Delaware's substantial interest in having its law applied when contracts include a Delaware choice-of-law provision. *See also Coface*, 430 F. App'x at 167-68; *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1046 (Del. Ch. 2006) (citing § 2708 and holding that "Delaware law clearly has a material relationship to the transaction," given incorporation in Delaware, even where buyer's operations were located in Massachusetts, seller was located in Rhode Island, and the acquired company was headquartered in Ohio); *Kan-Di-Ki, LLC v. Suer*, C.A. No. 7937-VCP, 2015 WL 4503210 (Del. Ch. July 22, 2015).

182.    Since the Plaintiffs are Delaware companies and the Defendants voluntarily subjected their rights and obligations under the RSA Agreements to Delaware law, in exchange for equity in a Delaware company, Delaware has a substantial relationship to the parties and this dispute.

## 2.    California Does Not Have a Materially Greater Interest Than Delaware in this Dispute

183.    California does not have a materially greater interest than Delaware in this dispute. *See Kan-Di-Ki*, 2015 WL 4503210, at *18 (rejecting argument that California has a materially greater interest than Delaware in enforcement of restrictive covenant); *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 170-71 (S.D.N.Y. 2006) (holding that California does not have a materially greater interest than New York in a restrictive covenant that had a New York choice-of-law provision, even though the defendant was a California resident that worked in California, because defendant was responsible for business outside California and New York had an interest in protecting its businesses).

184.    Indeed, where the state of the chosen law has a compelling interest in the enforcement of a restrictive covenant, California courts will honor that choice of law even against a California resident. *See, e.g., Synthes, Inc. v. Knapp*, 250 F. Supp. 3d 644, 651 (E.D. Cal. 2017). That three of the four Individual Defendants reside in California, alone, is therefore not dispositive, particularly given that Defendants do not dispute that they worked with and solicited customers nationwide with headquarters, offices, and customer sites predominantly outside of California.

185.    As President of Pinnacle and then, after the Pinnacle Acquisition, Navarrete was responsible for operations at all company work sites - a total of 98 across 26 states and 2 Canadian provinces while with Pinnacle, and more than 300 in 48 states and 2 Canadian provinces with Capstone. (Tomcho Decl. ¶ 99.)

186.    Poffenberger's responsibilities as Senior Vice President of Operations were nearly as broad. At various times throughout his tenure with the Company, Poffenberger was responsible for customers headquartered in, among other states, New York, Rhode Island, Georgia, Tennessee, New Hampshire, Illinois, California, and Arizona. Just prior to his resignation from Capstone, he oversaw operations at 151 sites in 36 states (ranging all the way from Hawaii to New Hampshire,

47

and from Mississippi to Michigan) and 2 Canadian provinces (British Columbia and Ontario). (*Id.* at 100.)

187.    At that same time, Willis was responsible for 60 sites in 24 states and 2 Canadian provinces, and Rojas managed the UNFI relationship, which encompassed the corporate headquarters in Rhode Island and 24 sites in 15 states and two provinces. (*Id.* at 101.)

188.    As this Court previously found, when Defendants signed the RSA Agreements, they were not working for a company whose majority of sites were in California, or where even a majority of customers were California customers. (July 20, 2017 Tr. at 77.)

189.    Nor is Humano a California-centric business.  Humano itself has operations across the country.  Based upon Humano's website, they are currently servicing customers in Maryland, Texas, Colorado, and Oregon.  In their efforts to win the business of Capstone's customers both before and after the injunction, Navarrete and Poffenberger not only traveled to these states, but also met with Capstone's customers in Rhode Island, Tennessee, and South Carolina, among others. (Tomcho Decl. ¶¶ 96-105.)

190.    Had Defendants successfully poached UNFI (a Delaware corporation, headquartered in Rhode Island), for example, they would be servicing customer sites in New York, New Hampshire, New Jersey, Connecticut, Pennsylvania, Washington, Wisconsin, Iowa, Indiana, and Florida among other states.  Defendants' proposed contract to UNFI contemplated that Humano would be UNFI's exclusive provider for workforce logistics services in all of North America. (*Id.*)

191.    The employees who joined Defendants in their competitive efforts were also located outside California.  For example, Rojas is located in Texas, Valentine in Montana, O'Neill in Oregon, and Cook in Arizona—not to mention the dozens of associates they solicited to work

at customer sites all around the country, including in Maryland, Colorado, Oregon, and Texas. (*Id.*)

192.    Humano is thus a national business and the Defendants are competing against Plaintiffs outside of California.   To apply California law here would mean that a defendant responsible for business outside California could do an end-run around an agreed-upon restrictive covenant by moving to California and working remotely.

193.    Capstone's principal place of business is in Georgia and it operates in 48 states (*id.*), further indicating that, as between California and Delaware, the former lacks a materially greater interest in this dispute.

194.    Upholding the parties' Delaware choice-of-law provision also makes practical sense, because Capstone and its state of incorporation, Delaware, have a substantial interest in the uniform interpretation of a Delaware-based equity plan and stockholders agreement with participants in multiple states. *See Sensus USA, Inc. v. Franklin*, No. 15-cv-742, 2016 WL 1466488, at *4 (D. Del. Apr. 14, 2016) ("Delaware has a fundamental interest in allowing its citizens to use its law as a commercial lingua franca to transact business across borders.") (citing *Abry Partners*, 891 A.2d at 1049-50). Invalidating the provision would mean that stockholders in different states would be subject to varying laws, meaning the contracts "could be interpreted differently for each" stockholder, "based on the whim and movements" of the stockholders. *Ministers*, 26 N.Y.3d at 475-76.

