**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CAPSTONE LOGISTICS HOLDINGS, INC.;     :
CAPSTONE LOGISTICS, LLC; PINNACLE     :
WORKFORCE LOGISTICS, L.L.C.,     :
    :
                     Plaintiffs,     :     <u>MEMORANDUM DECISION</u>
    :     <u>AND ORDER</u>
      -against-     :
    :     17 Civ. 4819 (GBD) (BCM)
PEDRO NAVARRETE; DAVID POFFENBERGER;     :
STEVEN WILLIS; MARIO ROJAS; HUMANO, LLC,     :
    :
                     Defendants.     :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

       Plaintiffs Capstone Logistics Holdings, Inc., Capstone Logistics, LLC, and Pinnacle

Workforce Logistics, L.L.C. (collectively, "Plaintiffs" or "Capstone") bring claims against

Defendants Humano, LLC, Pedro Navarrete, David Poffenberger, Steven Willis, and Mario Rojas

(collectively, "Defendants"),[1] for breach of contract, misappropriation of trade secrets, breach of

fiduciary duty, tortious interference, fraud, unjust enrichment, copyright infringement, and unfair

competition. (Second Am. Compl., ECF No. 284 at ¶¶ 193–314.) Pending before this Court are

Plaintiffs' motion for summary judgment, (*see* Notice of Mot. for Summ. J. Pursuant to

Fed. R. Civ. P. 56, ECF No. 395), Plaintiffs' motion to seal certain exhibits on the record, (*see* Notice

of Mot. to File Under Seal Certain Exs. Designated by the Parties as Confidential or Att'ys' Eyes

Only, ECF No. 393), Plaintiffs' motion for sanctions, (*see* Notice of Mot. for Sanctions for Spoliation

---

[1] Each of the individual Defendants are previous employees of Capstone and transitioned their employment
to Humano, LLC. Previously, Defendant Navarrete served as President of Capstone, Defendant Poffenberger
served as Senior Vice President of Operations of Capstone, Defendant Willis served as Vice President of
Capstone, and Defendant Rojas held various titles at Capstone, and most recently held the position of Senior
Director of Partnership. (*See* Findings of Fact and Conclusions of Law ("FFCL"), ECF No. 353 at ¶¶ 31–34.)

of Evid., ECF No. 400), and Plaintiffs' motion to exclude the testimony of Defendants' expert

Classen Ward, (*see* Notice of Mot. to Exclude the Report and Test. of Ward Classen, ECF No. 390).

Additionally, Defendants move to vacate the preliminary injunction, which this Court upheld in its

October 25, 2018 Findings of Fact and Conclusions of Law ("FFCL"). (*See* Mot. to Vacate, or in the

Alternative, to Modify Prelim. Inj. ("Mot. to Vacate"), ECF No. 285.)[2]

The relevant factual background is set forth in the FFCL and is incorporated by reference

herein.[3] Plaintiffs' motion for summary judgment is GRANTED. Plaintiffs are entitled to monetary

damages to the extent they can prove them. The preliminary injunction is hereby replaced by a

permanent injunction. Defendants are permanently enjoined from directly or indirectly accessing,

using, disclosing, disseminating, or otherwise misappropriating any of Plaintiffs' confidential and

proprietary information and trade secrets, including but not limited to, Plaintiffs' MobilTrak

---

[2] On July 20, 2017, this Court held a hearing on Plaintiffs' motion for a preliminary injunction. (*See* Tr. of Oral Arg. dated July 20, 2017, ECF No. 84.) Eight days later, this Court issued a narrowly tailored injunction enjoining Defendants from soliciting or attempting to do business with Capstone's current customers, soliciting or hiring Capstone's employees, and using Plaintiffs' confidential, proprietary and trade secret information. (*See* Order for Prelim. Inj., ECF No. 86.) The Second Circuit vacated that injunction, remanding the issue to this Court to "make appropriate findings of fact and conclusions of law concerning whether plaintiffs are entitled to injunctive relief." (*See* Summ. Order, ECF No. 303.) Following that order, on October 25, 2018, this Court issued its Findings of Facts and Conclusions of Law in support of the preliminary injunction and reinstated the injunction. (*See* FFCL.) Defendants appealed that decision, (*see* Notice of Appeal, ECF No. 367), and subsequently filed a separate motion with this Court requesting that the preliminary injunction be vacated or modified, (*see* Mot. to Vacate). The Second Circuit partially remanded the issue to this Court for the "prompt resolution" of the preliminary injunction, holding that the injunction would remain in place until this Court issues its decision. (*See* Mandate, ECF No. 438.)