195.    This reasoning has been applied to uphold choice-of-law provisions in similar executive compensation plans, despite arguments that the chosen law would violate public policy where the executive resided. *See Lucente v. IBM*, 75 F. Supp. 2d 169, 172 (S.D.N.Y. 1999) ("Executive compensation plans would be essentially worthless if their terms meant different

things to different participants based on a participant's residence."); *Estee Lauder*, 430 F. Supp. 2d at 173-75 (enforcing restrictive covenants in spite of defendant's argument that it would contravene California public policy, "given New York's interest in having a predictable body of law that companies can rely on when employing individuals who will have close contact with trade secrets and confidential information").[10]

196.    *Estee Lauder* is particularly instructive.  It upheld a New York forum selection clause and enforced restrictive covenants against a California employee, notwithstanding that the employee resided in California and had argued that enforcement of restrictive covenants contravenes California's public policy.  430 F. Supp. 2d at 173.

197.    Given the Defendants' work across the country and the strong interest in uniformity of interpretation of a Delaware-based equity plan and stockholders agreement, Defendants cannot meet their burden of proving that California has a materially greater interest than Delaware. Delaware law governs the RSA Agreements.[11]

### 2.    The RSA Agreements Do Not Violate California Public Policy

---

[10] *See also Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 608 (2d Cir. 1996) (holding that the parties' New York choice-of-law was appropriate where one party was incorporated in New York, despite a lack of other connections to the state, given the need for uniformity in a contract used nationwide); *Cordis Corp. v. Arterial Vascular Eng'g, Inc.*, 97-CV-778A, 1998 U.S. Dist. LEXIS 23871, at *51-52 (W.D.N.Y. March 19, 1998) (upholding choice-of-law provision in favor of New Jersey law, despite the fact that defendant was a New York resident, as plaintiff's parent company had a substantial interest in "ensuring uniform interpretation" of restrictive covenant agreements "for use throughout the country"), *aff'd* 175 F.3d 1007 (2d Cir. 1999).

[11] Notably, no fundamental policy of New York is violated by the enforcement of the restrictive covenants at issue here.  New York courts routinely enforce restrictive covenants against competition or customer solicitation where, as here, the covenants are reasonable and necessary to protect a legitimate business interest, such as customer relationships and goodwill.  *See, e.g., BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999); *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (enforcing restrictive covenants despite defendant's argument that California law applied, "given New York's interest in having a predictable body of law that companies can rely on when employing individuals who will have close contact with trade secrets and confidential information"); *Johnson Controls, Inc. v. A.P.T. Critical Sys.*, 323 F. Supp. 2d 525, 534 (S.D.N.Y. 2004) ("employer . . . has a legitimate interest in protecting client relationships developed by an employee at the employer's expense.").  Unlike *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364 (2015), where Florida law concerning restrictive covenants diverged widely from New York law, Delaware law regarding the enforcement of restrictive covenants is remarkably similar to New York law, for the reasons discussed *supra*.

198.    Even assuming California had a materially greater interest in the outcome of this dispute than Delaware, which this Court determines is not the case, the RSA Agreements do not violate California public policy.  California law *allows* the enforcement of restrictive covenants given in connection with the sale or disposition of all of the covenantor's interest in a business, as is the case here.  *See* Cal. Bus. & Prof. Code § 16601 ("Any person who sells the goodwill of a business . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on . . . ."); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 43 (1992) (upholding validity of five year covenant not to compete anywhere in the United States given in connection with sale of a business); *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *18 (Del. Ch. July 22, 2015) (applying Delaware law to a restrictive covenant, despite the fact that the defendant was a California resident; defendant's arguments that Delaware choice-of-law would undermine California public policy were unpersuasive, as California "generally does enforce non-competition agreements that were executed in connection with the sale of the goodwill of a business.").  California has *no fundamental public policy* against enforcing a reasonable restrictive covenant that is entered into in connection with the sale or disposition of a business.

199.    Defendants cannot meet their burden of proving that the RSA Agreements violate California's fundamental public policy.  Delaware law governs the RSA Agreements.

**C.    Plaintiffs Are Likely to Succeed on Their Breach of Contract Claim**

**1.    The Non-Solicitation Provision Is Enforceable Under Delaware Law**

200.    Under Delaware law, restrictive covenants such as those at issue in this case are enforceable if they (1) meet general contract law requirements; (2) are reasonable in scope and duration; (3) advance a legitimate economic interest of Capstone; and (4) survive a balance of the

equities. *See Am. Homepatient, Inc. v. Collier*, No. Civ. A. 274-N, 2006 WL 1134170, at *2 (Del. Ch. Apr. 19, 2006).

### (a)    The Restrictive Covenants in the RSA Agreement Meet General Contract Law Requirements.

20.    Under Delaware law, "[t]he formal elements required in an agreement not to compete are the same as those required for a contract in general, namely a mutual assent to the terms of the agreement by all parties and the existence of consideration." *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977). Delaware courts have recognized that continued employment is sufficient consideration to make a non-compete agreement enforceable. *See Am. Homepatient, Inc.*, 2006 WL 1134170 at *2; *All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *3 (Del. Ch. Aug. 9, 2004) ("In Delaware, employment or continued employment may serve as consideration for an at-will employee's agreement to a restrictive covenant."). Here, each of the Equity Defendants signed his RSA Agreement in conjunction with his participation in the equity incentive plan and continued access to Capstone's confidential information and trade secrets. Therefore, the RSA Agreements meet general contract law requirements.