[3] Defendants argue that the FFCL "do[es] not constitute 'binding precedent' in this litigation, nor do[es] [it] form the 'law of the case' . . . [b]ecause the standards of proof for issuance of a preliminary injunction and a grant of summary judgment are so vastly different." (*See* Defs.' Opp'n to Pls.' Mot. for Summ. J. as to Liability ("Opp'n to Mot. for Summ. J."), ECF No. 419, at 3–4 (internal citations omitted).) Although Defendants are correct that this Court applies different standards in determining whether to grant a preliminary injunction or summary judgment, the FFCL summarized all the evidence, based on this Court's thorough review of the record, even unrelated to its ultimate decision regarding whether to issue a preliminary injunction. This Court hereby upholds the FFCL, as the evidence summarized therein has not changed.

technology.[4]  Plaintiffs' motion for sanctions is DENIED.  Plaintiffs' motion in limine to strike the testimony of Defendants' expert is GRANTED.[5]

## I.   LEGAL STANDARDS

### A. Motions for Summary Judgment.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248).

---

[4] The noncompetition and non-solicitation provisions contained in the Defendants' agreements with Capstone is for a term of two years after each employee's employment with Capstone ended. (*See* Decl. of Rick Tomcho, ECF No. 17 at ¶ 36, Ex. B § 8(c); Pls.' Rule 56.1 Statement of Material Facts as to Which There is Genuine Issue to be Tried ("Pls.' Rule 56.1 Statement"), ECF No. 397 at ¶ 98.) Defendant Navarrete separated from Capstone on May 21, 2016, Defendant Poffenberger on March 11, 2017, Defendant Willis on June 2, 2017, and Defendant Rojas on June 9, 2017. (See FFCL at ¶¶ 55, 69, 83, 89; *see also* Mot. to Vacate at 10.) As of the date of this decision, the preliminary injunction—which this Court originally imposed on July 28, 2017—has been in place for more than two years. As the Defendants note, (Mot. to Vacate at 1), the injunction no longer serves the purpose for which it was originally intended. Indeed, when this Court upheld the injunction in its FFCL in 2018, it did so because the provisions of the noncompetition and non-solicitation clauses had not yet fully lapsed. Plaintiffs argue that (1) this Court should impose the contracts' tolling provisions because Plaintiffs did not receive the "full benefit of the injunction" due to Defendants' alleged violation of the contracts, and (2) it is equitable for this Court to toll the provisions," (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Vacate, or in the Alternative, Modify Prelim. Inj., ECF No. 408 at 6–16). Although Defendants have never fully complied with its noncompetition and non-solicitation obligations, permanent— and not preliminary—injunctive relief is the appropriate remedy to ensure Plaintiffs' future protection.

[5] Plaintiffs request that certain exhibits be kept under seal. Specifically, these documents include Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21, 22, 27, and 36 to the Declaration of James S. Yu in support of Plaintiff's motion for summary judgment, Exhibits 5, 6, 7, and 8 to the Declaration of Rick Tomcho in support of Plaintiffs' motion for summary judgment, and Exhibits 1, 2, 3, 4, and 5 of the Declaration of Edward F. Maluf in support of Plaintiffs' motion to exclude the report and testimony of Ward Classen. (*See* Pls.' Mem. of Law in Supp. of Mot. to File Under Seal Certain Exs. Designated as Confidential or Att'ys' Eyes Only, ECF No. 394.) In light of the fact that Defendants do not oppose this request, Plaintiffs' motion to seal is GRANTED and these documents shall remain under seal, subject to any further order of this Court.

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor. *See id.* However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (internal citations omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

### B. Motions for Sanctions.

Where a party fails to obey a court's discovery order, Federal Rule of Civil Procedure 37 authorizes the court to "issue further just orders," such as "dismissing the action or proceeding in whole or in part." Fed. R. Civ. P. 37(b)(2)(A). "[D]istrict courts possess 'wide discretion' in imposing sanctions under Rule 37." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135

4

(2d Cir. 2007) (citation omitted).   "[A]ll litigants, including *pro ses*, have an obligation to comply with court orders."  *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (per curiam) (quoting *Minotti v. Lensink*, 895 F.2d 100, 103 (2d Cir. 1990)).   In exercising the court's discretion to impose sanctions under Rule 37, several factors are considered, including:  "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . non-compliance."  *World Wide Polymers, Inc., v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012).  No single factor is dispositive, and each factor need not weigh against the sanctioned party for the sanction to be appropriate.

## II.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IS GRANTED

### A. Plaintiffs Have Met the Standard for Summary Judgment on Their Breach of Contract Claim.[6]

It has been clear since the commencement of this action that the relevant contracts, *i.e.*, Defendants Navarrete's, Poffenberger's, and Willis's Restricted Stock Award ("RSA") agreements and Defendant Rojas's Roadlink agreement, intended to preclude those Individual Defendants[7] from competing with or poaching employees and/or customers of Plaintiffs for a period of two years

---

[6] Because Plaintiffs have successfully demonstrated that they are entitled to summary judgment on their breach of contract claim, Plaintiffs' duplicative claim for unjust enrichment is dismissed. *See Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 682–83 (S.D.N.Y. 2015) (explaining that under New York law, courts will typically dismiss an unjust enrichment claim where there was a valid and enforceable contract regarding which the party brings a duplicative breach of contract claim). Additionally, Plaintiffs bring a claim of fraud, alleging that they relied to their detriment on Defendants' representations that they would not work for a direct competitor or violate other obligations to Plaintiffs. This claim is also dismissed. A party's failure to follow through with its promise to do or not do something is appropriately brought through a breach of contract claim. *See Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 243 (S.D.N.Y. 2014) ("The Second Circuit has held that, as a general rule, the allegation that a party entered into a contract intending to breach that contract is insufficient to support a claim for fraud under New York law.") (internal citations omitted).