### (b)    The Non-Solicitation Covenant Is Reasonable In Scope and Duration.

201.    Delaware courts have consistently held that two-year covenants not to compete are reasonable in duration. *See, e.g. Sensus USA, Inc. v. Franklin*, 2016 WL 1466488, at *7 (D. Del. April 14, 2016) ("Delaware courts have consistently found that two-year restrictions on covenants not to compete are reasonable, especially in industries where business transactions take years to conclude"); *COPI of Del., Inc. v. Kelly*, 1996 WL 633302 (Del. Ch. Oct. 25, 1996) (two-year restriction was reasonable for sales personnel with customer contact). Here, a two-year restriction is reasonable given (1) the Equity Defendants' high-level executive positions within the Company;

(2) their participation in the equity incentive plan; (3) their access to Plaintiffs' highly confidential information and trade secrets, including information relating to each customer contract, pricing, and employees and associates of the Company; and (4) the 90% year-over-year customer retention rate as advertised in Pinnacle's own documents prior to its acquisition.

202.    The geographic scope of the RSA Agreements is also reasonable.  Capstone's logistics business is a nationwide business, as evidenced by Defendants' own actions in soliciting customers and employees throughout the country.   Delaware courts have held in such circumstances that covenants not to compete and not to solicit without a geographic scope may be enforced. *See, e.g., Kan-Di-Ki,* 2015 WL 4503210, at \*20 ("If that market or the customer base of the business 'extends throughout the nation, or indeed even internationally, and the employee would *gain from the employment* some advantage in any part of that market,' then the employer and the business may enter into an enforceable contract prohibiting the employee 'from soliciting those customers on behalf of a competitor regardless of their geographic location'") (emphasis in original); *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at \*12 (Del. Ch. Oct. 23, 2002) ("the Court may, in the appropriate circumstances, enforce an agreement without express territorial scope and establish a reasonable geographical limitation where there is none in the Non-Competition Agreement"); *Research & Trading Corp. v. Pfuhl*, 1992 WL 345465, at \*12 (Del. Ch. Nov. 18, 1992) (enforcing non-compete and covenant not to solicit without a geographic restriction).

### (c)    The Non-Solicitation Provisions Advance Capstone's Legitimate Economic Interests.

203.    "Delaware courts have carved out a narrow list of legitimate business interests which companies may protect through the use of restrictive covenants," including "preserving employer goodwill and protecting an employer's confidential information, including customer lists,

pricing, trade secrets and proprietary information." *Sensus*, 2016 WL 1466488, at *7 (citing *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 156161, at *7-8 (Del. Ch. June 2, 2006)); *Delaware Exp. Shuttle*, 2002 WL 31458243 at *14 (finding that restrictive covenants on "key employees" with proprietary information serve legitimate business interests).

204.    Defendants, all high-level executives who previously had ownership interests in Pinnacle, were "key employees." In their roles as executives of the Company, they not only had unfettered access to confidential information, such as customer contracts, pricing, and the Company's financials, but they had direct responsibility for operational performance with respect to customers and cultivating those relationships both while at Pinnacle and at Capstone. The restrictive covenants are therefore necessary to protect Capstone's legitimate interests in preventing the Equity Defendants from taking advantage of such information against the Company's interests, or customer relationships and goodwill that Capstone either developed over the years with significant effort and expense, or purchased— including the $4 million buy-out paid to the Individual Defendants.

205.    Moreover, the agreements not to solicit Capstone's employees also serve Capstone's legitimate interest in protecting its goodwill and trade secret information. *Weichert Co. of Pennsylvania v. Young,* 2007 WL 4372823, at *4-*5 (Del. Ch. Dec. 7, 2007) (enforcing covenant not to solicit, hire, or retain any of the former employer's employees, because the employer has a "continued interest in protecting its goodwill, as well as the relationships it has developed with its employees and contractors through years of training"); *Sensus*, 2016 WL 1466488, at *1 (enforcing agreement not to solicit company's employees).

206.    In this case, the covenants not to solicit Capstone's employees protect Capstone's confidential information by making it less likely that such information will be divulged to

competitors. (Shelton Dep. at 71:16-72:18.) Such covenants also protect against a competitor poaching employees that Capstone had spent great efforts training. *Id.* 71:16-21. Moreover, in the logistics industry, whenever there is a transition to a new provider, there should be a transition protocol in place, which indeed Capstone sought to implement at the DPI sites. Poaching Capstone's employees undermines the implementation of an orderly transition.

### (d)    The Equities Balance in Favor of Enforcing the Restrictive Covenants.

207.    "Balancing the equities may weigh against enforcement 'where the interests the employer seeks to protect are ephemeral in contrast to the grave harm to the employee resulting from [enforcement].'" *Sensus*, 2016 WL 1466488, at *8 (quoting *Weichert Co. of Pennsylvania v. Young*, 2007 WL 4372823, at *5 (Del. Ch. Dec. 7, 2007)). The interests Capstone seeks to protect are far from ephemeral, but include its most valuable trade secrets and its biggest asset— its customer relationships. Pinnacle's own marketing materials boasted a 90% year-over-year customer retention rate.