[7] The Individual Defendants are Pedro Navarrete, David Poffenberger, Steven Willis, and Mario Rojas.

following their respective departures from Capstone. (*See* FFCL at ¶¶ 41–54.) There is no dispute that despite signing these agreements, this is precisely what these Individual Defendants did. (*See id.* at ¶¶ 209–211 (summarizing evidence).) There is overwhelming evidence, as outlined in the FFCL, that Defendants utilized Plaintiffs' confidential information, gained through the Individual Defendants' respective positions at Capstone, to acquire business from, and compete with, Plaintiffs by poaching their important customers and employees. (*See id.* at ¶¶ 221 (summarizing evidence); Pls.' Rule 56.1 Statement at ¶¶ 243–272 (summarizing evidence).) Defendants assert that they are disputing this issue, but do not demonstrate that there are any facts in dispute—particularly considering that the Individual Defendants previously admitted to contacting and poaching Plaintiffs' clients even after the preliminary injunction was in place. (*See, e.g.*, July 12, 2017 Dep. of Pedro Navarrete at 282:19–21; July 12, 2017 Dep. of Steven Willis at 87:6–15; July 11, 2017 Dep. of Mario Rojas at 29:18–22).

Defendants also continue to rely upon their argument that this Court should apply California law, which precludes the enforcement of restrictive covenants. (*See* Opp'n to Mot. for Summ. J. at 4–6.) Not only has this Court previously ruled that under New York's choice of law rules, Delaware, and not California, law applies to the RSA agreements, it has also previously determined that the covenants are reasonable and enforceable. (*See* FFCL ¶¶ 5, 198.)

Additionally, it is undisputed that Texas law applies to Defendant Rojas's Roadlink agreement. (*See* Mem. of Law in Supp. of Pls.' Mot. for Summ. J. as to Liability ("Mem. in Supp. of Mot. for Summ. J."), ECF No. 399 at 5 n. 2; Opp'n to Mot. for Summ. J. at 8–9.) This Court reaches the same outcome when applying Texas law to that contract. Indeed, per Texas law, "[c]ovenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the

[Covenants Not to Compete] Act." *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011).[8] Texas Courts have engaged in a two-part inquiry to determine whether a covenant is enforceable under the Act. Indeed, they ask (1) "whether there is an 'otherwise enforceable agreement' between the parties," and (2) "whether the covenant is 'ancillary to or part of' that agreement." *Id.* at 771 (quoting *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009); *Light v. Centel Cellular Co. of Tex.,* 883 S.W.2d 642, 644 (Tex. 1994)). Texas courts also consider whether "the relationship between the otherwise enforceable agreement and the legitimate interest being protected is reasonable," and there is an "otherwise enforceable agreement" where "the covenant is 'part of an agreement that contained mutual non-illusory promises.'" *Id.* at 773 (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 648–49 (Tex. 2006)); *see also id.* at 778. "Consideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus; and there is no textual basis for excluding the protection of [ ] goodwill from the business interests that a noncompete may protect." *Id.* at 775. It is clear that the Roadlink agreement is a valid and enforceable agreement under Texas law. Indeed, there is an enforceable agreement and the restrictive covenant is ancillary to the agreement. Additionally, there is a reasonable connection between this covenant and Defendant Rojas's employment agreement, as it was reasonable for Plaintiffs to protect their interests when entrusting Defendant Rojas with certain trade secrets and proprietary information.

---

[8] Notably, in their attempt to dispute this principle, Defendants cite to precedent that is no longer valid law. (*See* Opp'n to Mot. for Summ. J. at 9 (citing *Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168, 170–71 (Tex. 1987)).)

### B. Plaintiffs Have Met the Standard for Summary Judgment on Their Claims of Misappropriation of Trade Secrets and Unfair Competition.

#### 1. Plaintiffs Have Successfully Demonstrated that Defendants Misappropriated Plaintiffs' Trade Secrets.

Under New York law, trade secrets are defined as any "compilation of information which is used in one's business which confers a competitive advantage" over competitors who did not know about or use it. *U.S. Reins. Corp. v. Humphreys*, 205 A.D.2d 187, 191 (1st Dep't 1994); *Restatement (Third) of Unfair Competition* § 39 & cmt. b (1995); *Restatement of Torts* § 757 cmt. b (1939). The record is full of evidence that the Individual Defendants[9] wrongfully retained and misused Capstone's trade secrets and confidential information in furtherance of Humano's business. (*See* FFCL at ¶¶ 55–95, 221–222 (summarizing evidence).) Additionally, the information that Defendants utilized is "precisely the kind of information," per the Defend Trade Secrets Act of 2016 ("DTSA"), "that provides Capstone with a competitive advantage and is considered a trade secret." (*Id.* at ¶ 223.) Defendants argue that Plaintiffs do not provide any specific material facts to support their argument, and that Defendants are unable to fully address their arguments due to "page