208.    None of the Equity Defendants would suffer significant harm if an injunction is reinstated. Significantly, they were each paid substantial amounts as a consequence of the Pinnacle Acquisition, and they each agreed to participate in the equity incentive plan. Furthermore, the restrictions in the RSA Agreement are limited to a finite set of customers and a prohibition against working in workforce logistics. Just as the employee in *Sensus*, they are each "free to accept employment in a non-competitive industry," as Poffenberger and Willis claimed they would do when they resigned. *Id.* They are each "an experienced business professional who has not had issues finding employment." *Id.*

### 2.    Plaintiffs Have Shown that Defendants Have Likely Breached The RSA Agreement.

209.    There is no dispute that Defendants are competing with Capstone. (Navarrete Dep. I at 282:19-21; Willis Dep. I. at 87:6-15; Rojas Dep. at 29:18-22.)

210.    Plaintiffs have presented sufficient evidence demonstrating a likelihood of success that Defendants have violated their obligation not to solicit Capstone's customers for the purpose of providing services that compete with Capstone. As set forth in detail above, Defendants initiated contact, responded to RFPs and/or met with and made presentations to multiple Capstone customers, including DPI, UNFI, Home Depot, CVS, and Dollar General for the purpose of providing services that compete with Capstone. (*See supra* ¶¶ 60-68, 75-78, 85-87, 90-92, 124-138.) Specific examples in the record include:[12]

- **DPI**: DPI's corporate representative confirmed in his deposition that Humano solicited DPI. Poffenberger and Navarrete played an active role in terminating DPI's contract with Capstone. (Poffenberger Dep. I, at 189:21-190:8, 197:1-8-199:3; Navarrete Dep. I, at 71:13-23; 72:11-25; *see also supra* ¶¶ 66, 77, 78.)

- **UNFI**: Humano solicited UNFI as early as February 2017 (Navarrete Dep. I. at 112:17-19) and presented UNFI with a proposed contract that contemplated a takeover of all Capstone sites. (Yu Decl., Ex. 34.) Humano's RFP response stated that "humano's executive leadership has a long and successful history of service results, innovation to improve UNFI operational results, accurate invoice and data flow as well as operational stability. Bottom line is we know UNFI." (HL 5465, emphasis in original). Rojas and Willis admitted to having consulted on this presentation (and others). (Willis Dep. I at 228:5-8; Rojas Dep. at 130:2-132:3; Poffenberger Dep. I at 61:19-63:4). Poffenberger and Navarrete visited two UNFI locations on Humano's behalf. (Poffenberger Dep. I, at 56:14-57:8; *see also supra* ¶¶ 62-64).

- **CVS**: Defendants admit that they solicited CVS in March or April of 2017 (Poffenberger Dep. I, at 40:3-16;- 40:22-41:24; Navarrete Dep. I, at 89:12-0-81,- 90:16; ). Navarrete and Poffenberger drafted a presentation to CVS on Humano's behalf, and which they discussed with Willis, which stated "we know CVS." (Yu Decl., Ex. 27; Willis Dep. at 227:11-18; *see also supra* ¶ 65). This presentation was given to CVS in Rhode Island in May of 2017, with Navarrete and Poffenberger present. (Poffenberger Dep. I, at 42:7-17). Defendants continued to solicit CVS even after the injunction was entered. (*See supra* ¶¶ 131-133.).

---

[12] In addition to the below examles, Defendants also admit that they initiated contact with and solicited Home Depot, Albertsons, and WinCo as agents of Humano. Navarrete Dep. I, at 101:2-11, Navarrete Dep. III, at 61:1-5 (Home Depot)

- **Dollar General**: Defendants initiated contact with Capstone's customer, Dollar General, in July 2017, made several presentations before submitting a response to a RFP in May 2018. (*See supra* ¶¶ 124-129.)

211.   Plaintiffs have presented sufficient evidence demonstrating a likelihood of success that Defendants have violated their obligation not to solicit Capstone's employees. Navarrete testified that he asked Poffenberger in mid- to late-February 2017 if he wanted to join Humano. (Navarrete Dep. I at 171:23-172:5.) Poffenberger directed Willis to speak with Humano's VP of HR, O'Neill, about joining Humano. (Willis Dep. I, at 146:23-147:6). Defendants also solicited multiple site managers and Capstone's associates at several DPI sites prior to the expiration of Capstone's contract with DPI. (*See supra,* ¶¶ 96-110.)

### 3.   Even if California Law Applied (Which It Does Not), the Non-Solicitation Provision Would Still Be Enforceable

212.   Plaintiffs are likely to succeed on their breach of contract claims based on the employee non-solicitation provisions contained in the RSA Agreements even if California law applies. California courts consistently uphold the enforceability of employee nonsolicitation provisions. *See Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 279-80 (1985) (upholding one-year post-termination employee nonsolicitation provision); *Thomas Weisel Partners LLC v. BNP Paribas*, No. C 07–6198 MHP, 2010 WL 546497, at *6 (N.D. Cal. 2010) (finding one-year post-termination employee nonsolicitation provision enforceable); *Arthur J. Gallagher & Co. v. Lang*, No. C 14–0909 CW, 2014 WL 2195062, at *4 (N.D. Cal. May 23, 2014) (finding two-year post-termination employee nonsolicitation provision enforceable); *Dominion Enterprises v. LinkUSystems, Inc*, No. SACV 11-1852 DOC (ANx), 2012 WL 12886502, at *6 (C.D. Cal. Feb. 16, 2012) (refusing to dismiss claim for breach of employee nonsolicitation provision because, "California case law establishes the enforceability of such agreements.").

213.    Likewise, Plaintiffs are likely to succeed on their breach of contract claims even if California law applies, because the RSA Agreements were signed in connection with the sale of Pinnacle and the goodwill of Pinnacle's customer relationships that the Individual Defendants enjoyed as prior owners of Pinnacle.  (*See supra* ¶¶ 36-40.)