---

[9] The record is clear regarding the ways in which Defendants Navarrete, Poffenberger, and Rojas wrongfully utilized Plaintiffs' trade secrets. There is less direct evidence, however, with regard to Defendant Willis. Plaintiffs claim that, because of Defendants' spoliation of evidence on their computers—which this Court addresses below—Plaintiffs are entitled to a presumption that there was more evidence of misappropriation of trade secrets that was wrongfully destroyed. (*See* Mem. in Supp. of Mot. for Summ. J. at 19.) This Court has previously found that Defendant Willis began working for Humano before his last day at Capstone, (FFCL at ¶ 85), and that he worked to intentionally poach Capstone clients for Humano, (*see id.* at ¶¶ 85–88). Moreover, this Court found that after leaving Capstone but before returning his Capstone computer, Defendant Willis "authored two spreadsheets for Humano entitled 'DPI onsite contact list.xlsx' and 'DPI Onsite contact list-Copy2.xlsx.'" (*Id.* at ¶ 88.) By the time that Defendant Willis eventually returned the Capstone computer, he had re-installed the operating system, which deleted all content. (*Id.*) Due to the circumstantial evidence that Defendant Willis misappropriated trade secrets—*i.e.*, that he directly tried to poach Capstone's clients, had access to confidential Capstone information while doing so, and created a spreadsheet that likely was based off of this information—as well as Defendants' failure to allege any material facts in dispute, except to make the blanket assertion that Plaintiffs allege "complete fabrications," (Opp'n to Mot. for Summ. J. at 13–14), it is a reasonable conclusion that Defendant Willis misappropriated Capstone's confidential information.

restrictions." (Opp'n to Mot. for Summ. J. at 13–14.)  These arguments are unavailing when considering the overwhelming forensic evidence supporting Plaintiffs' claims.

Additionally, this Court rejects Defendants' argument that any trade secrets about which Plaintiffs bring this motion are not used in interstate commerce. (*See* Opp'n to Mot. for Summ. J. at 11–13.)  As Plaintiffs correctly note, the DTSA simply considers only whether trade secrets were *intended* for use in interstate commerce. (*See* Pls.' Reply in Supp. of Their Mot. for Summ. J. as to Liability ("Reply in Supp. of Mot. for Summ. J."), ECF No. 427 at 3–4.)  There is no reasonable dispute that Plaintiffs operate nationally, and that therefore, they intended to utilize their proprietary and confidential information in interstate commerce. (*See* FFCL at ¶¶ 10, 25.)

### 2. Plaintiffs Have Successfully Demonstrated that Defendants Have Engaged in Unfair Competition.

Plaintiffs allege that by utilizing Capstone's confidential information, Defendants have engaged in unfair competition. "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another" through "some element of bad faith." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (citations omitted).  It is generally comprised of "misappropriat[ing] for the commercial advantage of one person . . . a benefit or 'property' right belonging to another." *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (quoting *Metro. Opera Ass'n v. Wagner–Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492 (N.Y. Sup. Ct. 1950)).  Considering this Court's finding that Defendants breached their contracts with Plaintiffs, including by poaching Plaintiffs' clients and employees, and misappropriated Plaintiffs' trade secrets, it is clear that Defendants engaged in unfair competition.

**C. Plaintiffs Have Met the Standard for Summary Judgment on Their Claim of Breach of Fiduciary Duty and Humano's Aiding and Abetting a Breach of Fiduciary Duty.**

Plaintiffs assert that (1) Defendants Poffenberger, Willis, and Rojas each breached his fiduciary duty to Capstone, (2) Defendants Humano, Navarrete, Poffenberger, and Willis aided and abetted Defendant Rojas's breach of fiduciary duty, and (3) Defendant Poffenberger aided and abetted Defendant Willis's breach of his fiduciary duty to Capstone. (Mem. in Supp. of Mot. for Summ. J. at 23–24.)

### 1. Individual Defendants Poffenberger, Willis, and Rojas Breached Their Respective Fiduciary Duties.

Under New York law, to prove that an individual breached his or her fiduciary duty, a party must demonstrate: "(1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009). Here, it is clear that the individual Defendants Poffenberger, Willis, and Rojas each owed a fiduciary duty to Plaintiffs. A fiduciary relationship exists where one party puts "great confidence and trust" in the other and expects a "high degree of good faith" from the other. *Id.* (citation omitted). "[T]he existence of a fiduciary duty 'cannot be determined by recourse to rigid formulas' and often is a factual question. It arises . . . when a party 'reposes trust or confidence in another who thereby gains a resulting superiority or influence over the first,'" or "when a party exercises '*de facto* control' over or assumes responsibility for the affairs of another." *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 475 (S.D.N.Y. 2010) (footnotes and brackets omitted), *aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73 (2d Cir. 2011). "[I]t is well settled in New York that an employee owes a fiduciary duty to an employer in the performance of the employee's duties." *Benoit v. Commercial Capital Corp.*, No. 3 Civ. 5328, 2008 WL 3911007, at *9 (S.D.N.Y. Aug. 25, 2008). Additionally, it is a "firmly established principle in the law of [New York] that '[An employee] is prohibited from acting in any manner inconsistent

10

with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Maritime Fish Prods. v. World-Wide Prods.*, 100 A.D.2d 81, 88 (1st Dep't 1984).   Plaintiffs entrusted each of the Defendants with proprietary and confidential information, as part of the Defendants' employment with Capstone.   The fact that Defendants Poffenberger, Willis, and Rojas owed a fiduciary duty to Plaintiffs is further supported by their respective high-level positions at Capstone.   Defendants' only argument to the contrary is that because there is no contractual fiduciary duty, this issue should be left to a jury.   (Opp'n to Mot. for Summ. J. at 14–16.)   There is no material factual dispute as to the Defendants' duties or roles at Capstone—indeed, it is clear based on the record that Defendants owed a fiduciary duty to Plaintiffs. Therefore, this issue is not a jury question.