214.    Under California law, "[a]ny person who sells the goodwill of a business . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on.  Cal. Bus. & Prof. Code § 16601 (West 2018); *see also Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 43 n.5 (Cal. Ct. App. 1992) (upholding validity of nationwide five year non-compete given in connection with sale of a business); *Alliant Ins. Servs., Inc. v. Gaddy*, 159 Cal. App. 4th 1292, 1312 (Cal. Ct. App. 2008) (upholding enforcement of noncompetition and nonsolicitation covenants arising from $4.1 million sale of a business); *Monogram Indus., Inc. v. Sar Indus., Inc.*, 64 Cal. App. 3d 692, 697 (Cal. Ct. App. 1976) ("Covenants arising out of the sale of a business are more liberally enforced than those arising out of the employer-employee relationship").    Restrictive covenants made in connection with the sale of a business are enforceable even if they are contained in an employment agreement as opposed to a merger agreement. *See Hilb, Rogal & Hamilton Ins. Servs. v. Robb*, 33 Cal. App. 4th 1812, 1827 (1995) ("In sum, Business and Professions Code sections 16600 and 16601 do not render the noncompetition covenant invalid simply because it appears in the employment contract and not in the merger agreement.").

215.    California courts also enforce non-solicitation of customer covenants (and even non-competition covenants) to protect trade secrets. *See, e.g.*, *Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748, 758 (9th Cir. 2008); *Farmers Insurance Exchange v. Steele Insurance*

*Agency*, 2013 WL 3872950 (E.D. Cal. July 25, 2013) (non-compete and non-solicit agreements enforceable to protect trade secrets). Likewise, California courts have repeatedly held a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business. *See, e.g., Wanke, Indus., Commercial, Residential, Inc. v. Superior Court*, 209 Cal. App. 4th 1151 (Cal. Ct. App. 2012) (injunction prohibiting customer solicitation upheld); *Pyro Spectaculars N., Inc. v Souza*, 861 F Supp. 2d 1079 (E.D. Cal 2012); *Bank of Am., N.A. v. Lee*, No. CV 08–5546 CAS (JWJX), 2008 WL 4351348, at *6 (C.D. Cal. Sept. 22, 2008) (holding plaintiffs likely to succeed on breach of contract claim when trade secret exception applied to customer non-solicitation provision of contract).

216.    California Labor Law Code Section 925 is no bar to the enforcement of the restrictive covenants. That statute only applies to contracts entered into, modified, or extended on or after January 1, 2017. *See* Cal. Lab. Code § 925(f) (West 2018); *Scales v. Badger Daylighting Corp.*, No. 1:17-cv-00222-DAD-JLT, 2017 WL 2379933, at *5 (E.D. Cal. June 1, 2017) ("Plaintiff entered into the contract at issue here in August 2014 and terminated his employment with defendant in July 2016, before § 925 took effect. Therefore, by its very terms § 925 does not apply to the Agreement."). Here, the RSA Agreements were executed nearly 18 months before Section 925's effective date, and were neither modified nor extended thereafter.[13]

---

[13] Similarly, customer non-solicitation agreements are enforceable under New York law. *Integra Optics, Inc. v. Nash*, 2018 WL 2244460 (N.D.N.Y. April 10, 2018) (granting a preliminary injunction where defendants attempted to solicit plaintiff's clients because "the threatened diminishment of goodwill through the use of confidential proprietary information in violation of a restrictive covenant cannot be adequately compensated for through a monetary award"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ryan*, 73 F.Supp.2d 425, 428 (S.D.N.Y. 1999) (enjoining defendants from soliciting any business from any of plaintiff's clients whom defendants served or whose name became known to defendants while employed by plaintiff); *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F.Supp.2d 525 (S.D.N.Y. 2004) (granting a preliminary injunction to enforce a non-solicitation agreement prohibiting defendants from directly or indirectly servicing any of plaintiff's customers who had been served by defendant's or by another employee under defendants' supervision); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F.Supp.3d 326 (S.D.N.Y. 2018) (enforcing plaintiff's non-solicitation agreements because they were reasonable to the extent applicable to the solicitation of current clients).

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR MISAPPROPRIATION CLAIMS

217.    Plaintiffs have shown a likelihood of success on their misappropriation claims against all Defendants under both federal and state law.

218.    The Defend Trade Secrets Act of 2016 ("DTSA") defines a "trade secret" as

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if --
>
> (A)    the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B)    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C.A. § 1836(3).

219.    The DTSA forbids misappropriation of trade secrets.    The DTSA defines misapprorpriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5). Moreover, the DTSA expressly provides for the issuance of injunctions to maintain the sanctity of trade secrets. DTSA, 18 U.S.C. § 1836(b)(3).

220.    Under New York law, trade secrets are similarly defined as any compilation of information which is used in one's business and which gives it an opportunity to obtain an advantage over competitors who did not know or use it. *U.S. Reins. Corp. v. Humphreys*, 205 A.D.2d 187, 191 (1st Dep't 1994); *Restatement (Third) of Unfair Competition* § 39 & cmt. b

(1995); *Restatement of Torts* § 757 cmt. b (1939). To determine whether a trade secret exists, New York courts have considered the following factors:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (applying New York law).