The evidence demonstrates that individual Defendants Poffenberger, Willis, and Rojas breached the fiduciary duty they owed to Plaintiffs.   It is well-established that "[w]hen an employee uses an employer's proprietary or confidential information when establishing a competing business, the employee breaches his or her fiduciary duty to the employer." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521 (S.D.N.Y. 2011).   An employee owing a fiduciary duty to his or her employer may not make arrangements to work for a competitor "at the employer's expense, and may not use the employer's resources, time, facilities, or confidential information," nor may the employee, while still employed, "solicit clients of his employer, . . . copy his employer's business records for his own use, . . . charge expenses to his employer, which were incurred while acting on behalf of his own interest, [or] . . . actively divert the employer's business for his own personal benefit or the benefit of others. *Id.* at 521–22. Defendants' actions, as described above, directly breached their fiduciary duty to Plaintiffs.

Finally, Plaintiffs clearly demonstrated that they suffered a loss as a result of Defendants' breach of their fiduciary duty, by—among other things—pointing to their loss of DPI as a client, after seven years of service. Indeed, this was a loss to Plaintiffs, as DPI was one of Pinnacle's top ten customers at the time of Capstone's acquisition of Pinnacle and was a significant customer of Capstone after the acquisition, generating over $600,000 in profits annually. (*See* FFCL at ¶ 68.)

### 2. Defendants Navarrete and Humano Aided and Abetted Defendant Rojas's Breach of Fiduciary Duty.

To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must demonstrate "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009). "A plaintiff must plead actual knowledge, as opposed to constructive knowledge . . . [b]ut the actual knowledge prong can also be met by pleading facts sufficient [to] give rise to a strong inference of conscious avoidance of actual knowledge." *In re MF Global Holdings Ltd. Inc. Litig.*, 998 F. Supp. 2d 157, 182 (S.D.N.Y. 2014) (internal citations omitted).

While the record would support a theory of aiding and abetting on behalf of each of the Defendants, Plaintiffs' claims for aiding and abetting against Individual Defendants Poffenberger and Willis are duplicative of their direct claims for breach of fiduciary duty. Therefore, this Court need consider only the claims for aiding and abetting a breach of fiduciary duty as they apply to Defendants Navarrete and Humano. *See, e.g., Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 412 (S.D.N.Y. 2013) (dismissing plaintiffs' claim for aiding and abetting breach of a fiduciary duty when that claim was duplicative of plaintiffs' claim of breach of fiduciary duty against the same defendant). Additionally, it is clear, based on the evidence in the record, that each of the defendants were aware of each other's fiduciary duties, considering they worked together

both at Capstone and Humano. It would defy logic to assume—nor do Defendants argue—that Defendants were unaware of each other's obligations or actions at either company. Additionally, and as described above, Plaintiffs have demonstrated that they have suffered actual damages as a result of the Defendants'—including Rojas's—breach of their fiduciary duties.

Defendants Navarrete and Humano were aware and actively participated in Defendant Rojas's breach. Indeed, Defendant Navarrete collected information about UNFI—one of Capstone's top customers—from Rojas, and further testified that he was leaning on Rojas's experience working with UNFI in order to bring UNFI over to Humano. (July 11, 2017 Dep. of Mario Rojas at 130:16–131:25; Aug. 6, 2018 Dep. of Pedro Navarrete at 50:15–51:5; *see also* FFCL at ¶ 91.) Additionally, Defendant Navarrete included Defendant Rojas in emails regarding presentations to UNFI, and also received emails from Defendant Rojas that outlined private information about UNFI, which Defendant Rojas obtained while working with Capstone. (Aug. 6, 2018 Dep. of David Poffenberger at 29:7–16; *see also* FFCL at ¶ 92.) As creator and leader of Humano, it is difficult to distinguish where Navarrete's actions ended and Humano's began. Indeed, the actions that he took, as agent of Humano, aided and abetted Rojas's breach of his fiduciary duty. Plaintiffs have therefore met their burden of demonstrating that the Individual Defendants breached their fiduciary duty, and Defendants Navarrete and Humano aided and abetted Rojas's breach of his fiduciary duty.

## D. Plaintiffs Have Met the Standard for Summary Judgment on Their Tortious Interference Claim.

Plaintiffs have adequately demonstrated that Defendants have tortuously interfered with their prospective economic advantage. To prove a claim of tortious interference under New York law, a plaintiff must demonstrate (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of that contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of

the contract"; and (5) "damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). Plaintiffs have met their burden. Plaintiffs had legitimate and enforceable business contracts with various clients, including DPI, of which Defendants were aware. As outlined in the FFCL and above, Defendants took intentional steps to interfere with those business relationships in order to transition Capstone's clients to Humano by wrongful means. As a result, Plaintiffs lost business with those clients.

Defendants' sole argument on this point appears to be that Plaintiffs cannot successfully bring a tortious interference claim without demonstrating malice on the part of Defendants. (*See* Opp'n to Mot. for Summ. J. at 16–17.) This assertion is unavailing. As Plaintiffs correctly note, as an alternative to proving malice for a claim of tortious interference, Plaintiffs may demonstrate that the allegedly tortious conduct was completed through "wrongful means." (Mem. in Supp. of Mot. for Summ. J. at 25–27.) *See also Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009) ("[Under New York law,] [a] defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed 'wrongful means.'"). In breach of their fiduciary duty and contractual obligations, Defendants misappropriated trade secrets in order to successfully grow their client base and interfere with Plaintiffs' business relationships, *i.e.*, used "wrongful means" to harm Plaintiffs' business. Plaintiffs have therefore met their burden in proving this claim.