221. Plaintiffs presented ample evidence that Defendants used Capstone's confidential files sufficient to demonstrate a likelihood of success on its misappropriation claim. As set forth in the record and in greater detail above:

- On January 20, 2017, Poffenberger forwarded confidential pricing information relating to each of Capstone's customer sites to his personal email account. (*Supra* ¶ 73.)

- In January 2017, Poffenberger accessed from Capstone's private database confidential contact information of each Capstone employee with access to its intranet, as well as information relating to all of the revenues, equipment fees, employee pay and other financial information relating to a UNFI site. (*Supra* ¶ 74.)

- Poffenberger retained and converted to Word a copy of Capstone's confidential contract with DPI after he left, which Navarrete used to prepare a proposed contract to DPI. (Poffenberger Dep. 257:20-258:23; *supra* ¶66, Yu Decl., Ex. 37.)

- Poffenberger retained and used Capstone files to solicit DPI. Before Poffenberger's last day, on March 10, 2017, Poffenberger shared a Capstone document entitled "DPI Prices Deember 2010.xlsx" form his personal email account with Erklenz. A month later, on March 31, 2017, Poffenberger (while he is no longer with Capstone) sent to DPI, at Erklenz's request, a copy of Capstone's contract with DPI from his personal email account. (*Supra* ¶¶ 75-76.)

- After the TRO was entered, Poffenberger was forced to return a USB drive to Capstone containing approximately 3,700 files, including many confidential Capstone files relating to key customers, which he inserted into his Humano computer. (*Supra* ¶ 76.)

- A forensic investigation of Poffenberger's computer also revealed that in April 2017, several weeks after leaving Capstone, Poffenberger used a USB drive to access a

confidential Capstone Focus Report containing confidential customer financial information. (*Supra* ¶ 82.)

- Poffenberger, Willis, Valentine, and Rojas all started secretly working for Humano before their respective departures, while still having access to Capstone's trade secret information up until the last days of employment. (*Supra* ¶¶ 69-74, 85-87, 90-91.) Indeed, as part of an email distribution network of senior personnel, they each regularly received reports and real time information relating to Capstone's customers and current financial performance. (Tomcho Decl. ¶¶ 72, 86, 92.)

- Poffenberger admitted to transferring his contact list before leaving Capstone. (Poffenberger Dep. I at 232:12-15.)

- After joining Humano, Rojas connected a USB drive containing confidential files relating to Capstone's customers, financials, and payroll to his computer, and viewed two Capstone files related to UNFI. (Vaughn Decl. ¶ 15; Rojas Dep. 126:1-127:1.)

- In June of 2017, O'Neill solicited Capstone employees at a DPI site knowing the site managers' exact salaries and the warehouse associates' wages for the previous weeks, which is confidential information she improperly obtained. (*Supra* ¶ 104.)

- Valentine forwarded a trove of Capstone Excel payroll templates containing specific wage and hour information for dozens of Capstone employees to Sarah O'Neill and Carolyn Cook. (*Supra* ¶ 117.)

- The training guide prepared by Valentine for both MobilTrak and Genesis are also virtually identical, reveaing that they were copied from Capstone's files. (*Supra* ¶ 158.)

- On June 10, 2017, Rojas sent an email with Navarrete and Poffenberger attaching his "risk assessment" of UNFI site managers, based on his experience as a Capstone employee and management of the UNFI relationship on Capstone's behalf. (*Supra* ¶ 92.)

- Defendants used the MobilTrak documentation and code to develop Genesis. (*Supra* ¶¶ 158, 162.)

222.    Capstone has sufficiently demonstrated that many of the foregoing documents are confidential and proprietary to Capstone. *See supra* ¶ 119.

223.    Under the DTSA, this is precisely the kind of information that provides Capstone with a competitive advantage and is considered a trade secret under the DTSA. *See Exec. Consulting Grp., LLC v. Baggot*, No. 18-cv-00231, 2018 WL 1942762, at \*9 (D. Colo. Apr. 25, 2018) (granting preliminary injunction enjoining defendant from using or in any way sharing

plaintiff's trade secret information, including "software or computer programs"); *Ford Motor Co. v. Launch Tech Co.,* No. 17-cv-12906, 2018 WL 1089276, at *17 (E.D. Mich. Feb. 26, 2018) (integrated diagnostic software constitutes a trade secret under DTSA); *Henry Schein, Inc. v. Cook*, 16-CV-03166-JST, 2016 WL 3212457, at *3 (N.D. Cal. June 30, 2016) ("[c]ustomer information such as sales history and customer needs and preferences constitute trade secrets"); *Allstate Ins. Co. v. Rote*, 3:16-CV_01432-HZ, 2016 WL 4191015, at *3 (D. Or. Aug. 7, 2016) (same); *Earthbound Corp. v. MiTek USA, Inc.*, C16-1150 RSM, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016) ("detailed information about . . . current and prospective customers, pending projects, bid, pricing, product design, and other elements of its business constitute trade secrets" under DTSA).[14]

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

225.     Separate and apart from Defendants' agreements, under the DTSA, courts may grant an injunction to prevent actual or threatened misappropriation, and conditioning restrictions on employment accordingly, *including* "conditions placed on . . . employment . . . based on evidence of threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A). *See Waymo v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *13 (N.D. Cal. Mar. 2, 2017) (enjoining defendant who downloaded 14,000 confidential files from former employer from working on certain self-driving automobile technology for Uber, despite Uber's denials that the information crossed to its servers). *See also Engility Corp. v. Daniels,* No. 16–cv–2473–WJM–MEH, 2016

---

[14] The obligation not to disclose confidential and trade secret information is present even in the absence of an express non-disclosure provision and, thus, equally applicable to Rojas, even though he did not sign the RSA Agreement. *See, e.g., B.U.S.A.*, 2006 WL 3302841, at *6 (defendant can misappropriate a trade secret without having entered into a confidentiality agreement).