### E. Plaintiffs Have Met the Standard for Summary Judgment on Their Copyright Infringement Claim.

Plaintiffs also move for summary judgment for copyright infringement with regard to four items: (1) MobilTrak (the source code);[10] (2) MobilTrak documentation; (3) MobilTrak 2.0

---

[10] MobilTrak is a workforce logistics data processing platform originally developed by Pinnacle and its predecessor. (*See* FFCL at ¶ 139.) Pinnacle's entire business infrastructure was built upon and operated on the MobilTrak platform. (*See id.* at ¶ 140.) MobilTrak leverages technology from a third party software

Overview; and (4) MobilTrak 2.0 Training (collectively, the "MobilTrak IP"). (*See* Mem. in Supp. of Mot. for Summ. J. at 29–39.) Specifically, they allege that Defendants "copied the MobilTrak IP to make the competing software program, Genesis, and its related documentation." (*Id.* at 30.)

Theo Townsend, a former Capstone employee, was one of the primary architects of MobilTrak. (*See* FFCL at ¶ 147.) He continued to work on and upgrade MobilTrak throughout his employment. (*See id.*) Others, including Matthew Fletcher—working in Capstone's Information Technology group at the time—and Joe Valentine—Capstone's Senior Business Analyst at the time—helped with the creation of MobilTrak. (*See id.* at ¶¶ 148–49.) At the deposition of MobileFrame, its representative confirmed that it does not own any applications or code that is built or used by its licensees, nor did it dispute that applications built by its licensees are proprietary to their licensees. (*See id.* at ¶ 151.)

Despite the several years it took to develop MobilTrak, Humano succeeded in building a similar platform—Genesis—in only three months. (*See id.* at ¶ 145.) Genesis was built using MobileFrame and Townsend was the principal architect of Genesis, along with help from Fletcher and Valentine. (*See id.* at ¶¶ 152–53.) Defendants also hired Theraytow Consulting ("Theraytow") as an independent contractor, and according to Defendants, Theraytow "was instructed specifically not to cut and paste or otherwise copy Capstone's program." (Opp'n to Mot. for Summ. J. at 21 (emphasis omitted).) Additionally, according to Townsend, although he was instructed to create a platform similar to MobilTrak, he was specifically directed to do some things differently. (*See id.* at ¶ 154; *see also* Decl. of James S. Yu in Supp. of Pls.' Mot. for Summ. J. as to Liability ("Yu Decl."),

<hr/>

platform called MobileFrame, which can be licensed from MobileFrame, LLC. (*See id.* at ¶ 141.) As this Court previously determined, "[w]ithout a robust workforce logistics software platform such as MobilTrak, it would be extremely inefficient to effectively perform logistics services nationally across multiple sites for multiple customers." (*See id.* at ¶ 144.) Creating MobilTrak took years to develop and refine, and Pinnacle had originally marketed the technology to Capstone as proprietary state-of-the-art technology. (*See id.* at ¶ 145.)

ECF No. 398, Ex. 5 (Excerpt of Tr. of Aug. 1, 2018 Dep. of Theodore Townsend ("Townsend Dep."), ECF No. 398-15, at 84:5-21.)  It is clear, however, that Townsend maintained meticulous documentation concerning the development and logic behind MobilTrak, and that Defendants used MobilTrak documentation to develop Genesis.  (*See* FFCL at ¶¶ 156–57.)  Indeed, not only is the documentation for the back-office applications of both platforms virtually identical, but many of the same sample screenshots used in the documentation are identical.  (*See id.* at ¶¶ 157–59.)  Perhaps most notably, a side-by-side comparison of the MobilTrak and Genesis source codes indicate that there are numerous instances of verbatim lines of code and identical errors throughout the code.  (*See id.* at ¶ 160.)

To prove copyright infringement, a Plaintiff must demonstrate that (1) the plaintiff was the owner of a valid copyright, and (2) defendants copied the original elements of that work.  *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)).  The Defendants argue that (1) Plaintiff's work is not original; (2) Defendants cannot be held liable for copyright infringement, considering the limited role they played in the creation of Genesis; and (3) Defendants did not obtain any financial benefit from the creation and use of Genesis.  (Opp'n to Mot. for Summ. J. at 20–24.)

Regarding the first issue, the evidence in the record supports a finding that MobilTrak is "original."  Plaintiffs describe, in detail, the "creative choices" made throughout the development of MobilTrak, as well as the fact that the program was written "from scratch."  (Mem. in Supp. of Mot. for Summ. J. at 32–33.)  Plaintiffs further rely upon testimony and expert opinions to support their argument that MobilTrak is original and incorporates creative choices by its builders.[11]  (*Id.*)

---

[11] For example, Plaintiffs point to the way MobilTrak looks and feels (including font, color, and language), the information included on each screen, the features it provides, the data it requires users to enter, the language it uses in communicating with users, and more. (*Id.* at 32.)