WL 7034976, at *1 (D. Colo. Dec. 2, 2016) (enjoining defendant from competing for certain business for one year, despite defendant's claim that he no longer had access to trade secrets, where evidence was presented that he transferred proprietary information onto flash drives and then altered metadata before surrendering it); *W.W. Williams Co., LLC v. Reza*, 2:17-cv-01410, 2017 WL 5068522, at *2 (D. Nev. Sept. 20, 2017) (enjoining defendants from soliciting plaintiff's customers and employees under the DTSA).

## IV.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR BREACH OF DUTY OF LOYALTY CLAIMS

226.    Plaintiffs are likely to succeed on their claim that Poffenberger, Willis and Rojas each breached their respective duty of loyalty to Capstone. It is a "firmly established principle in the law of [New York] that [an employee] is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Maritime Fish Prods. v. World-Wide Prods.*, 100 A.D.2d 81, 88 (1st Dep't 1984); *accord DoubleClick, Inc. v. Henderson*, No. 116914/97, 1997 WL 731413, at *6 (Sup. Ct. N.Y. C'ty Nov. 5, 1997). The duty of good faith and loyalty to Capstone requiring the Individual Defendants to refrain from improperly using Capstone's confidential and trade secret information obtained while employed there remains in effect even after they leave the Company. *See Anacomp v. Shell Knob Servs., Inc.*, No. 93 Civ. 4003 (PKL), 1994 WL 9681, at *14 (S.D.N.Y. Jan. 10, 1994); *L.M. Rabinowitz & Co. v. Dasher*, 82 N.Y.S.2d 431, 435 (Sup. Ct. N.Y. C'ty 1948) ("[i]t is implied in every contract of employment that the employee will hold sacred any trade secrets or other confidential information which he acquires in the course of his employment. This is a duty that the employee assumes not only during his employment but after its termination.").

227.    Here, Plaintiffs have presented evidence showing that defendants Poffenberger, Willis, Rojas, and Valentine each started performing work for Humano while still employed by

Capstone, all under the direction of Navarrete.    The following facts in the record sufficiently

demonstrate a likelihood of success on the merits of a breach of duty of loyalty claim.

- Poffenberger was negotiating a license for the MobileFrame software on Humano's behalf on March 2, 2017 before he had signed his resignation papers with Capstone. (Yu Decl., Ex. 38.) The evidence also suggests that Poffenberger's efforts to transition DPI to Humano began while he was still under Capstone's employ. (*See supra*, at ¶¶ 75-76.)

- While Willis was still working for Capstone (and was responsible for the DPI account), he was simultaneously assisting on DPI's transition to Humano. (Willis Dep. at 37:3-38:3). Willis was notified of DPI's intent to terminate its relationship with Capstone prior to his last day with Capstone, and before Capstone received the notice of termination. Yet, he never informed Capstone that DPI would be terminating its relationship with Capstone or attempt to salvage the relationship. (*Id.* 171:5-172:9.) Willis also admitted to having performed work on Humano's behalf for a customer during his last two weeks as a Capstone employee, and booking flights to visit DPI on Humano's behalf prior to his last day. (*Id.*, 79:4-81:9, 195:17-196:5, 302:9-304:14; *see also supra* ¶¶ 85-88).[15]

- Rojas began working for Humano and visited a DPI site for Humano while still on Capstone's payroll. (Rojas Dep., 188:13-189:14; *see also supra* ¶ 91).

- On May 19, 2017, Valentine and Willis worked on a CVS presentation for Humano while both are still employed by Capstone. (*See supra*, at ¶¶ 85, 97.)

## V.    PLAINTIFFS HAVE DEMONSTRATED THAT THEY WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

228.    Under New York law, the use and disclosure of an employer's confidential

customer information and the possibility of loss of customers through such usage, constitutes

irreparable harm.    *Churchill Commc'ns Corp. v. Demyanovich*, 668 F. Supp. 207, 214-15

(S.D.N.Y. 1987); *see also Ayco Co. v. Frisch*, 795 F. Supp. 2d 193, 205 (N.D.N.Y. 2011) ("[T]he

loss of an employer's confidential customer information also constitutes irreparable harm.").

---

[15] On May 19, 2017, two weeks before his last day with Capstone, Willis reached out to Valentine from his Humano email account attaching a Humano PowerPoint presentation to a major Capstone customer and indicated that he would "call [Valentine] to review." (*Supra* ¶¶ 85, 97.)

229. "[W]hen a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm," and that damages are insufficient to compensate such loss, given the difficulty in calculating damages that would successfully redress the loss of a client relationship "that would produce an indeterminate amount of business in years to come." *Ayco*, 795 F. Supp. at 205 (citations omitted). *See also Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) (determining that defendant's solicitation of plaintiff's customers would likely cause plaintiff "to lose future sales, goodwill, and entire client accounts," which are not "readily remedied by money damages"); *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016) (noting that "the loss of client relationships and customer goodwill" resulting from breach of a non-compete "generally constitutes irreparable harm," and holding that movant established irreparable harm where the movant faced losing a customer's business to a former high-level executive).

230. In this case, Defendants have solicited some of Capstone's top customers. Capstone spent millions purchasing these relationships from Pinnacle, and they are collectively worth millions in annual revenues. It would be difficult to calculate damages resulting from the loss of such relationships, which would produce an indeterminate amount of business in years to come.