Defendants, however, assert that the merger doctrine applies—arguing that the question of whether MobilTrak was original is better left to the jury.  (Opp'n to Mot. for Summ. J. at 21–22.)  Pursuant to the merger doctrine, a Court will not afford protection for an expression "where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." *Kregos v. Assoc. Press*, 937 F.2d 700, 705 (2d Cir. 1991).  Defendants' theory is unavailing.  As Plaintiffs correctly note, while Defendants assert that there is a merger, they do not provide any evidence demonstrating that the idea behind the creation of MobilTrak is not distinguishable from its expression, or that there are no other methods or constructions that may be used to create the same type of technology.  (Reply in Supp. of Mot. for Summ. J. at 8–9; *see also* Mem. in Supp. of Mot. for Summ. J. at 33.)  Indeed, Plaintiffs' expert agreed that there are other ways to reach the same result, (*see* Yu Decl., Ex. 36 (Expert Report of Dr. Benjamin Goldberg), ECF No. 398-36 at ¶ 12(iv); *see also* Mem. in Supp. of Mot. for Summ. J. at 33), and even Townsend admitted during his deposition that he could have built Genesis on a different program or used a different code, and that there were alternative ways to reach the same result, (*see* Townsend Dep. at 213:4–6, 214:8–25, 253:15–254:9; *see also* Mem. in Supp. of Mot. for Summ. J. at 33).  Defendants therefore fail to carry their burden of demonstrating that the merger doctrine applies.

It is also clear that Defendants are responsible for the infringement of MobilTrak technology. As Plaintiffs properly explain, a company may be held liable for copyright infringement by engaging in a "volitional act that causes the alleged copying." (*See* Reply in Supp. of Mot. for Summ. J. at 9 (quoting *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 96 (2d Cir. 2016)).)  To support their claim that Defendants caused the infringement, Plaintiffs point to the undisputed facts that Defendants told Townsend to create a platform similar to MobilTrak and that Defendants were aware that those building the technology had the ability to infringe, evidenced by the fact that

Defendants told Theraytow not to copy and paste MobilTrak. (*Id.* at 9–10.) Defendants argue that they "reasonably relied upon Townsend's representations that the new program was built from scratch" and that they "stopped using Genesis after analysis of the source code revealed potential copying." (*See* Opp'n to Mot. for Summ. J. at 22.) Based on the evidence in the record, however, it was not reasonable for Defendants to rely upon any such assurances. First, Defendants used documentation virtually identical to that of Plaintiffs', and offer no explanation as to how they would not have noticed this. Additionally, it was unreasonable for Defendants to accept that Townsend was able to complete building Genesis in such a short period of time, given the extensive work he previously put into building MobilTrak. This is particularly unreasonable because Defendants were aware that individuals who were working on Genesis—who previously worked on the creation of MobilTrak—had access to and were capable of copying MobilTrak functionality and documentation. The Defendants, therefore, acted unreasonably in not checking on the program to ensure that there was no infringement on any copyright. *See, e.g., Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 434–35 (S.D.N.Y. 2011) (finding that a defendant can be found liable for vicarious copyright infringement if, *inter alia*, the defendant "had the ability to supervise or control the third parties' infringing activity and failed to do so"). The evidence minimally demonstrates that Defendants did not properly supervise the creation of Genesis, and instead, rushed a project that should have taken a great deal of time, causing Townsend and others to copy the MobilTrak technology.

Regarding the question of whether Defendants benefited from the infringed material, there is no genuine factual dispute. Humano utilized this technology to assist with its work in acquiring and keeping clients, including by transitioning DPI and other customers from Capstone to Humano. (*See* FFCL at ¶ 155; *see also* Mem. in Supp. of Mot. for Summ. J. at 38.) Defendants do not dispute

that Genesis was a major selling point in transitioning DPI over to Humano.  Therefore, Plaintiffs

have properly demonstrated that Defendants infringed on their copyrighted material.

## III.   PLAINTIFFS' MOTION TO STRIKE THE REPORT AND TESTIMONY OF DEFENDANTS' EXPERT IS GRANTED

In addition to their motion for summary judgment, Plaintiffs argue that this Court should

strike the report and testimony of Defendants' expert Ward Classen.  (*See* Pls.' Mem. of Law in

Supp. of Mot. to Exclude the Report and Test. of Ward Classen, ECF No. 392.)  The admissibility

of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which requires the

district court to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant

to the task at hand." *2 N.K. by Bruestle-Kumra v. Abbott Labs.*, 731 F. App'x 24, 26 (2d Cir. 2018)

(quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).  In assessing whether

expert testimony is reliable, "the district court should consider the indicia of reliability identified in

Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony

'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles

and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d

256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).

The Classen Report, includes various impermissible legal conclusions, including his opinion

that "[H]umano did not infringe on any allegedly copyrighted material" in its involvement in creating

Genesis.  (Additionally, the portions of Classen's report that appear to relate to the valuation of the

technology are irrelevant, based on his own deposition testimony.  Classen himself testified that

topics such as the valuation of the technology or the price that the average user would be willing to

pay are outside of the scope of his opinion and that he takes no position on those issues.  (*See* Maluf

Decl., Ex. 1 (Tr. of Ward Classen Dep.), ECF No. 391-1, at 130:20–131:3, 136:17–20, 152:22–

153:8, 171:6–173:3, 176:17–19, 177:13–16, 177:25–178:5, 178:18–24.)   Classen's testimony therefore does not meet the standard required by Rule 702, and is therefore stricken.