231. The Court previously noted that Capstone demonstrated that there would be "irreparable harm if [its confidential, proprietary, or trade secret information] are being used." (Tr. 90.) The Court also observed that there is irreparable harm if Capstone loses customers due to Defendants' improper actions, because if Capstone loses customers, they lose goodwill. (Tr. 59.) These statements still hold. Indeed, Capstone has already lost a long-time customer, DPI, and may lose more absent the reinstatement of the preliminary injunction. *See Bulman v. 2BKCO, Inc.*, 882

F. Supp. 2d 551, 564 (S.D.N.Y. 2012) ("prospective loss of goodwill alone is sufficient to support a finding of irreparable harm") (internal citations and alteration omitted).

232.   It would be exceedingly difficult calculcate Capstone's losses if Defendants are permitted to solicit Capstone customers and employees using Capstone's confidential information.

233.   Defendants' misappropriation of Plaintiffs' trade secrets also constitutes inrreparable injury. *See, e.g., Invesco Inst. (N.A.), Inc. v. Deutsche Inv. Mgmt Am.*, 74 A.D.3d 696, 697 (1st Dep't 2010) (irreparable injury may be established "where there is danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets.") (citing *Faively Trans. Malmo AB v. Wabtc Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). "'[A] trade secret once lost is, of course, lost forever.'" *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 628 (E.D.N.Y. 1996) (quoting *FMC Corp. v. Taiwan Tainan Gian Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)) (alteration in original).

234.   Lastly, Defendants' agreement that a violation of their restrictive covenants would result in irreparable harm supports a finding that allowing them to breach their agreements would cause such harm. *Ayco*, 795 F. Supp. 2d at 205, 207; *Marsh USA*, 183 F. Supp. 3d at 536 n.7.  For these reasons, Plaintiffs have demonstrated that they will suffer irreparable injury absent a preliminary injunction.

## VI.   THE BALANCE OF HARDSHIPS TIPS IN CAPSTONE'S FAVOR AND THE PUBLIC INTEREST IS NOT DISSERVED BY INJUNCTIVE RELIEF

235.   "[C]onsidering that the restriction was freely bargained for as part of a negotiated contract, it cannot be said that the equities favor defendant." *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 203 (1st Dep't 1996); *Aon Risk Svcs. v. Cusack*, 34 Misc.3d 1205(A), 2011 WL 6955890, at \*19 (Sup. Ct. NY C'ty Dec. 20, 2011) (the balance of hardships favored the plaintiff where employee "agreed to the restrictive covenant, and acknowledged that

injunctive relief would be appropriate when he signed his employment agreement"). Defendants were paid over $4 million from the Pinnacle Acquisition.

236.    Moreover, the Defendants are not enjoined from competing. They cannot claim an inability to earn a livelihood.

237.    This preliminary injunction prohibits customer and employee solicitation and misappropriation of confidential information. It is narrowly tailored so as not to contain a broad competitive restraint prohibiting Defendants from competing directly with Capstone.



239.    By contrast, without an injunction, Capstone will lose the confidentiality of its trade secrets, goodwill with its longstanding customers, and the benefit of its bargain in the Pinnacle Acquisition. Defendants have already taken a key Capstone customer ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when the initial preliminary injunction order was issued. None of the customer relationships at issue belong or belonged to Defendants. If anything, they belonged to Pinnacle, a plaintiff in this action, and those relationships and the associated goodwill were purchased by Capstone.

240.    Lastly, enforcement of the RSA Agreements is in the public interest. *H&R Block Tax Servs., LLC v. Strauss*, No. 1:15-CV-0085 (LEK/CFH), 2015 WL 470644, at *6 (N.D.N.Y. Feb. 4, 2015) ("The public has an interest in enforcing covenants not to compete contained within

valid contracts as long as the covenant is reasonably limited in scope, duration, and geographic region"). The Individual Defendants received large sums because they signed the RSA Agreements in connection with the sale of Pinnacle. In exchange, Plaintiffs are entitled to the benefit of their bargain.

* * *

For all of the reasons stated above, the Defendants are preliminarily and prospectively enjoined as follows:

1.  Defendants shall not, directly or indirectly, access, use, disclose, disseminate, or otherwise misappropriate any of Plaintiffs' confidential and proprietary information and trade secrets;

2.  Defendants shall not hire any of Plaintiffs' current employees or directly or indirectly induce or attempt to induce any employee, sales representative, consultant, or other agent of Plaintiffs to terminate his, her, or its relationship with, or breach any agreement with, Plaintiffs;

3.  Defendants shall not directly or indirectly:  (i) contact, solicit, service, or conduct business with any current customer of Plaintiffs for the purpose of providing products or services competitive with those offered by Plaintiffs; or (ii) request or advise any current customer or any supplier or vendor to withdraw, curtail, or cancel any of its business or relations with Plaintiffs;

**AND IT IS FURTHER ORDERED** that Defendants shall preserve and not destroy, damage, or alter in any way all potentially relevant evidence in this action;

**AND IT IS FURTHER ORDERED** that, to the extent they had not yet done so, Defendants shall return to Plaintiffs all Capstone property and all files or documents containing Capstone information or data of any kind;

**AND IT IS FURTHER ORDERED** that Plaintiffs' security bond in the amount of $100,000 shall remain in place.

Dated:  New York, New York
        October 25, 2018

SO ORDERED.

GEORGE B. DANIELS
United States District Judge