## IV.   PLAINTIFFS' MOTION FOR SANCTIONS IS DENIED

Plaintiffs allege that Defendants wrongfully destroyed evidence that was relevant to their claims. (*See* Pls.' Mot. for Sanctions for Spoliation of Evid. ("Mot. for Sanctions"), ECF No. 401.) To demonstrate spoliation of evidence, a party must demonstrate that (1) the party in control of the evidence was obligated to preserve it at the time it was destroyed; (2) the evidence was destroyed with a "culpable state of mind"; and (3) the evidence that was destroyed was relevant to the claims, "such that a reasonable trier of fact could find that it would support that claim or defense." *See Colon v. Metro-North Commuter R.R. Co.*, 778 F. App'x 7, 11 (2d Cir. 2019).   Defendants argue that any deletion of information or evidence occurred before the lawsuit was filed, and therefore they did not yet have an obligation to maintain or preserve it. (Defs.' Opp'n to Pls.' Mot. for Sanctions for Spoliation of Evid. ("Opp'n to Mot. for Sanctions"), ECF No. 412 at 9–10.)   Additionally, they assert that this is irrelevant anyway, because they eventually produced the information that Plaintiffs describe as destroyed. (*Id.* at 9–21.)

There are competing arguments as to when the Defendants' obligation to preserve began. While Defendants argue that it was on June 26, 2017, the date of the filing and service of the lawsuit, (Opp'n to Mot. for Sanctions at 9–10), Plaintiffs argue that Defendants reasonably should have known about the lawsuit "when they engaged in the conduct alleged," *i.e.*, when they violated their agreements and misappropriated documentation, (Mot. for Sanctions at 11).   Regardless, Defendants did not issue a litigation preservation notice until July 31, 2017—more than a month after Plaintiffs filed this lawsuit.   Defendants assert that individuals in the company were made aware of their obligation to preserve evidence through means other than a litigation hold notice—a strategic decision made with the help of their attorneys.   Considering that key employees at Humano did not

20

know about their obligation to maintain potential evidence, (*see, e.g.*, FFCL at ¶ 112 (summarizing evidence)), Defendants' methods of explaining their obligations within the company were inadequate—regardless of when their burden to do so began.

Additionally, James D. Vaughn, Plaintiffs' expert, provides a detailed account of the points in time at which Defendants deleted the information or utilized technology that effectively wiped data from computers—many of these points occurring even after the time that the lawsuit was filed, and including after this Court issued preservation orders.[12] (Decl. in Supp. of Pls.' Mot. for Sanctions for Spoliation of Evid. ("Vaughn Decl."), ECF No. 432; *see also* Mot. for Sanctions at 4–6.) Plaintiffs carry the burden of demonstrating that they did not actually receive the evidence. Of course, if Defendants did destroy evidence, it would be unreasonable to require Plaintiffs to indicate precisely what they are missing. It is therefore difficult for this Court to determine whether there was any additional physical documentation that Defendants deleted and that has not been produced to Plaintiffs. Plaintiffs, however, provide expert evidence that when Defendants deleted the evidence, even if the files themselves were produced later in time, any metadata associated with the files was permanently deleted and unrecoverable. (*See* Vaughn Decl. at ¶¶ 32–33; *see also* Decl. of Jim Vaughn in Supp. of Pls.' Mot. to Continue Prelim. Inj., ECF No. 285 at ¶ 37.) This metadata would have shown Plaintiffs whether the files were accessed, copied, or transmitted—which they claim would have lent further support for their claims. (Vaughn Decl. at ¶ 32; *see also* Mot. for Sanctions at 1–2.) Defendants do not dispute this point, and as described above, Defendants had an obligation to maintain this metadata.

---

[12] The evidence demonstrating that Defendants intentionally destroyed evidence or did not take appropriate and reasonable efforts to preserve evidence is summarized in this Court's previous decision. (*See id.* at ¶¶ 118–123.)

Plaintiffs request that this Court impose sanctions. Although Plaintiffs appear to have met their burden in demonstrating that Defendants destroyed certain evidence, this Court's previous and current orders have already provided Plaintiffs with adequate protection against the Defendants' actions. First, as described above, Plaintiffs are entitled to monetary damages for Defendants' misappropriation of trade secrets—the charge which they allege would have been further supported by any spoliated evidence. Second, this Court previously extended the preliminary injunction to apply throughout the period of this litigation, which eliminates the need for further sanctions. Finally, by granting monetary damages and permanent injunctive relief, Plaintiffs are protected from past or future injury that could potentially result from Defendants' misuse of any confidential information that they may possess or about which Plaintiffs may not be aware. Plaintiffs may pursue future violations of the permanent injunction, should any occur.

## V.   CONCLUSION

Plaintiffs' motion for summary judgment, (ECF No. 395), is GRANTED in their favor on their breach of contract, misappropriation of trade secrets, unfair competition, breach of fiduciary duty, tortious interference, and copyright infringement claims. Plaintiff is entitled to provable monetary damages. A permanent injunction is issued, providing that Defendants shall not, directly or indirectly, access, use, disclose, disseminate, or otherwise misappropriate any of Plaintiffs' confidential and proprietary information or trade secrets, or infringe on the MobilTrak IP.

The Clerk of Court is directed to close Plaintiffs' motion for sanctions, (ECF No. 400), Plaintiffs' motion to seal, (ECF No. 393), Plaintiffs' motion to strike the testimony of Defendants' expert, (ECF No. 390), and Defendants' motion to vacate the preliminary injunction, (ECF No. 353).

Dated: New York, New York
     June 23, 2020

SO ORDERED.

GEORGE B. DANIELS
United States District Judge